UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| HORIZON COMICS PRODUCTIONS, INC., | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| -against- | ) |
| | ) |
| MARVEL ENTERTAINMENT, LLC, ET AL. | ) |
| | ) |
| | ) |
| Defendant(s). | ) |

16-cv-2499-(JPO)

_____


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## <u>MOTION FOR SUMMARY JUDGMENT</u>

CHAFFETZ LINDSEY LLP
1700 Broadway, 33rd Floor
New York, New York 10019

HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022

*Attorneys for Defendants Marvel Entertainment,
LLC, MVL Film Finance, LLC, Marvel Worldwide,
Inc., Marvel Studios, LLC, DMG Entertainment,
LLC, and Walt Disney Studios Motion Pictures*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND...................................................................................2

    A.    Defendants' Lack of Access to the Caliban Drawing.................................3

         i.    Origin of the Caliban Drawing ......................................................3

         ii.   Plaintiff's Claim of Access...........................................................4

    B.    The Independent Creation of the *Iron Man 3* Poster.................................5

  I.    APPLICABLE LEGAL STANDARDS .............................................................10

    A.    Summary Judgment. .....................................................................................10

    B.    The Copyright Standard................................................................................11

  II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE HORIZON HAS NOT ESTABLISHED A *PRIMA FACIE* CASE OF COPYRIGHT INFRINGEMENT.......................................................................13

    A.    There Is No Evidence That the Creators of the *Iron Man 3* Poster Had Access to the Caliban Drawing........................................................13

         i.    Plaintiff Has Disavowed Ever Providing the Caliban Drawing to Anyone Associated With Defendants. .....................................13

         ii.   Displays of the Caliban Drawing at a Comic Book Convention in 2001 and on Horizon's Website From 2001 to 2003 Are Insufficient as a Matter of Law to Show Access. .................14

    B.    There is No "Striking Similarity" Between the Two Works. ...................19

  III.   THE UNREBUTTED RECORD EVIDENCE ESTABLISHES INDEPENDENT CREATION. .........................................................................21

CONCLUSION....................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Direct Mktg., Inc. v. Azad Int'l, Inc.*,
    783 F. Supp. 84 (E.D.N.Y. 1992)........................................................................12

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..........................................................................................10

*Computer Assocs. Int'l Inc. v. Altai Inc.*,
    982 F.2d 693 (2d Cir. 1992) ..............................................................................11

*Design Basics, LLC v. Lexington Homes Inc.*,
    858 F.3d 1093 (7th Cir. 2017) ...........................................................................15

*Dimmie v. Carey*,
    88 F. Supp. 2d 142 (S.D.N.Y. 2000) .................................................................21

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ..........................................................................................11

*Gal v. Viacom Int'l., Inc.*,
    518 F. Supp. 2d 526 (S.D.N.Y. 2007) .........................................................*passim*

*Jorgensen v. EpicSony Records*,
    351 F.3d 46 (2d Cir. 2003) ............................................................................*passim*

*Laureyssens v. Idea Grp. Inc.*,
    964 F.2d 131 (2d Cir. 1992) ..............................................................................11

*Meynart-Hanzel v. Turner Broad. Sys.*,
    No. 17 C 6308, 2018 WL 4467147 (N.D. Ill. Sept. 18, 2018).............................15

*Muller v. Twentieth Century Fox Film Corp.*,
    794 F. Supp. 2d 429 (S.D.N.Y. 2011) .........................................................*passim*

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
    590 F. Supp. 2d 500 (2008) .............................................................. 11, 15, 17, 18

*Price v. Fox Entm't Grp., Inc.*,
    499 F. Supp. 2d 382 (S.D.N.Y. 2007) ................................................................20

*Silberstein v. Fox Entm't Grp.*,
    424 F. Supp. 2d 616 (S.D.N.Y. 2004) .........................................................*passim*

*Tisi v. Patrick*,
    97 F. Supp. 2d 539 (S.D.N.Y. 2000).....................................................................................21

*Tomasini v. Walt Disney Co.*,
    84 F. Supp. 2d 516 (S.D.N.Y. 2000).....................................................................................15

*Vargas v. Transeau*,
    514 F. Supp. 2d 439 (S.D.N.Y. 2007).....................................................................................12

*Webb v. Stallone*,
    910 F. Supp. 2d 681 (S.D.N.Y. 2010).....................................................................................19

Defendants[1] submit this Memorandum of Law in support of their motion for summary judgment.[2]

## PRELIMINARY STATEMENT

Plaintiff's initial complaint, filed in April 2016, made the sweeping claim that Defendants had based the armored suits worn by the superhero Iron Man in the *Iron Man* and *Avengers* films on mechanical suits found in a trio of obscure comic books published in 2001 and 2002. That short-lived comics series, *Radix*, was created by two brothers, Ray and Ben Lai, operating as the owners of the plaintiff, Horizon Comics Productions, Inc. ("Horizon" or "Plaintiff").

Shortly after the complaint was filed and prior to taking any discovery, Defendants moved to dismiss the complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On March 27, 2017, the Court granted the motion as to Plaintiff's armored-suits claim, holding that "the mechanized armor employed by Marvel in its *Iron Man* and *Avengers* Films are, as a matter of law, not substantially similar to those created by Horizon and no reasonable juror, properly instructed, could conclude otherwise." *See* ECF No. 47 (the "MTD Dec.") at 11 – 14. But, while rejecting Plaintiff's broadside attack, the Court denied Defendants' motion with regard to a specific image created for and used to promote the 2013 film *Iron Man 3* (the "*Iron Man 3* Poster"), which Plaintiff claimed infringed an unpublished drawing it created in 2001 depicting a character from the *Radix* series (the "Caliban Drawing"). The Court stated it could not conclude "at this stage" that a jury could not find the two works "substantially similar." MTD Dec. at 10 – 11.

---

[1] Marvel Entertainment, LLC, MVL Film Finance, LLC, Marvel Worldwide, Inc., Marvel Studios, LLC, DMG Entertainment, LLC, and Walt Disney Studios Motion Pictures (collectively, "Defendants").

[2] In further support of this motion, Defendants submit herewith: (1) the Declaration of Sanford M. Litvack, dated March 25, 2019 (the "Litvack Declaration" or "Litvack Decl."), and the exhibits thereto; (2) the Declaration of Eli Bard, dated March 15, 2019 (the "Bard Decl."); (3) the Declaration of Warren Nung, dated March 19, 2019 (the "Nung Decl."), and the exhibits thereto; (4) the Declaration of William Jemas, Jr., dated October 23, 2018 (the "Jemas Decl."), and the exhibit thereto; and (5) their Rule 56.1 statement (in short form, "56.1").

With that slim reed in its pocket, Plaintiff embarked upon extensive discovery in a vain effort to show that Defendants had used the Caliban Drawing to create the *Iron Man 3* Poster. Now, after numerous depositions have been taken and tens of thousands of documents and other materials have been produced, it is time to put this claim to rest.

The undisputed facts, as set forth in Defendants' Rule 56.1 statement and below, show that: (1) Defendants never had access to the unpublished Caliban Drawing; and (2) the individuals responsible for the creation of the *Iron Man 3* Poster never heard of *Radix*, never saw a *Radix* comic, never saw the Caliban Drawing, and never heard of or met the Lai brothers. Indeed, the undisputed evidence is that defendant Walt Disney Studios Motion Pictures ("WDS" or "Disney Studios"), with the help of an outside vendor, embarked on a careful, detailed process, consistent with its usual procedures, to create promotional materials for *Iron Man 3*'s marketing campaign, including the central image on the *Iron Man 3* Poster. The record demonstrates that the WDS creative team mined the in-production *Iron Man 3* film and its themes for inspiration; crafted unique creative print and photographic materials; worked to meld those materials together in multiple drafts over a period of months; and, following feedback from the filmmakers and technicians, finally arrived at a finished product, the *Iron Man 3* Poster. In short, the record shows a clear-cut case of independent creation.

Because the record belies any claim that Defendants had access to or in any way copied the Caliban Drawing, and because the undisputed facts show that the *Iron Man 3* Poster was created independently, summary judgment is now appropriate.

## FACTUAL BACKGROUND

The material undisputed facts supporting this motion are set forth in Defendants' Rule 56.1 statement. For ease of reference we briefly summarize certain critical facts below.

### A.     Defendants' Lack of Access to the Caliban Drawing

#### i.     Origin of the Caliban Drawing

Horizon was formed in Canada in 1995 by the two Lai brothers, Ray and Ben.  56.1 ¶ 1.
During the first five years of its existence, the company did not produce any comic books or do
anything beyond some artwork for various studios.   Litvack Decl., Ex. I (hereinafter, "R. Lai
Tr."), at 9:5 – 10:6; 130:16 – 22.  The Lai brothers claim that during that time they also began to
work on what ultimately became the *Radix* comics.   *Id.* at 187:22 – 189:7.  But whatever they
were doing with respect to *Radix* was interrupted in 1999 when the brothers were hired to work
for CrossGen, at the time a publisher of comic books located in Tampa, Florida.   *Id.* at 42:20 –
43:8; *id.*, Ex. J (hereinafter, "B. Lai Tr."), at 16:14 – 17:24.  That job was, however, short lived;
Ben and Ray were both fired in October 2000, at which point they returned to Canada to work on
developing *Radix*.  *E.g.* R. Lai Tr. at 120:19 – 121:14.

The brothers ultimately produced three *Radix* comics, which were published between
December 2001 and June 2002.  56.1 ¶ 2.  The Caliban Drawing, which was produced in early
2001, was a standalone promotional image for the series (sometimes known as a "pinup"), and it
does not appear in any of the three published *Radix* comics.  *Id.* ¶¶ 3, 7.  In fact, Ray Lai testified
that only 10 or fewer copies of the Caliban Drawing were ever printed, and he does not know
what he did with them.  R. Lai Tr. at 115:20 – 116:7.

After publishing the last *Radix* comic, the Lai brothers had a short stint, beginning in late
2002 and ending in 2004, doing work for Marvel Comics as freelance artists.  *Id.* at 10:7 – 11:14;
B. Lai Tr. at 86:5 – 87:2.  They worked from their home in Canada; they never came to the
Marvel offices; and they do not claim to have given anyone access to the Caliban Drawing
during this time.  B. Lai Tr. at 29:18 – 34:5; 56.1 ¶ 6.  When the Lais stopped doing work for
Marvel in 2004, Ray Lai ceased all work in the comic field or as an artist.  Ben has continued to

do some work, but Horizon has not operated since 2004. R. Lai Tr. at 11:15 – 18, 94:22 – 25; B. Lai Tr. at 86:5 – 87:5.

### ii. Plaintiff's Claim of Access

Plaintiff claimed in its Initial Disclosures that it was aware of six individuals who purportedly had access to the Caliban Drawing: (1) Bill Jemas; (2) C.B. Cebulski; (3) Tom Brevoort; (4) Jeph Loeb; (5) Andy Park; and (6) Joe Quesada (the "Access Individuals"). 56.1 ¶ 4. Plaintiff elicited testimony from three of the six (Messers. Brevoort, Cebulski and Jemas) but chose not to pursue the other three (Messers. Loeb, Park and Quesada). *Id.* ¶ 5. Each of the testifying witnesses unequivocally denied ever receiving or having had any access to the Caliban Drawing. *Id.* ¶¶ 5, 8. [3]

That testimony is consistent with the testimony of the Lai brothers themselves, who affirmatively testified that they never provided any of the Access Individuals with a copy of the Caliban Drawing. 56.1 ¶ 6; R. Lai Tr. at 55:8 – 56:19 (never gave Jemas "any of the Radix art"); *id.* at 56:20 – 57:2 (the "same [was] true for Andy Park"); *id.* at 57:16 – 22 (the "same thing [was] true for" Quesada); *id.* at 59:8 – 21 (Ray Lai never gave Brevoort "any Radix art"); *id.* at 63:7 – 64:6 (the Caliban Drawing was "not anything you gave any of them," including Cebulski). All Plaintiff has ever claimed is that Ray Lai gave certain Access Individuals some unrelated art and his business card, the latter of which allegedly listed the address of Horizon's website, on which the Caliban Drawing supposedly could be found. 56.1 ¶ 9. Of course, if one tried to go to Horizon's website, one would have learned that the site only operated until 2003, and that even when it was operational, users would have had to navigate through several pages to get to a "pinup" gallery to find the image. *Id.* ¶ 10. In any event, and dispositively, there is no

---

[3] Neither in their disclosures nor since has the Plaintiff explained how these individuals allegedly had access to the Caliban drawing.

evidence that any Access Individual ever visited the site, let alone viewed the Caliban Drawing there. *Id.*[4]

The two Access Individuals who were deposed (Brevoort and Cebulski) testified that they had no role whatsoever in the creation of the *Iron Man 3* Poster, 56.1 ¶ 5, and there is no evidence that any of the other Access Individuals had any such role. Crucially, at their depositions, the Lais admitted that they never provided a copy of the Caliban Drawing to *anyone* associated with Defendants – including anyone at WDS or Marvel Studios who worked on the *Iron Man 3* Poster. 56.1 ¶ 6. As Ben Lai testified, he "never gave a copy" of the Caliban Drawing to "anyone in the world." B. Lai Tr. at 54:19 – 55:21.

### B. The Independent Creation of the *Iron Man 3* Poster

Work on the *Iron Man 3* Poster began in 2012 when John Sabel and Steve Nuchols, the individuals in charge of the Creative Print Services department at WDS, retained Warren Nung of BLT Communications ("BLT") to create ideas for potential posters for *Iron Man 3*. 56.1 ¶ 12, 16. Nung's team and Disney Studios had worked together over the years on a number of movies, *id.* ¶ 16, and others at BLT had worked with Paramount Pictures (the former distributor of Marvel Studios' films) on prior Marvel releases, including *Iron Man* and *Iron Man 2*. *Id.*

Once retained, Nung – who testified that he never saw the Caliban Drawing, never heard of *Radix* before this lawsuit, and never met the Lais, *id.* ¶¶ 15, 17 – reviewed a copy of *Iron Man 3*'s script and discussed potential ideas for posters with Sabel; Nung then worked with his staff to develop inspiration boards and sketches as possible concepts for the movie posters. *Id.* ¶¶ 25 – 26, 29. The inspiration boards were sourced from a variety of images, including art from the

---

[4] Brevoort and Cebulski both testified at their depositions that they had not seen the Caliban Drawing prior to the case. 56.1 ¶ 8. Jemas submitted a sworn statement that he had "never seen" the Caliban Drawing, "either before, during, or after my time" at Marvel Comics. *See* Jemas Decl. ¶ 4; 56.1 ¶ 8. Because Plaintiff did not depose Loeb, Park, or Quesada, the record contains no evidence that they ever visited Horizon's website or saw the Caliban Drawing there.

prior *Iron Man* movies and comics; they covered a range of images, moods, tones, and poses that would inspire additional thoughts for a poster. *Id.* ¶ 27. For instance, the boards had some figures in crouching poses, some not; some with mechanized suits, and some not, such as Spider-Man. *Id.*; Nung Decl., Ex. A. There is no evidence of the Caliban Drawing in any of these inspiration boards. 56.1 ¶ 28.

With the inspiration boards and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as a starting point, ▮▮▮ ▮▮▮▮, a BLT ▮▮▮▮▮▮, created black and white pencil sketches to be used as guides for an upcoming photo shoot WDS had arranged (the "Special Shoot"). 56.1 ¶ 29.






The photo shoot, which took place in August 2012, featured Robert Downey Jr. ("RDJ") and other key members of the cast of *Iron Man 3*. The WDS creative print team (Sabel and Nuchols), Nung, and the film's director and producers also attended, to oversee the shoot. *Id.* ¶¶ 31 – 32. RDJ appeared along with his personal hairstylist, who aided him in creating the hairstyle RDJ wanted to be used in the posters and other media. *Id.* ¶ 35.

Hundreds of photos were taken of RDJ in a myriad of poses, including some of him kneeling or crouching as shown in the *Iron Man 3* Poster. *Id.* ¶ 33. Several of the photos – including the very photos ultimately used to create key elements of the *Iron Man 3* Poster – capture RDJ looking down at BLT's sketches while kneeling or crouching, so as to capture the positioning and "look" the WDS and BLT creative teams were seeking. *Id.* ¶ 34.

 

After the Special Shoot, the BLT team began to assemble draft composite marketing and promotional images, using the Special Shoot materials, stock photography, and original art. *Id.*

¶¶ 36 – 37.   Hundreds of these composite images, known as "comps," were created over a 6-month period ████████████████████████████████████████

████████████████ *Id.* ¶¶ 37, 41.

To choose the image that would ultimately become the *Iron Man 3* Poster, a number of possibilities were considered, but the favorite was the image of RDJ emerging from the sea with a determined look on his face – a look captured in one of the pictures taken at the Special Shoot – set before a background of Iron Man's destroyed cliffside mansion and other Iron Man armors soaring into the sky.  This particular imagery invoked two scenes from *Iron Man 3* that appeared in the film's trailers – a helicopter attack on Iron Man's mansion, and a climactic battle involving dozens of Iron Man armors, *see* Litvack Decl., Ex. F, at 33:44 – 40:06, 1:41:30 – 1:42:18 – and had tested well with audiences who had seen the trailers.[5]  56.1 ¶¶ 38 – 40.    The use of those new, dramatic moments from *Iron Man 3* made this poster concept particularly appealing and a good fit with the film's overall themes; as Nuchols put it, the helicopter attack "was a huge, dramatic moment that we . . . wanted to get out there for fans to realize he's being brought down."  Litvack Decl., Ex. N, at 39:25 – 40:23.

On November 30, 2012, Sabel and Nuchols met with the film's directors, the marketing team, and others, to try to come to a decision on which of the many draft theatrical posters BLT had created would be used as the poster for the so-called payoff campaign. 56.1 ¶¶ 41 – 42. Sabel brought a stack of "comps" with him for discussion, *id.* ¶ 42, but the upshot of the meeting was that the "image of battle-scarred Iron Man emerging from [the] water, with multiple suits flying toward the sky" was the front runner.  *Id.*  But the race was not over; during the next few months more tweaking was done by the creative team as they developed "revised comps," with

---

[5] The trailers are available for viewing at the following links:  (1) https://www.youtube.com/watch?v=2CzoSeClcw0; and (2) https://www.youtube.com/watch?v=YLorLVa95Xo.

some further differences among them, for additional consideration. *Id.* ¶ 43.

In January 2013, Marvel Studios' visual effects ("VFX") team offered feedback on the existing "comp," suggesting modifications to the images of Iron Man's suit to make them closer to those depicted in the film. *Id.* ¶ 44. Some of the VFX team's proposed changes were adopted and some were not because, while conformance to the film was important, the creative image for the poster was for the creative print and production teams to decide. *Id.* In February 2013, the film's producers signed off on the *Iron Man 3* Poster and the creative print team proceeded to have it debuted later that month. *Id.* ¶ 46.

Before the poster was finalized, BLT sent WDS and Marvel Studios "callout" documents identifying, by source and serial number, every photographic and artistic element depicted in the *Iron Man 3* Poster, so that Marvel Studios' legal team could "clear" any license rights needed for those materials. *Id.* ¶ 45. There is, of course, no element based upon or having anything to do with the Caliban Drawing. Rather, the cited elements include stock photography, photos from the Special Shoot (the file names of which contain "SS" in some form), and BLT assets. *Id.*



In particular, the "callout" documents show that the photos used for Iron Man's head, shoulders, arms, and fist (among other elements) were all taken at the Special Shoot. *Id.*



These "callout" documents, in other words, provide the final bit of evidence confirming that the *Iron Man 3* Poster was independently created by Defendants' personnel and was in no way created from or connected to the Caliban Drawing.

**ARGUMENT**

## I.     APPLICABLE LEGAL STANDARDS

### A.     Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Defendants are entitled to summary judgment if they "demonstrate the absence of material evidence supporting an essential element of [Plaintiff's] copyright infringement claim." *Jorgensen v. EpicSony Records*, 351 F.3d 46, 50

- 10 -

(2d Cir. 2003). "[T]o avoid summary judgment, [Plaintiff] may not rely simply on conclusory allegations or speculation, but must instead offer evidence to show that its version of the events is not wholly fanciful." *Id.* at 51 (internal citations and quotations omitted).

### B. The Copyright Standard.

To establish a *prima facie* case of copyright infringement, a plaintiff must present substantial evidence that it owns a copyright and that the defendants actually copied some original, protected expression from the plaintiff's work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).[6] "[A]s an initial matter, a plaintiff must show that the defendant 'actually copied' his or her work." *Gal v. Viacom Int'l., Inc.*, 518 F. Supp. 2d 526, 536-37 (S.D.N.Y. 2007) (quoting *Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001)). Where, as here, there is no direct evidence of actual copying, "a copyright plaintiff's circumstantial proof of copying requires a showing of both access *and* probative similarity." *Jorgensen*, 351 F.3d at 51.[7] In this case the record is clear that Plaintiff can show neither.

With respect to access, the courts have been quite clear that in order "[t]o support a claim

---

[6] For purposes of this motion only, Defendants assume that Horizon owns a valid U.S. copyright in the Caliban Drawing, in the sense that the work has been registered and the copyright has not been assigned by Horizon to any third party.

[7] Similarities between two works are probative only if the similarities "would not be expected to arise if the works had been created independently." *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 517 (2008) (citing *Velez v. Sony Discos,* No. 05 Civ. 0615, 2007 WL 120686, at *6 (S.D.N.Y. Jan. 16, 2007)). Similarities are not probative of copying when they are "common or stock themes that appear often in these types of works." *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 443 (S.D.N.Y. 2011) (Chin, J.). "Probative similarity" is distinct from the concept of "substantial similarity." The former goes to whether any actual copying has occurred at all. "Substantial similarity," on the other hand, goes to "whether the copying was 'illicit,' that is to say whether . . . 'the defendant wrongfully appropriated something." *Computer Assocs. Int'l Inc. v. Altai Inc.*, 982 F.2d 693, 713 (2d Cir. 1992) (quoting *Arnstein v. Porter,* 154 F.2d 464, 473 (2d Cir. 1946)). Substantial similarity need only be considered *after* a plaintiff establishes a *prima facie* case of actual copying. *See, e.g., Laureyssens v. Idea Grp. Inc.*, 964 F.2d 131, 140 (2d Cir. 1992) ("If actual copying is established, a plaintiff must then show that the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists between the two works.").

At the motion-to-dismiss stage, this Court held that Horizon had plausibly alleged that the *Iron Man 3* Poster was "substantially similar" to the Caliban Drawing. *See* MTD Dec. at 10 – 11. While Defendants are not seeking summary judgment on the question of substantial similarity, Defendants dispute that any substantial similarity exists between any "protected material" in the two works, and reserve all their rights with respect to this issue.

of access, a plaintiff must offer 'significant, affirmative and probative evidence.'" *Gal*, 518 F. Supp. 2d at 538 (quoting *Jorgensen*, 351 F.3d at 51). More precisely put, "[a]ccess means that an alleged infringer had a reasonable possibility – not simply a bare possibility – of hearing [or seeing] the prior work; access cannot be based on mere speculation or conjecture." *Jorgensen,* 351 F.3d at 51 (internal quotations omitted).

Since Plaintiff cannot meet the requisite standard to show access, probative similarities – even if they existed – would not be sufficient to make out a *prima facie* case of actual copying. Thus, here, Plaintiff must go further and satisfy the demanding standard of proving that the two works are "strikingly similar." "Striking similarity exists when two works are so nearly alike that the only reasonable explanation for such a great degree of similarity is that the latter was copied from the first." *Am. Direct Mktg., Inc. v. Azad Int'l, Inc.,* 783 F. Supp. 84, 95 (E.D.N.Y. 1992) (internal quotation marks and ellipses omitted). In other words, the "striking similarity" test is "stringent," *Vargas v. Transeau,* 514 F. Supp. 2d 439. 445 (S.D.N.Y. 2007), and requires more than a showing of probative or "substantial similarity," *id.; see also Gal*, 518 F. Supp. 2d at 537-38.

Finally, even if a plaintiff proffers evidence supporting a *prima face* case of infringement, a defendant may still prevail at summary judgment by demonstrating independent creation of the allegedly infringing work. "Evidence of independent creation is an established ground for granting summary judgment." *Silberstein v. Fox Entm't Grp.*, 424 F. Supp. 2d 616, 628 (S.D.N.Y. 2004) (citing cases); *see also Muller*, 794 F. Supp. 2d at 439 ("A defendant may rebut a prima facie case of infringement by introducing evidence of independent creation.") (citing *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997)). Evidence of independent creation is particularly compelling "where an element occurs both in the defendant's prior work and the

plaintiff's prior work," because "no inference of copying can be drawn." *Muller*, 794 F. Supp. 2d at 444 (quoting *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 326 (6th Cir. 2004)).

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE HORIZON HAS NOT ESTABLISHED A *PRIMA FACIE* CASE OF COPYRIGHT INFRINGEMENT.

### A. There Is No Evidence That the Creators of the *Iron Man 3* Poster Had Access to the Caliban Drawing.

To establish a triable issue of fact on access, Plaintiff is required to proffer evidence that the creators of the *Iron Man 3* Poster – *i.e.*, the creative print team at WDS, headed by John Sabel and Steve Nuchols, and those with whom they worked, *see supra* at 5 – 9 – had access to the Caliban Drawing. In fact, the evidence is that *nobody* had access to Horizon's unpublished promotional image.

#### i. Plaintiff Has Disavowed Ever Providing the Caliban Drawing to Anyone Associated With Defendants.

Plaintiff's complaint alleges that "the Lai brother's [sic] submitted their work in *Radix* to Defendants." Compl. ¶ 29. As to the Caliban Drawing, this allegation is totally unfounded. At their depositions, both of Horizon's principals testified under oath that they *never* provided *any* employee of *any* Defendant with a copy of the Caliban Drawing. Ray Lai testified that he "didn't give [the Caliban Drawing] to "anyone at Marvel or anyone anywhere." R. Lai Tr. at 116:6; 116:18 – 22; *see also* 56.1 ¶ 6. Ben Lai's testimony was consistent. *See* B. Lai Tr. at 54:20 – 55:21.

These sworn statements are unambiguous, and foreclose a link between Plaintiff's work and the "alleged infringers." *Jorgensen,* 351 F.3d at 51; *see also Silberstein*, 424 F. Supp. 2d at 625 (plaintiff was required to show that the "creators of *Ice Age*" had access to his work, not others at the movie studio or other corporate affiliates). Not surprisingly, the Lais' testimony

was consistent with each of the witnesses involved in the creation of the *Iron Man 3* Poster, all of whom expressly disavowed ever seeing the Caliban Drawing or even knowing what *Radix* was. *See* 56.1 ¶ 8 (citing testimony of Sabel, Nuchols, Nung, Pasciullo, and Crumpacker).

> ### ii. Displays of the Caliban Drawing at a Comic Book Convention in 2001 and on Horizon's Website From 2001 to 2003 Are Insufficient as a Matter of Law to Show Access.

With no evidence that anyone had access to the Caliban Drawing, Plaintiff is forced to rely for its claim of "access" on the assertion that the drawing was hung on a wall at a booth at a comic book convention in 2001, and then appeared in a "pinup" gallery on Horizon's website during part of the period between 2001 and 2003, when Horizon's website was operational. 56.1 ¶¶ 9 – 10. While courts will infer access where works are "widely distributed," neither the single posting on a wall nor its presence on a website a decade before the alleged infringement would come close to meeting that standard.[8]

The courts have been clear that a work is "widely distributed," such that access may be inferred, "exclusively [where] the allegedly infringed work has had considerable commercial success or is readily available on the market." *Silberstein*, 424 F. Supp. 2d at 627. The examples cited in *Silberstein* include extremely popular hit songs and products continually marketed and advertised on a nationwide basis. *See id.* Horizon, of course, does not and could not claim to have ever produced or sold the Caliban Drawing for widespread consumption, much less achieved any commercial success with what was concededly a piece of promotional art. "[N]o inference of access may therefore be drawn . . . absent any signs that [plaintiff's work] was, even for a moment, popular or widely available for public consumption." *Id.*

---

[8] Ray Lai testified that while he printed 10 (or fewer) hard copies of the Caliban Drawing, he did "not recall what happened to them." R. Lai Tr. at 115:20 – 116:7. For obvious reasons, that is not proof of access by Defendants.

The two public displays of the Caliban Drawing claimed by Ray Lai fall well short of creating any inference of access in this case. First, whether or not the Caliban Drawing appeared on a wall at a booth at a comic book convention in 2001 is irrelevant because there is no evidence that anyone involved with the creation of the *Iron Man 3* Poster attended any such convention, much less visited Plaintiff's booth. *Cf.* 56.1 ¶ 8. And even if they had (and there is no such evidence), that would be insufficient to create an inference of access in the face of those individuals' sworn testimony that they never saw the Caliban Drawing. *See, e.g.*, *Tomasini v. Walt Disney Co.*, 84 F. Supp. 2d 516, 521 (S.D.N.Y. 2000) (proof that certain Disney executives attended "the 1992 Toy Fair" with plaintiff's licensing agent was "simply too speculative to give rise to a reasonable possibility of access" absent any evidence that those executives and the agent actually discussed plaintiff's work at the event).

Similarly, the Caliban Drawing's supposed availability on Horizon's website is also unavailing. "[T]he mere fact that [Plaintiff's] work was posted on the internet prior to the creation of [D]efendants' work is insufficient by itself to demonstrate wide dissemination." *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 516 (S.D.N.Y. 2008) (Stein, J.); *see also Design Basics, LLC v. Lexington Homes Inc.*, 858 F.3d 1093, 1108 (7th Cir. 2017) ("[T]he existence of the plaintiff's copyrighted materials on the Internet, even on a public and 'user-friendly' site, cannot by itself justify an inference that defendant accessed those materials"); *Meynart-Hanzel v. Turner Broad. Sys.*, No. 17 C 6308, 2018 WL 4467147, at *6 (N.D. Ill. Sept. 18, 2018) (holding, on a Rule 12(b)(6) motion, that plaintiff's claim that its work had been posted on YouTube was insufficient to *plausibly allege* access). Crucially, Plaintiff has not presented any proof that anyone involved in the creation of the *Iron Man 3* Poster (or any Access Individual, for that matter) ever visited Horizon's website. *See Design Basics*, 858 F.3d

at 1106 (internet presence insufficient absent evidence that the relevant individuals "ever

accessed the site"); *Silberstein*, 424 F. Supp. 2d at 626-27 ("The bare possibility that a defendant

may have seen a plaintiff's copyrighted material through some public medium is not sufficient to

create a genuine issue of fact as to access.").

The record in this case is particularly compelling because it shows that access via

Horizon's website would have been highly implausible, if not flatly impossible: (1) Ray Lai

testified that Horizon's website was "not active or available . . . certainly from 2003 on," Ray Lai

Tr. at 145:4 – 147:25; (2) there is no evidence that anyone on the *Iron Man 3* Poster's creative

team even knew *Radix* existed, let alone that Horizon had a website; and (3) work on the *Iron*

*Man 3* Poster did not begin for almost another decade after the site had cratered, *see supra* at 4.

In short, the presence of the Caliban Drawing on a website does not even rise to the level of a

"bare possibility" of access, which would not be enough in any event. *Jorgensen,* 351 F.3d at

51.

Moreover, even if there were any proof that an *Access Individual* (*supra* at 4) had seen

the Caliban Drawing on a wall in 2001 or on Horizon's website, that would not be sufficient

because there is no "nexus between the [Access Individuals] and the alleged infringers."

*Jorgensen*, 351 F.3d at 53. Absent any evidence (and there is none) that an Access Individual

ever shared the Caliban Drawing with anyone who worked on the *Iron Man 3* Poster, there

cannot be any inference of access. *See, e.g.*, *Gal*, 518 F. Supp. 2d at 538-39 ("[Plaintiff] has

conceded that she herself never submitted her Screenplay to any of the defendants or persons

employed by defendants who were involved in the creation of Clark's Novel, and that she had no

knowledge that any of the people to whom she had sent or shown any version or part of her

Screenplay had shown it to any of the defendants or anyone connected with them. . . . Here,

plaintiff has not established . . . a chain of events that could lead a reasonable juror to find that the persons involved in the creation of Clark's Novel had access to her Screenplay").[9]

The *O'Keefe* case is directly on point, and devastating to Horizon. There, plaintiff claimed to have sent an email containing a link to plaintiff's website to the director of the graphic design group at the advertising agency Ogilvy & Mather. *See* 590 F. Supp. 2d at 509. More than a year later, different individuals at Ogilvy began work on an advertising campaign for American Express that allegedly infringed portions of plaintiff's website – portions that were not visible from the site's home page. *Id.* at 508-10. Plaintiff claimed that because he never received any notification that the director did *not* receive the email, it was fair to infer that the director received and read the email, clicked on the link to plaintiff's website, "and in fact copied the website" to share with his Ogilvy colleagues. *Id.* at 516. Judge Stein rejected this speculative theory as "patently insufficient evidence" of access, *id.*, given: (1) the director's denials that he saw the email in question, visited plaintiff's website, or navigated onto the interior pages containing the allegedly infringed materials, *id.* at 515-16; (2) the denials of the "alleged infringers" at Ogilvy that the director had shared anything with them, *id.*; and (3) the absence of any contradictory evidence.

The undisputed facts here make any inference of indirect access even more speculative and unreasonable than in *O'Keefe* – where the alleged intermediary (the director) at least knew and worked in the same office as the alleged Ogilvy infringers at the time of the alleged infringement, and the copying supposedly occurred roughly a year after the director received the

---

[9] The only Access Individuals deposed by Plaintiff – Brevoort and Cebulski – testified under oath that they had no connection to the development of the *Iron Man 3* Poster. 56.1 ¶ 5. *See Muller*, 794 F. Supp. 2d at 442 (finding no inference of indirect access via independent producers was permissible where "there is no evidence that [the] independent producers . . . were involved in any aspect of the [allegedly infringing] film," the producers "stated that they never . . . provided it to anyone" who worked on the film, and plaintiff "has offered no evidence to contradict these sworn statements").

email in question.[10]  Not so here.  In 2003 – *i.e.*, the last point at which an Access Individual could have theoretically unearthed the Caliban Drawing on Horizon's website – Marvel Comics was *not* part of The Walt Disney Company ("TWDC"), and would not become one for at least another seven years.[11]  And any alleged copying occurred *more than ten years* after Horizon's website ceased to operate.  Thus, any claim of "indirect" access requires a host of implausible and frankly bizarre assumptions; namely that (1) at some time between 2001 and 2003, someone associated with Marvel Comics visited Horizon's website; (2) browsed the site, found the particular Caliban Drawing, and was so struck by it that; (3) he or she then decided to *save* the drawing *for a decade or more*, to share with a *future* corporate affiliate; and (4) then remembered the drawing and sent it to someone who was also so enamored with the drawing that he or she decided to copy it to promote the multi-million-dollar blockbuster *Iron Man 3*.  To call that farfetched would be a monumental understatement.  Yet, with no "significant, affirmative and probative evidence" of access, *see Jorgensen*, 351 F.3d at 51, that is what Plaintiff is forced to claim.

To paraphrase Judge Holwell's particularly apt words from *Silberstein*: "Ultimately, [P]laintiff's claim of access is based upon speculation and conjecture, not on evidence showing a reasonable possibility that the creators of [the *Iron Man 3* Poster] ever had access to [the Caliban Drawing]." *Silberstein*, 424 F. Supp. 2d at 627.  But "[c]onjecture cannot create a genuine issue of material fact as to access," *id.*, and Horizon's claim must fail.

---

[10] Even so, Judge Stein found that no reasonable inference of access was permissible.  *See O'Keefe*, 590 F. Supp. 2d at 510-11.

[11] Marvel Comics is and always has been based in New York City – a continent away from Disney and Marvel Studios.  Nor was any Marvel entity in the movie production business in 2003.  Marvel Studios did not actually produce one of its own films until 2008 (the first *Iron Man*), and did not become a TWDC affiliate (along with Marvel Comics) until the beginning of 2010.  *See* Bard Decl. ¶¶ 4 – 5; Litvack Decl., Ex. C.

**B.    There is No "Striking Similarity" Between the Two Works.**

Because Horizon has presented no triable issue of fact as to access, its copyright claim fails under the law of this Circuit unless it can meet the "stringent" test of showing that the two works are "strikingly similar" – namely, that the works are "so *identical* as to preclude any reasonable possibility of independent creation." *Webb v. Stallone*, 910 F. Supp. 2d 681, 687 (S.D.N.Y. 2010) (emphasis in original).  Horizon cannot do so, for multiple reasons.

*First*, all or almost all of what might be deemed similarities between the two works – the fighting pose, the mechanical suits, the blue lights, and red-colored armor – are scenes-a-faire, which count for nothing in the striking similarity analysis.  *See Webb*, 910 F. Supp. 2d at 688-89 (alleged similarities between two works were "simple stock devices that are standard in action movies" and thus did not "come[ ] anywhere near striking similarity"); *Muller*, 794 F. Supp. 2d at 443 (shared elements that were "common or stock themes that appear often in these types of works" insufficient to show striking similarity).[12]

*Second*, even if the few shared elements between the Caliban Drawing and the *Iron Man 3* Poster were not scenes-a-faire, "[m]ere multiple similarities are insufficient."  *Gal*, 518 F. Supp. 2d at 543.  While the Court previously held that it could not conclude, on a Rule 12(b)(6) motion, that a jury could not find that the two works were "substantially similar," *supra* at 11 n.7, the test for "striking similarity" requires Plaintiff to clear a much higher bar.[13]  In the "striking similarity" context, the court must consider both similarities *and differences* between

---

[12] The Court has already held that the "fighting pose" is "a scene a faire in the superhero or comic book context." MTD Dec. at 8.  The "stock" nature of the "glowing blue lights" and coloring of the suits is confirmed by the unrebutted expert testimony of Defendants' expert Klaus Janson – an acclaimed graphic artist with 45 years of experience in comics.  *See* Expert Report of Klaus Janson, dated Nov. 27, 2018 (the "Janson Report" or "Janson Rep.") ¶¶ 58 – 60, 64 – 66 (citing examples), attached as Exhibit Z to the Litvack Declaration.  Ben Lai also testified that blue lighting was "a fairly common thing to appear in a science fiction context."  B. Lai Tr. 72:20 – 73:3.

[13] *See id.* ("Plaintiff's reliance throughout her brief on the 'law of the case' doctrine is . . . misplaced, because invocation of that doctrine presumes that on this motion the Court is to evaluate the two works according to the same 'substantially similar' standard it applied to the earlier motion to dismiss. . . .  [T]hat more lenient standard is now inapplicable.")

the two works, and evaluate whether, considered as a whole, copying is the *only* reasonable conclusion. *See, e.g.*, *Price v. Fox Entm't Grp., Inc.,* 499 F. Supp. 2d 382, 388 (S.D.N.Y. 2007) ("Although various similarities do exist . . . there are sufficient dissimilarities that foreclose a finding of striking similarity.").

Here, there are more than "sufficient dissimilarities" between the works to "foreclose a finding of striking similarity." *Id.* For instance, there are significant and undeniable differences in the expression of the supposedly shared elements between the two works (*i.e.*, differences in pose, differing placement of blue lights, and significantly different overall coloring).[14] And the contexts of the two works could not be more different. The Radix figure appears in a void, with no background or context whatsoever; he has no friends, enemies, or interactions. *See, e.g.*, Janson Rep. ¶ 49. In contrast, Iron Man appears in the midst of an ongoing battle – damaged, crouched on a piece of debris floating in the ocean – while in the background, Iron Man's cliffside mansion burns and tumbles into the sea, and an armada of other Iron Men soar into the sky. *Id.* ¶ 48. Notably, this is not *any* battle. To the contrary, the poster specifically recalls two of the most important and gripping scenes from *Iron Man 3:* (1) a helicopter attack on Stark's home in which Iron Man and his girlfriend Pepper Potts (played by Gwyneth Paltrow) barely survive, Litvack Decl., Ex. F, at 33:44 – 40:06; and (2) a climactic battle between dozens of Iron Men suits (including the suits depicted in prior *Iron Man* movies) and the film's villains at a port, *id.* at 1:41:30 – 1:42:18.

In other words, the *Iron Man 3* Poster depicts a rich and textured scene, filled with notable narrative elements ripped from the film; it tells a story of Iron Man's impending

---

[14] The Court has also previously noted that the blue lights on the two suits are "executed in different ways," MTD Dec. at 10; that "the color of the suits differs," *id.*; and that "the notches in the shoulder covers differ in their details," given that "Iron Man's shoulder is capped with a boxy, gold shoulder cover, while the Radix suit is rounded," *id.* Any "general" similarity between the "look" of the shoulders is not a *striking* similarity.

payback, with help from his armored friends.  *See also supra* at 8.  But Caliban, like the cheese, stands alone.  Where, as here, the similarities between two works consist of "common or stock" elements, and "the inescapable fact is that the two works tell two very different stories," the works are not strikingly similar as a matter of law.  *Muller*, 794 F. Supp. 2d at 443.

## III. THE UNREBUTTED RECORD EVIDENCE ESTABLISHES INDEPENDENT CREATION.

Putting aside the lack of any evidence of access and the absence of striking similarity, the plain truth is that Defendants would still be entitled to summary judgment because the undisputed facts demonstrate that the *Iron Man 3* Poster was created independently of the Caliban Drawing.  The record leaves no doubt: there was no copying.  Instead, executives from WDS, with assistance from outside vendors, created the *Iron Man 3* Poster from ideas inspired by the *Iron Man 3* script, BLT's inspiration boards and pencil sketches, the fruits of the Special Shoot, and the dozens of comps that eventually ripened into a final poster, *see supra* at 8 – 9 – none of which had any connection to Plaintiff or the Caliban Drawing.  Indeed, the *Iron Man 3* Poster "callouts" show *precisely* what sources were used to create the *Iron Man 3* Poster, and that none of them was the Caliban Drawing.  *Supra* at 9 – 10.

Horizon cannot produce, and has not produced, a shred of evidence contradicting this straightforward development process.  Where the record contains clear and unrebutted evidence of independent creation, courts do not hesitate to grant summary judgment.  *See Dimmie v. Carey*, 88 F. Supp. 2d 142, 150 (S.D.N.Y. 2000) ("several working tapes which document the creative steps" taken, and "a journal [showing] the evolution of the lyrics for the song" were "compelling proof that [defendants] actually wrote the song" in question); *Tisi v. Patrick*, 97 F. Supp. 2d 539, 549 (S.D.N.Y. 2000) ("unrebutted evidence that [the work] was created independently" required summary judgment for defendant); *Muller*, 794 F. Supp. 2d at 443

(granting summary judgment where, "[i]n contrast to [plaintiff's] virtually non-existent evidence of copying, defendants submitted undisputed evidence of their independent creation"); *see also Silberstein*, 424 F. Supp. 2d at 628-29.[15]

Moreover, as in *Muller*, Defendants' proof of independent creation is particularly compelling because their own preexisting *Iron Man* and *Avengers* "franchises served as independent sources for the [*Iron Man 3* Poster]." *Muller*, 794 F. Supp. 2d at 443-44. In *Muller*, the creators of the film *AVP: Alien vs. Predator*, offered proof that they relied on the preexisting *Alien* and *Predator* film franchises, owned by the defendant, and related comic books to create the allegedly infringing screenplay for their new movie. *Id.* at 436. Judge Chin found that evidence more than sufficient to grant summary judgment on independent creation, concluding that "[w]here, as here, defendants' own prior works contain the same elements, they have 'no reason, beyond the illicit thrill of copyright infringement, to copy wrongfully from another what they legally could copy from themselves." *Id.* at 444 (quoting *Murray Hill*, 361 F.3d at 326) (internal brackets omitted).

This logic applies with even greater force here. The universe of "[D]efendants' own prior works" includes decades of comics featuring Iron Man in red and gold suits, with glowing blue lights and a number of different shoulder designs, in all manner of kneeling and crouching poses. *See, e.g.*, Janson Rep. ¶¶ 58 – 66. Marvel Studios created three prior motion pictures containing broadly similar elements that, along with comic book imagery, were incorporated into the "inspiration boards" that BLT used to create original art for the print campaign. 56.1 ¶¶ 19 – 23. The inspiration boards, the hand-penciled sketches, the photographic fruits of the Special Shoot, and many of the numerous "comps" developed by the WDS executives and Nung/BLT

---

[15] Defendants' "evidence of independent creation . . . can [also] serve to bolster a finding of a lack of striking similarity." *Gal*, 518 F. Supp. 2d at 548 (citing cases).

are all reflected in the *Iron Man 3* Poster.  56.1 ¶¶ 27, 30, 34, 37, 41, 43-44.  This is not a close call; "there was *no* reason for [D]efendants to copy [the Caliban Drawing], as they simply needed to draw on their own prior materials."  *Muller*, 794 F. Supp. 2d at 444.  And that is precisely what they did.

### <u>CONCLUSION</u>

The extensive process followed to create the *Iron Man 3* Poster is typical of the approach used to market any WDS or Marvel Studios film, but especially one, such as *Iron Man 3*, which represents a tentpole franchise for the studio.  The notion that Defendants would do anything other than take the time and spend the money needed to best assure a successful rollout of an important film, is willfully naïve at best.  The claim that they would copy a drawing made some 10 years earlier by unknown artists, to promote an unheard-of comic book, depicting an anonymous character wearing a generic armored suit in a stock fighting pose is, candidly, ludicrous.  It did not happen; fortunately the undisputed facts make that crystal clear.

We respectfully submit that it is time to bring this misguided case to an end.  Defendants' motion for summary judgment should be granted.

Dated:  March 25, 2019
          New York, New York

/s/ Sanford M. Litvack

Sanford M. Litvack
CHAFFETZ LINDSEY LLP
1700 Broadway, 33rd Floor
New York, New York 10019
Telephone: (212) 257-6960
Fax: (212) 257-6950
sandy.litvack@chaffetzlindsey.com

Benjamin A. Fleming
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100
benjamin.fleming@hoganlovells.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Darcy Hansen, Esq., hereby certify that on March 25, 2019 I served a true and correct copy of the foregoing **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** upon counsel for the plaintiff named below using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service of the foregoing document will be accomplished by the CM/ECF system.

Jeffrey Wiesner
Shapiro, Weissberg & Garin, LLP
90 Canal Street
Boston, MA 02114
Tel: (617) 742-5800
Fax: (617) 742-5858
jwiesner@swglegal.com

Paul S. Sennott
Sennott & Williams, LLP
90 Canal Street
Boston, MA 02114
Tel: (617) 303-1656
Fax: (617) 303-1666
psennott@sennottwilliams.com

Tamara Lynn Fitzgerald
Edward C. Greenberg P.C.
570 Lexington Avenue
19th Floor
New York, NY 10022
(212) 697-8777
Fax: (212) 697-2528
Email: tl.ecglaw@gmail.com

*Attorneys for Plaintiff*

Dated: March 25, 2019
      New York, New York

                                             /s/ Darcy Hansen
                                             Darcy Hansen