UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HORIZON COMICS PRODUCTIONS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| - against - | ) Civil Case No. 16-2499 (JPO) |
| | ) |
| MARVEL ENTERTAINMENT, LLC, | ) |
| ET AL. | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**Plaintiff Horizon Comics Productions, Inc.'s**
**Opposition to Defendants' Motion for Summary Judgment**

## I.      Introduction

Notwithstanding defendants' strident tone in their Memorandum, at times almost

demanding that this Court resolve this case in their favor ("it is time to bring this misguided case

to an end"), Defendants are willfully blind to a central point that lays the groundwork for their

Motions' failure. That point is this: Defendants showed significant interest in Plaintiff's comic,

*Radix*. The demeaning characterizations ("unknown artists," "unheard-of comic book")

notwithstanding, Defendants' employees—some of them key employees—recruited the Lai

brothers to work as artists for Marvel Comics because they liked their work in *Radix*. Despite

this incontrovertible fact, Defendants spill much ink arguing that the Lai brothers never

submitted their work to the Defendants. Yet they didn't need to: key Marvel decision-makers

saw the Lai brothers' publicly-available work in *Radix* and recruited them to work at Marvel

because of it.

Defendants invest so deeply in the straw man argument that the creators of *Radix* did not submit their work, because the case law they rely on almost universally involves plaintiffs who made *unsolicited* submissions of their work to corporations. The issue to be resolved in those cases concerns whether the defendants ever actually viewed the unsolicited work. The inescapable backdrop to the present case, in contrast, is that the Defendants certainly viewed *Radix*. They were familiar with the Lai brothers' pre-*Radix* work for years, saw their work in *Radix* and, on that basis, hired the Lai brothers. The Defendants have disregarded this central fact in an attempt to distort the facts of this case to make them more congenial to Defendants' request that it be dismissed.

Defendants' willful blindness does not end there, however. It extends to much of the evidence in this case. Rather than confronting that evidence, the Defendants carefully sort through it and meticulously select only those facts that support their position. Defendants do not even acknowledge obvious, disputed material facts such as the Plaintiff's expert report, which offers the opinion—based on careful and illustrative analysis revealing virtually identical dimensions and proportions in the the *Radix* and *Iron Man 3* images—that the *Iron Man 3* image could not have been created independently of the *Radix* image.

As to the element of "access," Defendants rely in part on the testimony of now Editor-in-Chief of Marvel Comics, C.B. Cebulski, who Plaintiff alleged in its complaint was a key individual who recruited the Lai brothers and for whom they worked at Marvel Comics. Contradicting Plaintiff's contentions, Cebulski testified at his deposition that he had *no interaction* with the Lai brothers (except for a chance encounter years after the relevant time period). (Wiesner Dec., Ex.6 – (hereinafter "Cebulski Tr.") at Cebulski Tr. 46:9-11; 46:20; 51:23-24). He maintained this dubious position even when confronted with comic books naming

him as "Assistant Editor" and the Lai brothers as artists. (Cebulski Tr. 54:13; 66:2-13). He maintained the position even when confronted with contemporaneous media reports in which Ray Lai discusses his recruitment by Cebulski to Marvel Comics. (Cebulski Tr. 60:16-20; 62: 22-25—63:1-4). Faced with Cebulski's startling testimony, Ray Lai searched old hard drives and computers, and was finally able to forensically recover hundreds of emails exchanged between him and Cebulski concerning work on the very comic books Cebulski denied he had any role in creating. (R. Lai Dec. §§ 38-39; R. Lai. Dec., Ex. 16, HCP000199-213; R. Lai. Dec., Ex. 17; HCP000234-HCP000630). The conclusion that Cebulski perjured himself at his deposition is inescapable. The Defendants did not correct the record, and their reliance on his testimony is troubling.

Similarly, Tom Brevoort, who has worked at Marvel in various roles continuously since 1989, and in 2002 was a Senior Editor, testified affirmatively that he had not seen the three *Radix* issues prior to the commencement of this case. (Brevoort Tr. 62:9-25—63:1-6). Subsequent to that testimony, however, Plaintiff discovered an email communication noting that the Lai brothers were offered the position of artists on the comic *Thor* (edited by Brevoort) because of their work on *Radix*. (R. Lai Dec., Ex. 27, HCP000319). The email, dated October 20, 2002, is authored by Brevoort's assistant editor, Marc Sumerak, and Brevoort is copied. It reads, "After seeing the work you have been doing both in RADIX and with C.B., **we'd** love for [the new *Thor*] art team to be you guys!" (R. Lai Dec., Ex. 27, HCP000319) [emphasis added].

These are just three significant examples of facts Defendants blantantly ignore; as explained below, there are many more. The inexorable conclusion is that Defendants cannot succeed on their Motion for Summary Judgment.

## II. Plaintiff's Additional Facts In Support of Its Opposition to Summary Judgment

Plaintiff has submitted its Additional Facts in Support of Its Opposition to Summary Judgment in its Response to Defendants' Statement of Undisputed Facts and Plaintiffs Additional Facts.

## III. Argument

### A. Summary Judgment Standard

At summary judgment the burden rests with the movant to show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp.,* 477 U.S. at 331 (Brennan, J., dissenting), citing 10A Wright, Miller & Kane § 2727. A party moving for summary judgment must affirmatively show the absence of evidence in the record. *Id*. at 332. "If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied…." *Id*.

"Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must 'set out specific facts showing a genuine issue for trial' …." *Toshiba Corp. v. Am. Media Int'l, LLC*, No. 12 Civ. 800, 2012 WL 3822759, at *4 (S.D.N.Y. Sept. 4, 2012), quoting Fed. R. Civ. P. 56(e). The moving party is entitled to summary judgment whenever "the nonmoving party has failed to make a sufficient showing on an essential element

of her case with respect to which she has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. The court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).

### (i)    Defendants Have Failed to Meet Their Burden of Production On Summary Judgment and As a Result Their Motion Fails

Far from discharging their "initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *Celotex Corp.* 477 U.S. at 323, Defendants instead chose simply to ignore all the facts not in their favor. This failure alone dooms their motion and fails to trigger any burden on the part of Plaintiff. *See id.* ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.").[1]  Notwithstanding the Defendants' failure, the complete facts present in this case, including those ignored by the Defendants, fully support Plaintiff's claims of copyright infringement.

### B.   Standard for Copyright Infringement

"In a copyright infringement case, the plaintiff must show: (i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003).

---

[1] By simply ignoring the facts in the record that go against their position, it appears the Defendants may be attempting to "game" the process by waiting to include in their reply brief the facts that the summary judgment burden demands they address in their opening brief. If the Court decides against ruling that the Defendants have not met their initial burden of production, Plaintiff requests leave to file a surreply.

To satisfy the first element, a plaintiff need only present a certificate of copyright registration. *See Folio Impressions, Inc. V. Byer Cal.*, 937 F.2d 759, 763 (2d Cir. 1991). "To satisfy the second element of an infringement claim—the 'unauthorized copying' element— a plaintiff must show both that his work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'" *Jorgensen*, 351 F.3d at 51, quoting *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,* 150 F.3d 132, 137 (citation and internal quotation marks omitted). "'Actual copying may be established by direct or indirect evidence.'" *Id*., quoting *Boisson v. Banian, Ltd.,* 273 F.3d 262, 267 (2d Cir. 2001). "Because direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially 'by demonstrating that the person who composed the defendant's work had access to the copyrighted material,' 'and that there are similarities between the two works that are 'probative of copying,' *Repp v. Webber,* 132 F.3d 882, 889 (2d Cir. 1997). *Id*. (internal citations omitted).

As to the first element—ownership of a valid copyright—the Defendants concede for the purposes of this motion that Plaintiff possesses a valid copyright. (Defs. Memo at P. 11, n.6). Thus, the Court need only address the remaining element here.

i.    **Plaintiff Has Established a Triable Issue of Copyright Infringement**

1.    **Plaintiff Has Established a Triable Issue of "Probative Similarity"**

Among the significant evidence in the record simply ignored by Defendants is the Plaintiff's expert report. William Westwood is a medical illustrator with 46 years of experience illustrating complex anatomical illustrations and medical procedures for the medical profession. (Wiesner Dec. Ex. 20, Hereafter "Westwood Report") The analysis undertaken in his expert report shows almost identical proportions in the bodies of the *Radix* and *Iron Man 3* images. *Id.*

Based on his analysis—supported with step-by-step illustrations—he concludes that "it would be highly unlikely in my opinion—approaching impossible—for all the aforementioned similarities between these two images to align so closely in the absence of copying." (Westwood report at para. 55).

Mr. Westwood's analysis utilized the software, which enabled him to create side-by-side comparisons of various points of the two images and their relative proportions. *Id*. His knowledge of anatomy permitted him to locate points such as the shoulder joint to enable further comparisons. *Id*. Some of the illustrations contained in his report are set out below:



This report is not mentioned at all by Defendants, yet clearly—at the least[2]—it creates a material issue of fact concerning "probative similarity" in this case and puts to rest Defendants' baseless argument that Plaintiff has not established a sufficient case of copying. *See Silberstein v. Fox Entertainment Group, Inc.*, 424 F. Supp. 2d 616, 628 (S.D.N.Y. 2004) (holding expert affidavit created a genuine issue of material fact as to probative similarities.)

Moreover, in addition to ignoring much of the evidence in this case, Defendants make the argument that Plaintiff has not established "probative similarity," ignoring this Court's previous ruling on Defendant's motion to dismiss. This Court held, after a detailed comparison of the images, that a reasonable jury could find that the images are substantially similar. (ECF No. 47). In the course of that ruling, this Court *a fortiori* identified multiple similar elements probative of copying.

Having satisfied "probative similarity," all that remains is a showing of "access."

### 2. <u>Plaintiff Has Established a Triable Issue of "Access"</u>

#### a. <u>Standard for Access</u>

"The access requirement is not onerous." *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017). "Access means that an alleged infringer had a 'reasonable possibility'—not simply a 'bare possibility'—of [seeing] the prior work; access cannot be based on mere 'speculation or conjecture.'" *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) quoting *Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir. 1988); and citing *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1250 (11th Cir. 1999); *Grubb v. KMS Patriots, L.P.,*

---

[2] The Plaintiff's expert's analysis and conclusions show what is tantamount to a quantitative conclusion of copying and thus creates a significant basis for a claim of a "striking similarity" between Plaintiff's and Defendants' images. See below.

88 F.3d 1, 3 (1st Cir. 1996); *Ellis v. Diffie,* 177 F.3d 503, 506–07 (6th Cir. 1999). "In order to support a claim of access, a plaintiff must offer 'significant, affirmative and probative evidence.'" *Id*. quoting, *Scott v. Paramount Pictures Corp.,* 449 F. Supp. 518, 520 (D. D.C. 1978), *aff'd,* 607 F.2d 494 (D.C. Cir. 1979) (Table), *cert. denied,* 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980); and *Tisi v. Patrick,* 97 F. Supp. 2d 539, 547 (S.D.N.Y. 2000).

"There is an inverse relationship between access and probative similarity such that 'the stronger the proof of similarity, the less the proof of access is required.'" *Jorgenson*, 351 F. 3d at 56, quoting Nimmer on Copyright, §13.03[D], at 13-77.

### b. <u>Multiple Individuals at Defendants' Companies Were Aware of *Radix*</u>

The Plaintiff has established a short chain of access to the *Radix* artwork from the Marvel employees who hired and worked with the Lai brothers to the creators of the *Iron Man 3* poster that is more than sufficient to establish Plaintiff's prima facie case for access, namely a "reasonable possibility" that the creators saw their work.

The Lai brothers were recruited to work as artists for Marvel Comics in 2002 by now editor-in-chief C.B. Cebulski. (R. Lai Tr. 74:22-25-75:1-12; R. Lai Dec. §§ 15, 22-23; R. Lai Dec., Ex. 10, HCP000234). Cebulski first learned of *Radix* and saw the Caliban image in the summer of 2001 when he spoke with the Lai brothers at a comic convention.[3] (R. Lai Tr. 38:16-25—39:1-23; (R. Lai Dec. § 8). The Lais had a booth at the convention in order to promote their yet-to-be published *Radix* comic book. (R. Lai Tr. 38:16-25—39:1-23; R. Lai Dec. § 7-8; R. Lai Dec. Ex. 4, HCP000211-213).  The Caliban image was displayed at the Lais' booth at the

---

[3] Cebulski was already aware of the Lai brothers and their work, having first met them at the San Diego ComicCon in 1999. (R. Lai Dec. § 11). The Lai brothers attended that ComicCon to promote Crossgen Comics, a startup founded by multi-millionaire Mark Alessi, that had hired the Lai brothers to be its first artists only a few weeks prior. *Id*. Interest in this new company was high and Cebulski was just one of a number of people who visited the booth and spoke with the Lai brothers. *Id.* The Lai brothers permitted Crossgen to display their early *Radix* artwork at that booth, as Crossgen did not have any art of its own to display at that early stage of its development. *Id.*

ComicCon. (R. Lai Dec. Ex. 4, HCP000211-213). There were also large posters displaying the website created to promote *Radix*. (R. Lai Dec. ; HCP000211-213; HCP00009-HCP00015). Promotional materials were given out to those who visited the booth, including Cebulski. (R. Lai Tr. 42:3-16; 62:12-25—63:1-6; HCP000190-196).



The Caliban image, shown above, was one of several promotional images available at the horizoncomics.com website. (R. Lai Dec. § 13; R. Lai Dec., Ex. 6, HCP00013).

At the ComicCon, Cebulski and Ray Lai exchanged business cards. (Wiesner Dec., Ex. 3 (hereinafter "B. Lai Tr. at 92:21-25-93:1-1; 94:3-22; R. Lai Tr. 33:24-25—34:1-5;17-22; 38:19-25—39:1-12; R. Lai Dec. § 10; R. Lai Ex. 6, HCP00007). Ray Lai's business card included his email address and phone number as well as the internet address of the Horzoncomics.com website. (R. Lai Dec. § 10; R. Lai. Dec., Ex. 6, HCP00007). Cebulski called Ray Lai in March 2002 to congratulate him on the publication of *Radix*. (R. Lai Tr. 66:19-22; 65:25-66:1-7; 67:5-11; R. Lai Dec. § 15).  Issue 1 of *Radix*, published in December 2001, had the same image of the Caliban that is the subject of this case on page 18 of the comic, albeit in a light blue color. (R. Lai Tr. 30:17-19; 120:2-6; R. Lai Dec. § 4, R. Lai Dec. Ex. 2). The image occupies one whole

page of the comic book with the Horizoncomics.com website address printed on the page. (R. Lai Dec., Ex. 2).



There is significant evidence that Cebulski accessed the Horizoncomics.com website. He contacted Ray Lai in September 2002 using an email address that was embedded in the website (not the email address on Lai's business card (R. Lai Dec. § 31; R. Lai. Dec., Ex. 6, HCP00007). (R. Lai Dec. §§ 23, 27; R. Lai Dec., Ex. 10-11, HCP000234). The email address on the website was a different email address than the one on his business card, so that Ray Lai would know when he was being contacted by someone viewing the website, where the full-colored version of Caliban image was displayed.[4]  (R. Lai Dec. §§ 30, 32).

---

[4] The horizoncomics.com website, and the Caliban image in particular, was fully functioning and available at least as late as February 2003.

The Lai brothers' work, and *Radix* in particular, were well-known in the comic book industry and amongst key Marvel Comics employees by 2002. (R. Lai Tr. 38:16-25—39:1-23; R. Lai Dec. §§ 8-9, 12). The three editions of the comic book itself sold tens of thousands of copies. (R. Lai Tr. 91:15-20; R. Lai Dec. § 16). The first edition containing the blue Caliban image with the Horizoncomics.com website sold the most of the three editions. (R. Lai. Tr. 91:15-20).

The Lai brothers were recruited to work on Marvel projects by different editors as *Radix* gained renown owing to MIT's admission that it had infringed an image from *Radix* in an application for a government grant. (R. Lai Dec. § 19; R. Lai Dec. Ex. 8, HCP00073-127). Plaintiff's horizoncomics.com website temporarily crashed due to the huge increase in traffic after that story broke. (R. Lai Dec. § 20). Ray Lai appeared on national news, interviewed by Anderson Cooper, just prior to Cebulski calling him again in August 2002 and urging him to work on Marvel projects. (R. Lai Dec. § 21; R. Lai Dec. Ex. 9; CNN video at 30:59-35:20, HP00091-93). In September, 2002, Plaintiff fielded film interest in the *Radix* property. (R. Lai Dec. § 35; R. Lai Dec., Ex. 14).

However, even before that, the Lai brothers were a known commodity in the comic industry. They were multi-millionaire Mark Alessi's first artist hires when he founded Crossgen Comics in 1999 and their early *Radix* artwork was used by Crossgen to promote itself during its infancy, before it had produced any art of its own. (R. Lai. Tr. 37:15-16; 43:7-8; R. Lai Dec. § 11). Their work on *Sigil*, a Crossgen title, was also widely known amongst comic industry professionals. (Wiesner Dec., Ex. 5, hereinafter "Brevoort Tr." at 63:11). In addition to Cebulski, the record in this case demonstrates that many other Marvel employees, past and present were keenly aware of the Lai brothers and *Radix*. In 2002, Joe Quesada, who first met the Lai brothers at Megacon in 2000, was the Chief Creative Officer at Marvel Comics in New York. (Brevoort

Tr. 25:13-16; 52:21-23).[5] Brevoort believed Quesada suggested that the Lai brothers would be a good fit as artists on the comic *Thor*. (Brevoort Tr. 75:10; 77:16-19). Quesada was also a member of Marvel's "Creative Committee." (Brevoort Tr. 25:13-16; 52:21-23). The "Creative Committee" "was a group of Marvel employees and creators who consulted with Marvel Studios on the various Marvel film projects…" (Brevoort Tr. 51:3-6). "The purpose of the creative committee was to advise the—interface with the Marvel studios personnel on the conceptualizing on the various Marvel properties for film." (Brevoort, Tr. 53:13-16). In short, the purpose of the Creative Committee was to create a nexus between Marvel Comics and Marvel Studios to inform the latter's translation of the comics to the screen.

Tom Brevoort, an editor at Marvel, hired the Lai brothers to work on the comic *Thor* in part because of their work on *Radix*. (R. Lai Dec., Ex. 27, HCP000319)

Jeph Loeb, a current Marvel employee and former Marvel comic book writer, was one of the first industry professionals to notice the Lai brothers and their work on *Radix*. They met Loeb at a comic convention in Montreal in 1998 and showed him some early *Radix* artwork. (R. Lai. Tr. 61:15-25—62:1-8). He asked them to create some sample pages for a title he was working on at Marvel, *Deadpool*.  (R. Lai Tr. 62:1-11).

William Jemas was President of Consumer Products, Publishing and New Media at Marvel Enterprises Inc. (Dec. of William Jemas, Doc. 101).  In his Declaration, provided at the request of Defendants, Jemas claims he was "made aware" of the Lais during this litigation. (Dec. of William Jemas at para. 2). Jemas claims that he has "no recollection of meeting or knowing" the Lais. (Dec. of William Jemas at para. 2). Nevertheless, emails reveal that Jemas

---

[5] The Lai brothers first met Joe Quesada at Megacon 2000. Megacon was owned by Mark Alessi, owner and founder of the Lais' then-employer Crossgen comics. Mark Alessi invited Joe Quesada and Stan Lee, founder of Marvel Comics, to be guests of honor at a party during Megacon 2000. (R. Lai Dec. § 11). It was at that party that the Lais spoke with Joe Quesada. (R. Lai Dec. § 12).

worked with the Lais on the comic book *Blade* in 2003. (R. Lai Dec., Ex. 32, HCP000585-590 HCP000622). Jemas was responsible for outlining the script for *Blade* (R. Lai Dec., Ex. 28, HCP000574-630), and the Lais were brought on by Cebulski as the artists. (R. Lai Dec., Ex. 28, HCP000574). Emails document that the Lais and Jemas took part in conference calls as they collaborated to create the issues of *Blade*. (R. Lai Dec., Ex. 28, HCP000585-590). Ray Lai testified that he spoke with Bill Jemas several times in 2002 and 2003 about doing work for Marvel and they discussed *Radix*, with which Jemas was familiar. (R. Lai Tr. 55:8-25-56:1-9).

The colorist of *Radix*, Brian Reber, later became a colorist working for Marvel at the behest of the Lai brothers and continued doing work for Marvel. (Wiesner Dec., Ex. 7, hereinafter "Bogart Tr.") at 26:18-25—27:1-8).

In addition to the Marvel employees at the time, Andy Park, who would later become a key creator at Marvel, was familiar with the Lai brothers and *Radix*. (R. Lai Dec. § 9). Park, a concept artist on *Iron Man 3* for Marvel Studios, was an artist at Top Cow, a competing comic book publisher during the period the Lai brothers created *Radix* and he knew of *Radix*. (Wiesner Dec. Ex., 11, hereinafter "Nung Tr.") at 52:5-14; R. Lai Dec. § 9). He, along with some of his colleagues from Top Cow, visited Plaintiff's booth at the San Diego Comicon in 2001. (R. Lai Dec. § 9) Andy Park congratulated the Lai brothers on *Radix* during that encounter. (R. Lai Dec. § 9).

At the time of the creation of the *Iron Man 3* poster, Mike Pasciullo and Tim Dillon were recent transplants from Marvel Comics in New York and friends of C.B. Cebulski. (Wiesner Dec. Ex. 8, hereinafter "Pasciullo Tr.") at 21:7-9; 24:2-10). They oversaw the creation of the *Iron Man 3* poster. (Pasciullo Tr. 21:7-9; 24:2-10). Pasciullo was the key executive at Marvel Studios responsible for the print advertising campaign and he was deeply involved in the

development of the *Iron Man 3* poster. (Wiesner Dec. Ex. 9, (hereinafter "Crumpacker Tr.") at 27:18-21). Pasciullo contributed to the creation of the Poster by offering feedback on it and providing artistic materials to Sabel and Nuchols at Disney. (Pasciullo Tr. 26:21-25-27:1-7). Pasciullo testified that it was in Tim Dillon's purview as well to provide artistic materials to Disney personnel. (Pasciullo Tr. 31:7-21).

There is also evidence that the Creative Committee had some involvement in the print and advertising campaign. In an email dated October 13, 2011, Pasciullo explains to Alan Fine, also a member of the Creative Committee (with Joe Quesada), in response to Fine's inquiry, what the "payoff poster" (i.e. what became the Iron Man 3 poster) is going to look like. (Wiesner Dec. Ex.17, MENTO03282). This further shows Pasciullo's involvement early on in the campaign.

These key employees at Marvel Studios, with connections to Cebulski at Marvel Comics, show the clear nexus between Marvel Comics and the filmmakers. The Creative Committee's involvement, which included Joe Quesada, provides a further nexus.

Finally, Cebulski's and Brevoort's testimony provides a more than sufficient basis for an inference that they were covering up access to the *Radix* image. Cebulski went so far as to deny he even knew the Lai brothers and did not back away from this testimony even after being confronted with materials—including comic books and news reports—that showed without any doubt that he was lying. (Cebulski Tr. 54:13; 45:3, 8; 49:25—50:1-2). Still unchastened days later, he signed the errata sheet to his deposition with no corrections. (Wiesner Dec. Ex. 6.) After the recovered emails were produced to Defendants several months later, there has still been no correction of the record.

### c.  The Evidence Clearly Establishes a "Reasonable Possibility" that the Creators of the *Iron Man* Poster Saw the Caliban Image.

The facts set out above more than satisfy the lenient standard for a plaintiff to meet its prima facie case of "access." As stated in *Jorgensen*, all that is required is a "reasonable possibility of access" by the alleged infringer. He is not required to establish *actual* access. *See Bouchat v. Baltimore Ravens, Inc.,* 241 F.3d 350, 354-55 (4th Cir. 2001) ("A copyright infringement plaintiff need not prove that the infringer *actually saw* the work in question; it is enough to prove that the infringer (or his intermediary) had the mere opportunity to see the work and that the subsequent material produced is substantially similar to the work.") (emphasis added); *Towler v. Sayles*, 76 F.3d 579, 583 (4th Cir. 1996) ("A court may infer that the alleged infringer had a reasonable possibility of access if the author sent the copyrighted work to a third-party intermediary who has a *close relationship* with the infringer. An intermediary will fall within this category, for example, if she supervises or works in the same department as the infringer or contributes creative ideas to him" (emphasis added)); *Moore v. Columbia Pictures Indus., Inc.,* 972 F.2d 939, 944 (8th Cir. 1992) (finding access where intermediary was "in a position to provide suggestions" to the alleged copiers); *Bouchat,* 241 F.3d at 354 (jury could infer access where intermediary with access to plaintiff's drawings had "a close relationship to the alleged infringers"), *cert. denied,* 532 U.S. 1038, 121 S.Ct. 2000, 149 L.Ed.2d 1003 (2001).

### d. Defendants' Arguments to The Contrary Are Based on Their Willful Blindness to the Record Evidence

Defendants make several arguments that rely on their significant distortion of the evidentiary record. First, based upon the Lais' testimony that they "didn't give [the Caliban drawing]" to "anyone at Marvel or anyone anywhere" (Defendants' Memo at 13), Defendants attempt to draw from this a conclusion of a lack of access. Of course, this disregards the fact that Marvel recruited the Lai brothers as artists because of their work in *Radix* and clearly indicates

they were familiar with that work and did not require any submissions. Defendants' strategy appears to be to attempt to convince the Court that the present circumstances should be governed by case law that addresses unsolicited submissions to corporations; obviously, those are not the facts at play in the present case. Quite unlike those factual circumstances, decisions at the highest levels of Marvel Comics were made to hire the Lai brothers based on their prior work.

Second, Defendants attempt to bolster their willful blindness to the central fact of this case by relying on disavowals of certain of their witnesses: "Not surprisingly, the Lais' testimony was consistent with each of the witnesses involved in the creation of the *Iron Man 3* Poster, all of whom expressly disavowed ever seeing the Caliban Drawing or even knowing what *Radix* was." (Defendants' Memo at 14). While it is certainly true that the witnesses involved in the creation of the *Iron Man 3* Poster denied any such knowledge, there is significant evidence that key individuals at Marvel were very aware of the *Radix* materials. Indeed, there is no doubt Cebulski and Brevoort were quite aware of *Radix*. And there were others who were also very likely aware of *Radix*, including Joe Quesada, who in turn was involved in advising Marvel Studios on *Iron Man 3*. Furthermore, the executive in charge of the print advertising campaign at Marvel Studios, Mike Pasciullo, and his colleague Tim Dillon at Marvel Studios, were both friends with Cebulski and, at the time, were recent transplants from Marvel Comics in New York.

Third, Defendants argue as follows: "With no evidence that anyone had access to the Caliban Drawing, Plaintiff is forced to rely for its claim of 'access' on the assertion that the drawing was hung on a wall at a booth at a comic book convention in 2001, and then appeared in a 'pinup' gallery on Horizon's website during part of the period between 2001 and 2003, when Horizon's website was operational." (Defendants' Memo p. 14). Again, the Defendants maintain

the position—despite the facts—that nobody had "access" to the Caliban image. (In this regard, Defendants appear to use the term colloquially rather than relying on its legal definition.) Of course, if the only facts were—as the Defendants would like it—that the Lai brothers displayed their work on a website and at a booth at a comic convention, that would indeed be a minimal showing.[6] However, against the backdrop of Marvel's recruitment of the Lais' and the significant attention their *Radix* comic received both in the press and by Marvel employees, the website and the attention created by the booth at the ComicCon are significantly amplified. Cebulski's recruitment of the Lai brothers began with that very booth and website. Indeed, beyond the general interest in *Radix* that led to the Lais' recruitment to Marvel, and the significant media attention generated by the MIT infringement, Plaintiff has provided proof that Cebulski accessed the Horizoncomics.com website in order to contact Ray Lai—all facts completely ignored by Defendants.

Based on the premise that Plaintiff is relying solely on the image at the booth and the posting on the website, Defendants proceed along a tangent arguing that the exposure from those two sources is insufficient to meet the "widely distributed" access standard set out in the cases. While Plaintiff has exposed this straw man, Plaintiff does argue a variant of the "widely distributed" access standard, set out in *Repp v. Webber* and *Arstein* and *Porter*. In *Repp*, the Court addressed a "specialized market" argument, advanced by Plaintiff, that his work was widely distributed among the specialized market of listeners of religious music. *Repp*.

There is no doubt that those individuals the Plaintiff here is required to establish access to are a specialized group of comic industry professionals who kept close watch on new titles and

---

[6] Nonetheless, in light of the significant showing of probative similarity made above, Plaintiff maintains its even this minimal showing would be sufficient. Indeed, the Plaintiff's expert's report shows that there is a "striking similarity" between the Caliban image and the Iron Man 3 Image.

artists. Tom Brevoort testified he visited his local comic shop every Wednesday to view the new releases. (Brevoort Tr. 22:3-7). There is significant evidence in this case that the Lai brothers' work, and the MIT situation, created significant interest in this niche community.

Finally, Defendants argue that "even if there were any proof that an Access Individual (referring to Bill Jemas, C.B. Cebulski, Tom Brevoort, Jeph Loeb, Andy Park, and Joe Quesada) had seen the Caliban Drawing on a wall in 2001 or on Horizon's website, that would not be sufficient because there is no 'nexus between the [Access Individuals] and the alleged infringers.'" (D Memo at 16, Quoting *Jorgensen*, 351 F.3d at 53.) Yet again, Defendants make this argument based on their false factual record. As set out above, Mike Pasciullo was the key executive at Marvel Studios overseeing the creation of the *Iron Man 3* poster. (Crumpacker Tr. 27:18-21). He worked closely with Tim Dillon. (Pasciullo Tr. 26:21-25-27:1-7.) Both were employees at Marvel Comics, Pasciullo leaving for Marvel Studios in August 2011 close to the start of the *Iron Man* 3 creative print campaign. (Pasciullo Tr. at 21:7-9; 24:2-10.). C.B. Cebulski testified that he is friends with both Pasciullo and Dillon. (Cebulski Tr. 30:17-25; 44:4-11) See *Towler*, 76 F.3d at 83. Pasciullo was involved in all aspects of the creation of the *Iron Man 3* poster. Pasciullo and Dillon, as well as several others at Marvel Studios as well as the filmmakers, commented on the poster, influenced its creation, and ultimately signed off on its final version. (MENT021548; MENT008934-35; MENT008596; MENT0008609-0008610 and 5KND000768-000780; MENT0009384; MENT003282). Pasciullo testified that it would have been within his purview at Marvel Studios to send artwork to John Sabel, the head of print creative at Disney. (Pasciullo 27, 15-17).

In addition, Brevoort beleives Joe Quesada had recommended the Lai brothers to him to work on *Thor*. (Brevoort Tr. 75:2-10.) Joe Quesada was a part of the Creative Committee

overseeing the use of Marvel assets. (Brevoort Tr. 25:13-16; 52:21-23). He was on that committee with Alan Fine who corresponded with Pasciullo at the beginning stages of the print campaign (Pasciullo provided Fine with a description of the print campaign, including the payoff poster). (MENTO03282)

 **e.** **The case relied on most heavily by Defendants, O'Keefe v. Ogilvy & Mather _Worldwide, Inc._ employs the wrong standard**

Finally, Defendants rely heavily on *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500 (S.D.N.Y. 2008): "The O'Keefe case is directly on point, and devastating to Horizon." (Def. Memo. P. 17). In fact, this decision is particularly problematic for Defendants, as it is legally flawed. But before addressing the flaw, its facts are readily distinguishable. O*'Keefe* is a case where the Plaintiff predicated his allegations on unsolicited submission of materials to the defendant corporations. The Court also relied upon the denials of the Defendant witnesses that they ever received the unsolicited submissions because there was no evidence that the defendants' testimony in *O'Keefe* was untruthful. *Id.* at 516-517, distinguishing *Gaste v. Kaiserman*, 863 F.2d 1061 (2d Cir. 1988) (where the plaintiff introduced direct evidence that defense witnesses had testified untruthfully, a jury was entitled to reject the defense witnesses claims of non-exposure to the plaintiff's work). In the present case there isn't just *some* evidence of lack of truthfulness; there is *incontrovertible* evidence of lying concerning access.

In addition, *O'Keefe* relied for its conclusion on an erroneous standard. *O'Keefe* purports to quote the Second Circuit's decision in *Jorgenson,* but strangely alters the language of the standard from "reasonable *possibility*" to "reasonable *probability.*" *See* 590 F. Supp. 2d at 515 ("'reasonable probability'--not simply a 'bare possibility.'"); *id.* at 517 ("Summary judgment dismissing O'Keefe's copyright claim is appropriate because he has failed to demonstrate...that defendant had a reasonable *probability* of being exposed to his work.") (Emphasis added). As the

quoted portions reveal, the error was not a one-time typo; the erroneous standard was used throughout the opinion and finally to reach the Court's conclusion finding a lack of access. Altering "*possibility"* to "*probability"* significantly increases a plaintiff's burden of proof. Moreover, the Defendants rely on progeny of the erroneous *O'Keefe* opinion in their argument: *see Meynart-Hanzel v. Turner Broadcasting Sys*, No. 17 C 6308, 2018 WL 4467147 (N.D. Ill. Sept. 18, 2018) (cited by Defendants on p. 15 of their Memorandum).

### f.   False testimony of Cebulski and Brevoort requires inference to be made against Defendants on the Element of Access

The addition of C.B. Cebulski's and Tom Brevoort's false testimony creates a triable issue concerning their knowledge of the Caliban as well as Pasciullo and Dillon's access to the Caliban and its subsequent use in the creation of the *Iron Man 3* poster. A jury could conclude that Cebulski and Brevoort testified falsely because they have something to hide.

While "[s]ummary judgment should not be denied simply because the opposing party asserts that the movants witnesses are not to be believed…summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's witnesses." *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151 (Fed Cir. 2004), citing *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 628-29 (1944) and 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane *Federal Practice Procedure* 2726, at 446 (3d ed. 1998) ("[I]f the credibility of the movants witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial…"). *See also Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc*. 831 F.2d 77, 81 (5th Cir. 1987) ("While the mere claim that an affidavit is perjured is insufficient, where specific facts are alleged that if proven would call the credibility of the moving parties witnesses into doubt, summary judgment is improper."); *In re Citizens Loan Sav.*

*Co.,* 621 F.2d 911, 913 (8th Cir. 1980) (acknowledging that specific facts tending to discredit a key witness could create a genuine issue for trial.)

The principles of these cases are particularly apt in the context of a finding of access in copyright cases. A leading commentator observes that there is a particular reluctance among courts to find for a movant on summary judgment where "knowledge of the events or occurrences on which the action is based lies exclusively within the control of the party moving for summary judgment." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane *Federal Practice Procedure* 2726, at 446 (4th ed. Nov. 2018 Update). "[T]here is a justifiable judicial fear of the injustice which could result from judgment based on affidavits asserting facts that are, because of their nature, incapable of being effectively controverted." *Id.*, quoting Bauman, *A rationale for Summary Judgment*, 33 Ind. L.J. 467, 492 (1958). Such a situation is endemic in copyright cases on the element of access. Indeed, the inability of a plaintiff ever to know whether a Defendant was exposed to a particular work has resulted in the "reasonable possibility" formulation of the access standard.

### 3.     The Plaintiff Has Established a Triable Issue Concerning the "Striking Similarity" Between the *Caliban* Image and the *Iron Man 3* Poster

As set out above, Plaintiff's expert analyzed the *Radix* and *Iron Man 3* poster images and concluded that proportions in the bodies of the images and in the lengths of anatomical structures were nearly identical. This conclusion establishes a "striking similarity" between the two images allowing for an inference of access.

"We have held that where there are striking similarities probative of copying, proof of access may be inferred: 'If the two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access." *Repp v. Webber,* 132 F.3d at 889, quoting *Lipton v. Nature Co.,* 71 F.3d 464, 471 (2d Cir. 1995). "…[S]imilarity

may be regarded as 'striking' even if somewhat less than verbatim. What is required is that the similarities in question be so striking as to preclude the possibility that the defendant independently arrived at the same result." Nimmer on Copyright, 13.02[B] 13-32.

Mr. Westwood concludes based on his analysis that "[i]t would be highly unlikely in my opinion—approaching impossible—for all of the aforementioned similarities between these two images to align so closely in the absence of copying." (Westwood Report at para. 55)

Mr. Westood's conclusion following his illustrative analysis is precisely the type of evidence that creates at genuine issue of material fact of "striking similarity."

### 4. Defendants Have Not Established Independent Creation Sufficient to Defeat Plaintiff on Summary Judgment.

The conclusion of Plaintiff's expert that it would approach the "impossible" for the *Iron Man 3* image to have been created in the absence of copying precludes a finding of summary judgment for the Defendants on their claim of independent creation. But, even without Plaintiff's expert opinion, Defendants' argument for independent creation is wholly unconvincing. As a leading commentator on copyright law has said: "Proof of independent creation, whether direct or inferential, should be taken with a grain of salt." 2 Paul Goldstein, Copyright: Principles, Law and Practice sec 7.2.2 (1989). That sentiment applies with force in this case.

It is difficult to discern exactly what Defendants' argument is in support of their claim of independent creation. Defendants outline the testimony of their witnesses describing a general process of creation, but nothing in Defendants' description of that process is inconsistent with—let alone preclusive of—copying Plaintiff's work. Indeed, the process Defendants describe weighs heavily *against* Defendants' contention of independent creation in a critical respect. Defendants have pointed out the materials it claims provide a road map from inception of the *Iron Man 3* image to its completion. Missing from this supposed road map, however, is a single

preexisting image—either in the inspiration boards, the sketches, or in the photoshoot materials—showing the *Iron Man 3* image in his final pose with his right arm up and right knee up (the same pose as the Caliban). While Defendants boldly assert that "Horizon cannot produce, and has not produced, a shred of evidence contradicting this straightforward development process" (Defs Memo at p. 21), the process appears not to have been straightforward at all. From the materials Defendants have provided, Robert Downey Junior's left arm needed to be cut from the photoshoot materials and presumably electronically mirrored to become his *right* arm in the final *Iron Man 3* image. A straightforward development process would, at the least, have included inspiration board material, a sketch, or a photoshoot pose with the *Iron Man 3* figure in the position in which he ultimately appears in the poster.

Additionally, Defendants admit that BLT created "inspiration boards" which they used to create art for the print campaign. (Defs Memo at p. 22). Those inspiration boards contained what appear to be third party, non-comic book content, including video game promotional art. (Exhibit 20 to Deposition of John Sable). Despite this incontrovertible fact, Defendants close their argument on independent creation by arguing that "they simply needed to draw on their own prior materials." (Defs Memo at p. 23).

Defendants' argument for independent creation fails even to be convincing, let alone sufficient for judgment as a matter of law. In any event, "[w]hether the evidence of independent creation here is sufficient to rebut the prima facie case established in this action is a question for the factfinder, whatever the contours of the burden of establishing the defense." *Repp v. Webber*, 132 F.3d 882 (2d. Cir 1997), citing 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright s. 12.1[D](1997).

## IV.    <u>Conclusion</u>

For the reasons set forth above, Defendants' Motion for Summary judgment should be

denied.


Respectfully submitted,

HORIZON COMICS PRODUCTIONS, INC.

By: /s/ Jeffrey P. Wiesner
*Admitted Pro Hac Vice*
Jeffrey P. Wiesner, BBO# 655814
Jennifer McKinnon, BBO# 657758
Wiesner McKinnon LLP
90 Canal Street
Boston, MA 02114
Telephone: (617) 303-3940
Facsimile: (617) 507-7976
jwiesner@jwjmlaw.com
jmckinnon@jwjmlaw.com

*Admitted Pro Hac Vice*
Paul S. Sennott, BBO# 670571
Sennott, Williams & Rogers, LLP
90 Canal Street
Boston, MA 02114
Telephone: (617) 303-1656
psennott@sennottwilliams.com


Dated: April 24, 2019

### <u>CERTIFICATE OF SERVICE</u>

I certify that on this day I caused a true copy of
the above document to be served upon the
attorney of record for all parties via CM/ECF.


Date: 4/24/19          /s/Jeffrey Wiesner
                     Jeffrey Wiesner