UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

HORIZON COMIC PRODUCTIONS, INC.,　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff(s),　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　-against-　　　　　　　　　　) 　16-cv-2499-(JPO)
　　　　　　　　　　　　　　　　　　)
MARVEL ENTERTAINMENT, LLC, ET AL.　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant(s).　　　　　)
_____　)

**PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1
STATEMENT OF MATERIAL UNDISPUTED FACTS AND PLAINTIFF'S
<u>STATEMENT OF ADDITIONAL MATERIAL FACTS</u>**

Pursuant to L.R., D. Mass., 56.1, Plaintiff Horizon Comic Productions Inc. responds to

Defendants' Statement of Material Undisputed Facts, and provides a statement of additional

material facts, as follows.

**Defendants' Statement ¶ 1**

Plaintiff, Horizon Comics Productions, Inc. ("Horizon or Plaintiff") is a Canadian

Corporation founded and owned by brothers, Ben and Ray Lai, in or about 1995. (Compl. ¶ 6;

Declaration of Sanford Litvack, dated March 25, 2019 (the "Litvack Decl."), Ex I (transcript of

the deposition of Ray Lai, or the "R. Lai Tr.") at 8:12 – 9:11.)

**Plaintiff's Response to ¶ 1**

Not disputed.

**Defendants' Statement ¶ 2**

In 2001, the Lai brothers (through Horizon) created a comic book called Radix. Three editions of the comic book were ultimately published – one in December 2001, one in February 2002 and a final comic in April 2002. (Compl. ¶ 19; R. Lai Tr. at 30:16 – 31:2.)

**Plaintiff's Response to ¶ 2**

Not disputed.


**Defendants' Statement ¶ 3**

In or about January 2001, the Lai brothers created a character named Caliban, for their planned comic book series. At that time they also created a drawing of the character, in a kneeling pose (herein the "Caliban Drawing") which they now claim was infringed by a theatrical poster created in 2013 for the film *Iron Man 3* (the "*Iron Man 3* Poster). (*See* Compl., Ex. B; R. Lai Tr. at 12:8 – 25, 126:9 – 126:19.) This is the only claim that survived Defendants' motion to dismiss. *See* Dkt. No. 75.


**Plaintiff's Response to ¶ 3**

Disputed in part. It is not disputed that in or about January 2001, the Lai brothers created a character named Caliban. It is disputed that the Plaintiff only "now" claims their work was infringed upon by the Defendants. This is an inaccurate characterization, as the Plaintiff submitted a Cease and Desist letter to the Defendant Marvel on April 3, 2013, shortly after *Iron Man 3* was released. (HCP00058-59; R. Lai Tr. 164:13-17). It is also disputed that the Plaintiff's claim is limited to the "theatrical poster," as it is the image depicted in the *Iron Man 3* poster that is infringed, not the poster itself.

**Defendants' Statement ¶ 4**

In its initial disclosures, Plaintiff identified six individuals who allegedly had "access" to the Caliban Drawing: (1) Bill Jemas; (2) C.B. Cebulski; (3) Tom Brevoort; (4) Jeph Loeb; (5) Andy Park; and (6) Joe Quesada (the "Access Individuals"). (Litvack Decl., Ex. A at 2.) Plaintiff did not specify how or when these individuals allegedly had such access. (*Id*.)

**Plaintiff's Response to ¶ 4**

Disputed in part. It is not disputed that the Plaintiff identified six potential "Access" individuals in its initial disclosures. However, despite the Defendants' attempt to present the Radix comic and materials as obscure, Plaintiff's work in Radix and the Lai brothers were widely known among comic book artists at the time. (See Plaintiff's Additional Statement of Facts, below).

**Defendants' Statement ¶ 5**

The only Access Individuals who were deposed (Brevoort, Cebulski) testified that they had no role in the creation of the *Iron Man 3* Poster. (Litvack Decl., Ex. K (transcript of the deposition of Tom Brevoort, or the "Brevoort Tr.") at 137:17 – 138:6, 140:7 – 12; Litvack Decl., Ex. L (transcript of the deposition of C.B. Cebulski, or the "Cebulski Tr.") at 77:22 – 78:5.) There is no evidence that any of the other Access Individuals had any responsibility for, or input into, the creation of the *Iron Man 3* Poster. (*See, e.g.*, Declaration of William Jemas, Jr., dated October 25, 2018 (the "Jemas Decl.") ¶ 1.)

**Plaintiff's Response to ¶ 5**

Disputed.  Cebulski and Brevoort's testimony is demonstrably false.  Cebulski's testimony in particular has no credibility.  (See Plaintiff's Additional Statement of Facts at §§ 149-172).

While the Defendants attempt to invent an iron curtain between Marvel Comics and Marvel Studios and Disney, there is evidence of overlap between the entities—and central to that overlap is Michael Pasciullo ("Pasciullo") and Joe Quesada ("Quesada"). Pasciullo was Senior Vice President of Marketing for Marvel Studios at the time that the *Iron Man 3* movie, and poster, were being developed.  (Wiesner Dec. Ex. 8 (hereinafter "Pasciullo Tr.") at 10:25-11:1-12).  Quesada was the Chief Creative Officer at Marvel Comics in New York and was on the Creative Committee.  (Wiesner Dec. Ex. 5 (hereinafter "Brevoort Tr.") at 25:13-16).  Pasciullo was the "key executive" at Marvel Studios working on the print advertising campaign for *Iron Man 3*. (Wiesner Dec. Ex. 9 (hereinafter "Crumpacker Tr.") at 27:18-21). (See Plaintiff's Additional Statement of Facts at § 14).

**Defendants' Statement ¶ 6**

Neither of the Lai brothers claims to have ever given, sent, or otherwise provided the Caliban Drawing (or any copy thereof) to any of the six Access Individuals or to any other person associated with any Defendant. (R. Lai Tr. at 55:8 – 57:22, 59:8 – 60:21, 62:12 – 64:6, 89:2 – 20, 104:25 – 106:4, 116:18 – 117:2; Litvack Decl., Ex. J (transcript of the deposition of Ben Lai, or the "B. Lai Tr.") at 54:19 – 55:21, 101:8 – 11, 104:4 – 17.)

**Plaintiff's Response to ¶ 6**

Disputed it part. Ray Lai did not recall what he did with the printed Caliban images. (R. Lai Tr. 115:20-25—116:1-14). At the 2001 summer ComicCon, Ray Lai gave Cebulski his business card. (R. Lai Tr. 92:21-25-93:1-1; R. Lai. Dec., Ex. 6, HCP00007). Ray Lai's business card included the Horizoncomics.com web address. (R. Lai Tr. 62:17-25; R. Lai Dec., Ex. 6, HCP00007). The Caliban image was displayed on the website. (R. Lai Dec., Ex. 7, HCP00013). It was one of approximately 11 images of the *Radix* comic characters displayed on the website. (R. Lai Dec., Ex. 6, HCP00011).

In addition, Ray Lai also gave Cebulski promotional materials for their work, including a *Radix* preview book. (R. Lai Tr. 42:3-16; 62:12-25—63:1-6; R. Lai Dec., Ex. 5, HCP000190-196). The *Radix* preview book contains a synopsis of the story line of *Radix* and a character page showing the various characters, among which is a head shot of the Caliban character on a page citing to the Horizoncomics.com website. (R. Lai Dec., Ex. 5, HCP000195). Cebulski also visited the Lais' booth at the ComicCon convention in 2001 where the Caliban was displayed. (R. Lai Dec., Ex. 4, HCP000211-213).

Issue 1 of *Radix* contained a blue-colored Caliban image as a stand-alone page with "Horizoncomics.com" appearing above it. (R. Lai Tr. 30:17-19; 120:2-6; R. Lai Dec., Ex. 3). The full-colored version of the Caliban appeared on the website. (R. Lai Dec., Ex. 3, HCP00013). In addition, Radix and the Lai brothers gained significant attention as the result of an admission by the Massachusetts Institute of Technology ("MIT"), one of the United States' premier scientific research institutions, that it had used a Radix image in its successful $50 million grant proposal to the Pentagon. (R. Lai Dec., Ex. 8, HCP00073-127).

Thomas Brevoort, despite his testimony to the contrary, had also seen the Lais' work in Radix. In 2002, Brevoort was a Senior Editor at Marvel Comics. (Brevoort Tr. 67:8-10). Soon after Cebulski's recruitment of the Lai brothers to Marvel, Brevoort offered them a position as lead artists on *Thor*. (Brevoort Tr. 18:16-17; 76:19-25—77:1-11; R. Lai. Dec., Ex. 17 at HCP000319). In an October 20, 2002 email to the Lais, Brevoort's Assistant Editor, Marc Sumerak, copying Brevoort, wrote "After seeing the work you have been doing both in RADIX and with C.B., **we'd** love for [the new *Thor*] art team to be you guys!" (Lai. Dec., Ex. 17 at HCP000319) (emphasis added).

The additional witnesses mentioned, Jeph Loeb, Andy Park, and Joe Quesada also had knowledge of Radix. Quesada was also a comic book artist who worked with people the Lai brothers worked with at Crossgen comics. The Lai brothers were part of a small community of comic book artists and were generally aware of each other's work. (See e.g., R. Lai Dec. §§ 9, 11, 12, 16, 17, 20). Brevoort testified that Joe Quesada alerted Brevoort and others on the editorial staff at Marvel of certain creators who had been at CrossGen that would be available for work, including the Lais. (Brevoort Tr. 75:2-10; 77:16-19). In relation to that shift, Brevoort recalls either Jose Quesada or Bill Jemas suggesting that the Lai brothers might be a good fit for *Thor*. (Brevoort Tr. 76:27-25). Andy Park was also aware of the Lai brothers. (R. Lai Dec. § 9). Jeph Loeb was also aware of early Radix materials and the Lai brothers. (R. Lai Tr. 38:7-12). In 1998, Loeb saw the Lai brothers early Radix materials at a comic convention in Montreal. Loeb asked the Lai brothers to create some sample work for the Deadpool book Loeb was working on at Marvel. (R. Lai. Tr. 61:15-25—62:1-8).

The Defendants attempt to paint the Plaintiff's failure to depose several witnesses as suggesting that their original claims that these individuals were aware of their work were either

unfounded or withdrawn. But Plaintiff decided not to pursue deposing these individuals after Cebulski perjured himself at his deposition. Brevoort also testified falsely by denying knowledge of Radix and was otherwise less than forthcoming in his testimony. The Lai brothers' work in Radix was widely known by the small community of budding artists and future movie makers in their small group in the early 1990s. The publicity engendered by the MIT infringement and the news coverage it received made their work even more well-known than it otherwise would be in the small comic book community.

**Defendants' Statement ¶ 7**

The Caliban Drawing was not included in any of the three published Radix comic books. (Litvack Decl., Ex. B; R. Lai Tr. at 117:4 – 18, 119:21 – 120:9, 195:21 – 196:6.)

**Plaintiff's Response to ¶ 7**

Disputed in part. While the Caliban drawing was not included in any of the three published Radix comic books, a full-page, blue colored version of it appeared in Issue 1. (R. Lai Tr. 120:2-6; R. Lai Dec., Ex. 2). In that Issue, the horizoncomics.com website appears above the Caliban. (*Id.*). The full color version of the Caliban image was also displayed on the website. (R. Lai Dec., Ex. 3 at HCP000197). In addition, the Caliban was displayed at the Lais' booth at the 2001 ComicCon, where Cebulski first approached them. (R. Lai Tr. 38:16-25—39:1-23; R. Lai Dec., Ex. 4, HCP000211-213).

**Defendants' Statement ¶ 8**

Other than the Lai brothers, no witness in this case, including the Access Individuals, has testified to ever having seen the Caliban Drawing or any of the three Radix comic books, prior to this lawsuit. To the contrary, every witness has disavowed ever seeing the Caliban

Drawing or even being aware of Radix. (Jemas Decl. ¶¶ 3 – 4; T. Brevoort Tr. at 62:9 – 63:6, 138:20 – 139:10; C.B. Cebulski Tr. at 52:11 – 52:22, 77:12 – 77:16; Litvack Decl., Ex. M (transcript of the deposition of Megan Crumpacker, or the "Crumpacker Tr.") at 195:14 – 195:22; Litvack Decl., Ex. N (transcript of the deposition of Steve Nuchols, or the "Nuchols Tr.") at 145:14 – 19; Litvack Decl., Ex. O (transcript of the deposition of Warren Nung, or the "Nung Tr.") at 119:11 – 120:1, 120:25 – 121:5; Litvack Decl., Ex. P (transcript of the deposition of Michael Pasciullo, or the "Pasciullo Tr.") at 20:6 – 18; Litvack Decl., Ex. Q (transcript of the deposition of John Sabel, or the "Sabel Tr.") at 191:16 – 193:4; Litvack Decl., Ex. Y (transcript of the deposition of Dave Bogart, or the "Bogart Tr.") at 68:4 – 17.)

**Plaintiff's Response to ¶ 8**

Disputed in part.  It is not disputed that the witnesses denied seeing the Caliban drawing or any of the three Radix comic books prior to this lawsuit.  It is disputed that this testimony is credible.  Cebulski and Brevoort's deposition testimony has been proven to be false.  Cebulski's testimony was almost certainly intentionally false.  The Lai brothers were recruited to work at Marvel because of their work in Radix.  (See Plaintiff's Additional Statement of Facts at §§ 55, 73, 82).

**Defendants' Statement ¶ 9**

While Horizon claims the Caliban Drawing was available to view on its website, and that in or about 2001 Ray Lai gave his business card (with a reference to Horizon's website on it) to people who were employed at one time or another at Marvel Comics, there is no evidence that any of those individuals, or anyone associated with Defendants, ever visited the website.

(R. Lai Tr. at 59:22 – 60:9.)

**Plaintiff's Response to ¶ 9**

Disputed. The citation relied upon by the defendants for this statement does not support their statement. Further, there is evidence that Cebulski visited the website. On September 12, 2002, Cebulski sent an email to Ray Lai through the email address embedded in the Horizoncomics.com website, "raylai@horizoncomics.com," asking Lai to email him. (R. Lai Dec. Ex. 10, HCP000234). Cebulski did not use the email address on the Ray Lai's business card, "rayradix@horizoncomics.com." (R. Lai Dec. Ex. 6, HCP00007). Ray Lai embedded a different email address in the website so he could later tell if he was being contacted through the website. (R. Lai Dec. Ex.11).

**Defendants' Statement ¶ 10**

Horizon's website was operational from approximately Spring of 2001, through 2003 at the latest. (R. Lai Tr. at 145:17 – 21, 147:11 – 25.) During that time a visitor to the Horizon website would have had to click through a number of pages to arrive at the Caliban Drawing. (R. Lai Tr. at 177:3 – 17, 179:4 – 25, 181:10 – 182:17, 182:23 – 183:8.) There is no evidence that anyone associated with any Defendant did so, at any time. (*E.g.* Jemas Decl. ¶¶ 3 – 4; T. Brevoort Tr. at 139:11 – 139:16; R. Lai Tr. at 59:22 – 60:9.)

**Plaintiff's Response to ¶ 10**

Disputed in part. It is not disputed that Horizon's website was operational from approximately Spring of 2001, through 2003 at the latest. It is disputed that there is no

evidence that anyone associated with any Defendant accessed it at any time. There is evidence that C.B. Cebulski accessed the website. See Plaintiff's Response to ¶ 9, above.

Moreover, there is a fundamental difference in point of view between the parties in this case. Defendants actively recruited Ray and Ben Lai to work as artists at Marvel Comics because of the Defendants' interest in the Lai brothers' work in *Radix*. That interest is evidence that individuals associated with Defendants accessed the website to view the Lai brother's work.

## Defendants' Statement ¶ 11

From 2001 through 2003, Marvel Comics was owned and operated (either directly or via a subsidiary) by Marvel Enterprises, Inc. ("Marvel Enterprises") a publicly owned company with no affiliation with The Walt Disney Company ("TWDC") or its affiliates. In September 2005, Marvel Enterprises changed its name to Marvel Entertainment, Inc. ("Marvel Entertainment"). In January 2010, Marvel Entertainment was acquired by TWDC, after which Marvel Entertainment changed its name and form of entity to Marvel Entertainment, LLC. (Bard Decl. ¶¶ 3 – 5.)

## Plaintiff's Response to ¶11

Not disputed.

## Defendants' Statement ¶ 12

Work on the *Iron Man 3* Poster began in 2012 and concluded in March 2013. (Nung Tr. at 19:16 – 19:20.)

**Plaintiff's Response to ¶12**

Disputed. The Photoshop files produced in this case contain creation dates of 2011.

**Defendants' Statement ¶ 13**

The personnel at Defendants responsible for creating and producing the *Iron Man 3* Poster, Steve Nuchols and John Sabel, worked in the Creative Print Services department at Walt Disney Studios in 2012 and 2013. Sabel was Executive Vice President, Creative Print Services; Nuchols was Vice President, Creative Print Services. (Nuchols Tr. at 13:19 – 14:2; Pasciullo Tr. at 54:19 – 25; Sabel Tr. at 10:17 – 11:4, 149:4 – 8.) Both Sabel and Nuchols worked in California. (Litvack Decl., Exs. S at WDS005729, U at BLT_000980.)

**Plaintiff's Response to ¶13**

Disputed.  It is disputed that only Nuchols and Sabel were responsible for creating and producing the *Iron Man 3* poster. Pasciullo and Dillon were recent transplants to Marvel Studios from Marvel Comics in New York and both were friends with Cebulski.  (See Plaintiff's Additional Statement of Facts at § 14). At Marvel Studios, Pasciullo and Dillon were also involved in the print advertising campaign. Pasciullo was the "key executive" at Marvel Studios overseeing the creation of the *Iron Man 3* poster. (Crumpacker Tr. 27:18-21). Pasciullo contributed to the creation of the Poster by offering feedback on it and providing artistic materials to Sabel and Nuchols at Disney. (Pasciullo Tr. 26:21-25-27:1-7).  Pasciullo testified that it was in Tim Dillon's purview as well to provide artistic materials to Disney personnel. (Pasciullo Tr. 31:7-21). Pasciullo was involved at all stages of the creation of the *Iron Man 3*

poster, including providing comments on creative aspects of the work and providing artistic

materials to Disney. (See Plaintiff's Additional Statement of Facts at § 14).


**Defendants' Statement ¶ 14**

There is no evidence that Mr. Sabel or Mr. Nuchols (or anyone else on the Creative

Print Services team) had any connection to or interaction with employees at Marvel who

worked in New York at Marvel Comics. (Sabel Tr. at 188:24 – 189:14.) The only witness asked

that question, Mr. Sabel, testified he had no connection to or knowledge regarding Tom

Brevoort or C.B. Cebulski. (*Id.*)


**Plaintiff's Response to ¶14**

Disputed. The citation the Defendants rely upon for this fact does not support their

statement. Sabel testified that he was not sure if he knew anyone at Marvel Comics, and that he

was not sure if some of the people that he attended meetings with were from Marvel Comics.

(Sabel Tr. 189:7-13).

More significantly, Sabel, Nuchols and others involved in the creation of the Iron Man 3

poster had a connection to and/or interaction with Pasciullo and Dillon, employees at Marvel

Studios who formerly worked in New York at Marvel Comics. (See Plaintiff's Response to § 3,

above).  Before joining Marvel Studios in 2011, Pasciullo worked for many years at Marvel

Comics in New York. (Pasciullo Tr. 15:19-20, 19:11-13) (Sabel Tr. 162:16-25—163:1-23;

179:12-20). Tim Dillon, who worked in Pasciullo's department at Marvel Studios and on the

*Iron Man 3* poster, was also a former employee of Marvel Comics in New York. (Pasciullo Tr.

24, L. 2-6); Cebulski Tr. 43:12-15). Pasciullo has known C.B. Cebulski since approximately

2008. (Pasciullo Tr. 16:21-22). Cebulski and Pasciullo are friends. (Cebulski Tr. 30:17-25). Cebulski and Pasciullo worked together in the same office beginning in approximately 2008, after Pasciullo re-joined Marvel. (Cebulski Tr. 32:7-13). They worked together creating advertisements for Marvel Comics. (Cebulski Tr. 32:23-25). At that time, Cebulski and Pasciullo also worked with Tim Dillion creating advertisements for Marvel Comics. (Cebulski Tr. 43:12-15). Cebulski also considers Dillon a friend. (Cebulski Tr. 44:4-11).

In addition, there was the "Creative Committee," a "a group of Marvel employees and creators who consulted with Marvel Studios on the various Marvel film projects…" (Brevoort Tr. 51:3-6). "The purpose of the creative committee was to advise the—interface with the Marvel studios personnel on the conceptualizing on the various Marvel properties for film." (Brevoort, Tr. 53:13-16). Joe Quesada, the Chief Creative Officer at Marvel Comics in New York (Brevoort p. 25, L. 13-16) was a member of the "Creative Committee," which was a group of Marvel [Comics] employees and creators who consulted with Marvel Studios on the various Marvel film projects. (Brevoort p. 51, L. 3-6). "The purpose of the creative committee was to advise the— interface with the Marvel studios personnel on the conceptualizing on the various Marvel properties for film." (Brevoort, p. 53, L. 13-16). Joe Quesada was on the Creative Committee. (Brevoort Tr. 25:13-16; 52:21-23). Brevoort recalls either Jose Quesada or Bill Jemas suggesting that the Lai brothers might be a good fit as artists for *Thor*. (Brevoort Tr. 76:27-25). Alan Fine was also on the Creative Committee and there is evidence that he had involvement with the print advertising campaign. (Wiesner Dec., Ex. 17, MENTO03282). The "Creative Committee" evidences cross-over between Marvel Comics and Marvel Studios.

**Defendants' Statement ¶ 15**

Neither Mr. Sabel, Mr. Nuchols, nor anyone else who was involved in the creation, development or production of the *Iron Man 3* Poster ever (a) met either of the Lais (b) saw or received the Caliban Drawing (c) saw a Radix comic or (d) ever heard of Horizon or its three Radix comics prior to the lawsuit. (Declaration of Warren Nung, dated March 19, 2019 (the Nung Decl.") ¶ 17; R. Lai Tr. at 104:25 – 105:25; B. Lai Tr. at 54:19 – 55:21 Nuchols Tr. at 145:8 – 19; Nung Tr. at 119:11 – 120:1, 120:25 – 121:3; Sabel Tr. at 191:16 – 193:4.)


**Plaintiff's Response to ¶15**

Disputed. The denials of Defendants' employees in light of Cebulski and Brevoort's deposition testimony is not credible. Although not referred to by the Defendants, Michael Pasciullo and Tim Dillon were involved in the creation and development of the *Iron Man 3* poster. (See Plaintiff's Response to §§ 13, 14, above). Creative Committee member Joe Quesada was aware of *Radix* and the Lai brothers, and there is evidence the Creative Committee was involved in the print advertising campaign. (Brevoort, Tr. 53:13-16; 25:13-16; Wiesner Dec., Ex. 17, MENTO03282).


**Defendants' Statement ¶ 16**

At the outset of their work on the *Iron Man 3* Poster, in 2012, Sabel retained BLT Communications, LLC ("BLT"), an outside creative vendor that he had used on many other motion pictures, to help develop and create ideas for possible posters for *Iron Man 3*. (Nung Decl. ¶ 3; Sabel Tr. at 25:15 – 26:4, 29:18 – 23.) A different team at BLT had worked on print campaigns for *Iron Man* and *Iron Man 2* (films that were distributed by Paramount Pictures

Corporation, not by Walt Disney Studios. (Nung Tr. at 121:15 – 122:18; Nuchols Tr. at 31:1 – 31:10, 32:1 – 8.)

**Plaintiff's Response to ¶16**

Disputed in part. The photoshop files produced of the *Iron Man 3* poster comps show creation dates of 2011.

**Defendants' Statement ¶ 17**

Warren Nung headed the BLT team that worked on creating the *Iron Man 3* Poster. Mr. Nung and his staff, along with Messers Nuchols and Sabel, are responsible for the creation of the *Iron Man 3* Poster. (Nung Decl. ¶¶ 3, 5 – 12; Nuchols Tr. at 61:9 – 62:5; Sabel Tr. at 149:4 – 150:11.) Mr. Nung has never met either of the Lai brothers and had never seen the Caliban Drawing or heard of Radix prior to this lawsuit. (Nung Decl. ¶ 17.) Nor did Nung know Cebulski, Brevoort, or anyone at Marvel Comics. (Nung Tr. at 179:25 – 180:11.)

**Plaintiff's Response to ¶17**

Disputed. Mr. Nung and his staff, along with Nuchols and Sabel, are not the only individuals responsible for the creation of the *Iron Man 3* Poster. Pasciullo and Dillon, as well as several others at Marvel Studios as well as the filmmakers, commented on the poster, influenced its creation, and ultimately signed off on its final version.  (Wiesner Dec. Ex. 12, MENT021548; Ex.13, MENT008934-35; Ex.14, MENT008596; Ex.15, MENT0008609-0008610 and 5KND000768-000780; Ex. 16, MENT0009384; Ex. 17, MENT003282). There is also evidence the Creative Committee was involved in the print advertising campaign. (Wiesner

Dec. Ex. 17, MENTO03282-3283).  See also Defendants' Statement § 44, "the Marvel Studios visual effects team (VFX) sent Sabel and others a number of emails and renderings suggesting changes to the proposed Iron Man 3 Poster,  and § 46, "The Iron Man 3 Poster was approved by the film's lead producers, Kevin Feige and Stephen Broussard, on February 2, 2013."

**Defendants' Statement ¶ 18**

There is no evidence that: (a) the Lai brothers ever sent the Caliban Drawing to anyone associated with BLT or (b) anyone at BLT has ever seen the Caliban Drawing. (R. Lai Tr. at 116:18 – 22; B. Lai Tr. at 54:19 – 55:21.)

**Plaintiff's Response to ¶18**

Disputed in part.  Lai brothers did not send their artwork to anyone.  They were recruited by Marvel because of their work in Radix.  Artistic materials were exchanged between Pasciullo, Sabel and Nung.  Sabel testified he had a large "library" of artwork that he would use as "reference material" as inspiration when developing an advertising campaign. (Sabel Tr. 61:11-25—62:1-25). Nung regularly met with Sabel and viewed art work with Sabel, and testified to the artwork he had explored with Sabel, including religious materials, but he cut himself off in his deposition claiming not to recall. (Nung Tr. 49:2-25—50:1-24). Pasciullo testified he would provide materials to the team creating the posters to facilitate their creative work. (Pasciullo 27, 15-17).  It was within Tim Dillon's purview to provide artwork to Sabel at Disney. (Pasciullo Tr. 31:7-21).

**Defendants' Statement ¶ 19**

Key elements of the *Iron Man 3* suit and poses similar to the one that appears in the *Iron Man 3* Poster had existed in the Iron Man and *Avengers* films prior to *Iron Man 3* and the creation of the *Iron Man 3* Poster. (Litvack Decl., Ex. C (*Iron Man*) at 1:17:06 – 1:17:24; Ex. D (*Iron Man 2*) at 0:05:11 – 0:06:00, 1:35:55 – 1:36:12; Ex. E (*The Avengers*) at 0:42:23 – 0:42:36, 1:52:27 – 1:52:39; Ex. F (*Iron Man 3*) at 0:05:35 – 0:07:38, 0:19:09 – 0:20:12, 1:30:52 – 1:31:02, 1:43:00 – 1:44:28).

**Plaintiff's Response to ¶19**

Disputed. There is no prior art that matches the pose of the Iron Man 3 Image with right arm up and right knee up.

**Defendants' Statement ¶ 20**

Marvel Studios released Iron Man on May 2, 2008. The actor Robert Downey Jr. played Tony Stark/Iron Man. (Litvack Decl. ¶ 3(c) & Ex. C.)

**Plaintiff's Response to ¶ 20**

Not disputed.

**Defendants' Statement ¶ 21**

In *Iron Man*, Iron Man's armor has a red and gold color scheme, and has glowing blue lights on the chest plate of his armor, as in *Iron Man 3* and the *Iron Man 3* Poster. (*Id.* at

0:25:15 – 0:26:00, 0:50:30 – 0:52:30, 1:05:58 – 1:07:28, 1:15:58.)


**Plaintiff's Response to ¶ 21**

Disputed in part, as the *Radix* materials pre-date the *Iron Man* movies.


**Defendants' Statement ¶ 22**

*Iron Man 2*, also starring Robert Downey Jr., was released on May 7, 2010. In that film Iron Man's armor has a red and gold color scheme, and glowing blue lights on the chest plate as in *Iron Man 3* and the *Iron Man 3* Poster. (Litvack Decl., Ex. D, at 0:19:24 – 0:19:51, 1:02:56 – 1:05:29, 1:26:34 – 1:28:07, 1:46:18 – 1:47:20.)


**Plaintiff's Response to ¶ 22**

Disputed in part, as the *Radix* materials pre-date the *Iron Man* movies.


**Defendants' Statement ¶ 23**

*The Avengers*, also starting Robert Downey Jr., was released on May 4, 2012. In that film Iron Man's armor has a red and gold color scheme, and glowing blue lights on the chest plate as in *Iron Man 3* and the *Iron Man 3* Poster. (Litvack Decl., Ex. E, at 0:44:00 – 0:44:20, 1:13:53 – 1:13:59, 1:20:48 – 1:20:57, 1:50:06 – 1:50:21, 2:05:37 – 2:05:57.)


**Plaintiff's Response to ¶ 23**

Disputed in part, as the *Radix* materials pre-date the *Avenger* movie.

**Defendants' Statement ¶ 24**

Iron Man 3 was released on May 3, 2013, as the third installment in the Iron Man film series. (Litvack Decl. ¶ 3(f) & Ex. F.)

**Plaintiff's Response to ¶ 24**

Not disputed.

**Defendants' Statement ¶ 25**

After BLT and Warren Nung were retained in early 2012, Nung reviewed the Iron Man 3 film script; as a result of that review and discussions with Sabel and his team (who had also reviewed the script and brainstormed with producers), BLT's artists developed "inspiration boards" and black and white pencil sketches. (Nung Decl. ¶¶ 5 – 7; Nung Tr. at 39:5 – 19, 45:11 – 15, 46:21 – 47:2, 54:13 – 15; Nuchols Tr. at 33:4 – 34:7, 40:4 – 23; Sabel Tr. at 30:8 – 11, 30:20 – 31:5.)

**Plaintiff's Response to ¶ 25**

In his deposition, Nung testified that "we get concept art from Disney from John [Sabel] through the process. They have designers and they have concept artists that are visualizing through the process of what the films looks like and designing as the film, and some of that material is shared." (Nung Tr. at 48:9-11). Nung testified that some concept art that came from John Sabel included work from Andy Park, Ryan Meindering, and other artists. (Nung Tr. 52:5-14). Andy Park and Ray Lai had met in the past and Park was familiar with Radix. R. Lai Dec. § 9).

The "pencil sketches" are photoshop layered files.

**Defendants' Statement ¶ 26**

The inspiration boards were collections of images that BLT used to inform their art direction and poster concepts for the print advertising campaign ("the Campaign"), as guides for the clients, team-members, and/or illustrators. BLT's typical inspiration boards were 4 x 4 pieces of foam core, with pins to pin images, sketches, and thumbnails. (Nung Tr. at 55:22 – 25, 56:6 – 20.)

**Plaintiff's Response to ¶ 26**

Not disputed.

**Defendants' Statement ¶ 27**

The inspiration boards BLT created for Iron Man 3 featured many different images, including promotional art for film and videogames. They included numerous figures in crouching/kneeling postures, including Iron Man and fellow Marvel hero Spider-Man. The boards depicted numerous iconic characters wearing mechanized suits of armor, including Iron Man, Darth Vader, and videogame protagonists Master Chief (Halo series) and Isaac Clarkson (Dead Space series). (Nung Decl. ¶ 6 & Ex. A.)

**Plaintiff's Response to ¶ 27**

Not disputed. The inspiration boards included many crouching figures, but not a single

one that was crouching in the manner of the Caliban and the *Iron Man 3* poster with right arm and right knee up.  The BLT sketches too did not depict a crouching figure in the manner of the *Iron Man 3* poster.

**Defendants' Statement ¶ 28**

The Caliban Drawing does not appear on any of BLT's inspiration boards. (Id.)

**Plaintiff's Response to ¶ 28**

Plaintiff does not dispute that the inspiration boards provided by BLT do not include the Caliban image.

**Defendants' Statement ¶ 29**

Working from BLT's inspiration boards, BLT created black and white pencil sketches depicting Iron Man and other characters in a variety of poses with a variety of different themes and tones. (Nung Decl. ¶ 7; Nung Tr. at 31:13 – 25, 32:16 – 19.) BLT developed those pencil sketches in preparation for a photo shoot with the film's talent. (Nung Decl. ¶ 7; Nuchols Tr. at 39:5 – 17, 43:14 – 22; Nung Tr. at 79:15 – 80:2, 81:16 – 82:25, 124:22 – 125:3.)

**Plaintiff's Response to ¶ 29**

The "pencil sketches" are photoshop layered files.

**Defendants' Statement ¶ 30**

Xxxxxx sketches included several different designs depicting Iron Man in a kneeling/crouching/hero pose. (Litvack Decl., Ex. G at WDS000133 – 134, WDS000138 – 139; Nung Tr. at 81:16 – 18, 82:15 – 25, 83:16 – 17, 85:7 – 8.)

**Plaintiff's Response to ¶ 30**

Not disputed. None of the poses match the Caliban pose, or the *Iron Man 3* poster pose.

**Defendants' Statement ¶ 31**

A photoshoot with *Iron Man 3*'s talent – including Robert Downey Jr., Don Cheadle, and Guy Pearce was held on August 5, 2012 at Screen Gem Studios in Wilmington, North Carolina (the "Special Shoot"). (Litvack Decl., Ex. R at BLT_000711, BLT_000718; Nuchols Tr. at 55:24 – 56:5.)

**Plaintiff's Response to ¶ 31**

Not disputed.

**Defendants' Statement ¶ 32**

Sabel, Nuchols, and Nung all attended the Special Shoot, as did *Iron Man 3*'s director and several producers. (Litvack Decl., Ex. R at BLT_000718; Nuchols Tr. at 57:2 – 10; Nung Tr. at 111:10 –12; Sabel Tr. at 120:2 – 5, 150:6 – 11.)

**Plaintiff's Response to ¶ 32**

Not disputed.

**Defendants' Statement ¶33**

The photographer, Michael Muller, took a host of pictures of Robert Downey Jr. in a variety of different poses, including crouching and kneeling poses as depicted in BLT's concept art sketches. (Nuchols Tr. at 57:15 – 59:22; Nung Tr. at 80:12 – 15, 81:2 – 14, 93:18 – 20, 94:9 – 95:2.)

**Plaintiff's Response to ¶ 33**

Not disputed. None of the photographed poses were the pose in the *Iron Man 3* poster.

**Defendants' Statement ¶ 34**

Photos taken during the Special Shoot show Robert Downey Jr. looking down at BLT's concept sketches while engaging in kneeling and crouching poses – including the photos of Downey Jr. that BLT ultimately used to create the *Iron Man 3* Poster. (Litvack Decl., Ex. G; Nung Decl. ¶ 14 & Ex. D; Nuchols Tr. at 58:2 – 59:8.)

**Plaintiff's Response to ¶ 34**

Disputed in part. The photos used to create the Iron Man 3 Poster are cutouts from the photos. For example Robert Downey Junior's left arm was used in the poster as his right arm.

**Defendants' Statement ¶ 35**

Robert Downey Jr., through a personal hairstylist present at the Special Shoot, styled his own hair for the shoot. (Nuchols Tr. at 57:4 – 57:10; Nung Decl. ¶ 9; Litvack Decl., Ex. R at BLT_000713.)

**Plaintiff's Response to ¶ 35**

Disputed in part, the hairstyle appears to be modeled up on the BLT sketches.

**Defendants' Statement ¶ 36**

Over the course of the Campaign, Marvel and Walt Disney Studios delivered to BLT various Iron Man 3 film assets – including film clips, dailies (meaning raw footage shot on a "daily" basis), – for reference or use in creating theatrical posters for the picture. (Nung Tr. at 135:22 – 137:23, 155:3 – 4, 155:10 – 12; Sabel Tr. at 127:10 – 129:17.)

**Plaintiff's Response to ¶ 36**

Not Disputed.

**Defendants' Statement ¶ 37**

By blending together the photographic material from the Special Shoot, film assets, and their original artwork, BLT created "composite" draft theatrical posters, or so-called "comps." (Nung Decl. ¶ 10; Nung Tr. at 124:22 – 125:7; Sabel Tr. at 49:14 – 49:19.) BLT created hundreds of "comps"; Sabel Tr. at 118:4 – 119:5.)

**Plaintiff's Response to ¶ 37**

Not disputed.


**Defendants' Statement ¶ 38**

In the fall of 2012, Walt Disney Studios released a teaser trailer for *Iron Man 3*; the trailer featured a scene from the film in which multiple attack helicopters fired explosive rounds at Tony Stark's Malibu mansion. The trailer shows Tony Stark wearing the Iron Man suit as the mansion slips off its cliff-side perch into the sea, dragging Iron Man beneath the waves while he struggles for breath. (Litvack Decl., Ex. H.)


**Plaintiff's Response to ¶ 38**

Not disputed.


**Defendants' Statement ¶ 39**

Prior to the release of the teaser trailer, MarketCast, an independent market research firm, was retained to conduct a poll to gauge audience response to the teaser trailer concepts. (*See* Litvack Decl., Ex. H.) MarketCast reported that scenes featuring "Tony Stark's mansion exploding and collapsing, as Iron Man slides down a cliff" and "Iron Man sinking underwater" were among audience's "most-liked" scenes. (*Id.* at 21 – 23.) The report also stated that the helicopter attack scene was a "good example" of an action scene that "establish[es] the scale and grand scope of action [in *Iron Man 3*] and elevate[s] it to the standards set by *The Avengers*." (*Id.* at 14)

**Plaintiff's Response to ¶ 39**

Not Disputed.


**Defendants' Statement ¶ 40**

Having had access to the information from the MarketCast study on the film's teaser trailer and after watching the film clips featuring the Tony Stark's exploding mansion, as well as fight sequences from the film with multiple automated armors, such as those that had appeared in the teaser trailer, Sabel and Nung decided on the concept for the *Iron Man 3* Poster. (Nung Tr. at 95:6 – 97:9; Sabel Tr. at 58:16 – 60:21, 127:4 – 131:11; Litvack Decl., Ex. F at 0:33:44 – 0:40:06, 1:41:30 – 1:42:18 (scenes from *Iron Man 3* of mansion attack and battle involving multiple armors.)


**Plaintiff's Response to ¶40**

Not disputed.


**Defendants' Statement ¶ 41**

BLT created various potential designs for the final poster (often called the "payoff" poster), including the design ultimately chosen for the *Iron Man 3* Poster. Many of them depicted Iron Man in a kneeling or crouching pose. Some of them depicted Iron Man looking straight ahead at the viewer. Some depicted him in a crouching pose that was similar to the one ultimately used, but at a different level of "zoom" or cropping. Some depicted him in the same crouching position that was ultimately used, but with other characters, other colors, and other backdrop images. (Nung Decl., Ex. B; Nuchols Tr. at 61:9 – 62:11; Nung Tr. at 95:6 – 97:9.)

**Plaintiff's Response to ¶ 41**

    Not disputed.

**Defendants' Statement ¶ 42**

    On November 30, 2012 the producers of *Iron Man 3*, the creative print team headed by John Sabel, and other marketing executives met at Marvel Studios' offices in Manhattan Beach, California to review the numerous BLT comps Sabel presented. (Litvack Decl., Ex. S; Crumpacker Tr. at 169:21 – 170:20, 171:9 – 21; Nuchols Tr. at 95:1 – 24; Sabel Tr. at 112:7 – 11). After the meeting Megan Crumpacker, a Walt Disney Studios marketing executive, advised Jennifer Whitlock, an ABC marketing executive working on the Campaign, that: "PAYOFF PRINT – [was] really well received. Sabel brought a massive stack for discussion. Current frontrunner looks to be image of battle-scarred Iron Man, emerging from water, with multiple suits flying towards the sky." (Litvack Decl., Ex. S at WDS005013.)

**Plaintiff's Response to ¶ 42**

    Not disputed. Mike Pasciullo and Tim Dillon attended this meeting.

**Defendants' Statement ¶ 43**

    On December 3, 2012, sent several emails to Nung and others at BLT, entitled "IM3 Revised Comps." Attached to those emails were numerous designs for theatrical Iron Man 3 posters, including various drafts of a crouching/kneeling Robert Downey Jr. Some of these draft crouching posters displayed multiple armors flying in the background, and some did not. (Litvack Decl., Ex. T at BLT_000069 – 70, BLT_000121; Nung Tr. at 149:22 – 150:25, 152:25

– 154:15.)

**Plaintiff's Response to ¶ 43**

      Not disputed.

**Defendants' Statement ¶ 44**

      During January 2013 the Marvel Studios visual effects team (VFX) sent Sabel and others a number of emails and renderings suggesting changes to the proposed Iron Man 3 Poster to have it conform with the depiction of the suit and the hero in Iron Man 3. Some of the VFX team's proposed changes were adopted and some were not, because while conformance to the film was important, the creative image for the poster was for the creative print and production teams to decide. (Litvack Decl., Ex. U; Nuchols Tr. at 102:1 – 109:10; 113:10 – 115:21, 122:11 – 123:2, 123:20 – 124:8, 125:15 – 127:24.)

**Plaintiff's Response to ¶ 44**

      Disputed. Defendants facts contradict their earlier statements (para. 13, 14) that it was only the Creative Print Team at Disney, Sabel and Nuchols, that was responsible for the Iron Man 3 poster. The filmmakers at Marvel Studios had the final sign off for the poster, including Pasciullo. (Wiesner Dec. Ex. 12, MENT021548; Ex.13, MENT008934-35; Ex.14, MENT008596; Ex.15, MENT0008609-0008610 and 5KND000768-000780; Ex. 16, MENT0009384; Ex. 17, MENT003282).

**Defendants' Statement ¶ 45**

On January 23, 2013 a member of Sabel's team, Michelle Testa, emailed Inyoue requesting sourcing information for the visual assets in the draft *Iron Man 3* Poster to provide Marvel Legal to clear all licensing, including for stock photography. XXXXXX then uploaded BLT "call outs" for the *Iron Man 3* Poster to Disney's secure server. (Litvack Decl., Ex. V; Nuchols Tr. at 76:10 – 17; Sabel Tr. at 24:11 – 15.) BLT's call outs are visual reference sheets sourcing the images and files used in a draft comp. (Nung Decl. ¶ 13.) BLT's call outs identified the exact Special Shoot photos, as well as the other sources, used in the *Iron Man 3* Poster, and show that the photos used for Iron Man's head, shoulders, arms, and fist (among other elements) were all taken at the Special Shoot. (Nung Decl. ¶ 13 – 15 & Exs. C, D, and E.)

**Plaintiff's Response to ¶ 45**

Disputed.  The elements from the Special Shoot used in the final image are two pieces of RDJ's body: the head and the left arm.  The left arm had to be mirrored, presumably in photoshop, to make it a right arm.  The torso and other portions of RDJ body were taken from a body stunt double.  The body was pieced back together and greatly revised in the final image.

**Defendants' Statement ¶ 46**

The Iron Man 3 Poster was approved by the film's lead producers, Kevin Feige and Stephen Broussard, on February 2, 2013. (Litvack Decl., Ex. W; Nuchols Tr. at 136:17 – 138:9.) It debuted online at Yahoo! on February 27, 2013 and was displayed in U.S. and Canadian theaters by March 8, 2013. (Litvack Decl., Ex. X.)

**Plaintiff's Response to ¶ 46**

Not disputed. Defendants' statement contradicts its statement in paragraph 14 that the Disney Print Creative team had final say on the Iron Man 3 poster.


## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

**Plaintiff's Statement ¶ 47**

Plaintiff Horizon Comic Productions Inc. is a Canadian corporation and is the owner of all rights, including copyright, in and to the Radix series of comic books and the advertising and promotional materials associated therewith and its rights are evidenced by United States Copyright Registration Nos. TX0007905283, TX0007948821, TX0007948818, VAu001213367, and VA0001962652 each of which it owns as works made for hire or via assignment, and Registration No. VA0001950739. (Wiesner Dec., Ex. 1, HCP00028-39).


**Plaintiff's Statement ¶ 48**

Ray Lai and Ben Rai are brothers and comic book artists who founded Horizon Comic Productions, Inc. in 1995. (Wiesner Decl., Ex. 2 (hereinafter "R. Lai Tr.") at 8:12-15; 9:10-11.


**Plaintiff's Statement ¶ 49**

The Lai brothers worked together at CrossGen, a new comic book publisher founded by multi-millionaire Mark Alessi, from 1999-2000, with several other former and future Marvel artists. (R. Lai. Tr. 37:15-16; 43:7-8; R. Lai Dec. § 11). Mr. Alessi had hired the Lais as the first artists at Crossgen in 1999, and the Lais attended the San Diego Comicon in 1999 to promote Crossgen. The Lais allowed Crossgen to use some early *Radix* art to promote itself at

this Comicon. Interest in this new company was widespread and many people stopped by the Lais' booth to see what was going on and to speak with the Lais.  (R. Lai Dec. § 11).

**Plaintiff's Statement ¶ 50**

Joe Quesada was also a comic book artist who the Lais knew from CrossGen. (R. Lai Dec. § 12). Quesada was a guest of honor, along with Marvel founder Stan Lee, at a party that Mark Alessi threw in association with Alessi's Megacon comic convention in 2000. Ray Lai was in attendance at that party and spoke with Quesada. (R. Lai Dec. § 12).

**Plaintiff's Statement ¶ 51**

Jeph Loeb was also aware of early Radix materials and the Lai brothers.  (R. Lai Tr. 38:7-12; R. Lai Dec.).  In 1998, Loeb saw the Lai brothers early Radix materials at a comic convention in Montreal.  Loeb asked the Lai brothers to create some sample work for the Deadpool book Loeb was working on at Marvel.  (R. Lai. Tr. 61:15-25—62:1-8).

**Plaintiff's Statement ¶ 52**

The Lai Brothers published their comic book series Radix in 2001-2002. (R. Lai Tr. at 10:7-9).

**Plaintiff's Statement ¶ 53**

In the comic books, heroic characters are depicted wearing highly detailed, futuristic, armored, and weaponized suits of body armor to fight enemies.  (R. Lai Dec. § 1).

**Plaintiff's Statement ¶ 54**

Brain Reber ("Reber") was the colorist for Radix.  (R. Lai Dec. § 2.; R. Lai Tr. 107:6-10).

**Plaintiff's Statement ¶ 55**

Based on their work in Radix, they were recruited by Chester Bror Cebulski ("Cebulski") to work as artists for Marvel Comics in 2002. (R. Lai Tr. 74:22-25-75:1-12; R. Lai Dec. §§ 15, 22-23; R. Lai Dec., Ex. 10, HCP000234).  Ray Lai met Cebulski in 1999 at the San Diego Comicon. (R. Lai Dec. § 11).

**Plaintiff's Statement ¶ 56**

In 2001, a few months prior to the publication of *Radix*, Cebulski approached the Lai brothers at their *Radix* booth at a comic book convention—called "Comicon"—where the Lais were promoting their work in the upcoming release of *Radix*.  (R. Lai Tr. 38:16-25—39:1-23; (R. Lai Dec. § 8).

**Plaintiff's Statement ¶ 57**

The Lais had many visitors to their booth at the 2001 Comicons. Those visitors included Andy Park, who came over at the San Diego Comicon with some of his colleagues from comic publisher Top Cow to congratulate the Lais on Radix.  (R. Lai Dec. § 9).

**Plaintiff's Statement ¶ 58**

One of the characters in the soon-to-be released Radix comic was called the Caliban. (R. Lai Tr. 12:12-15; R. Lai Dec. §§ 3, 9; R. Lai Dec., Ex. 1, HCP00001).

**Plaintiff's Statement ¶ 59**

The Caliban was displayed at the Lais' booth at Comicon conventions in 2001. (R. Lai Dec. § 7; HCP000211-213).

**Plaintiff's Statement ¶ 60**

When Cebulski approached the Lais at the convention, he and Ray Lai exchanged business cards. (Wiesner Dec., Ex. 3 (hereinafter "B. Lai Tr.") at 92:21-25-93:1-1; 94:3-22; R. Lai Tr. 33:24-25—34:1-5;17-22; 38:19-25—39:1-12; R. Lai Dec. § 10; R. Lai Ex. 6, HCP00007).

**Plaintiff's Statement ¶ 61**

In addition, to giving Cebulski his business card at that convention, Ray Lai also gave Cebulski promotional materials for their work, including a *Radix* preview book. (R. Lai Tr. 42:3-16; 62:12-25—63:1-6; HCP000190-196).

**Plaintiff's Statement ¶ 62**

The horizoncomics.com website was prominently displayed at the booth and appeared in the promotional materials. (R. Lai Dec. ; HCP000211-213; HCP00009-HCP00015). Because the comic book was not yet published, the purpose of the website was to allow those interested to

gain a sneak preview of what was soon to come.  (R. Lai Dec.; R. Lai Tr. 42:12-16; R. Lai Dec. §§ 5-8).

**Plaintiff's Statement ¶ 63**

The *Radix* preview book contains a synopsis of the story line of *Radix* and a character page showing the various characters, with brief descriptions of the characters. (R. Lai Dec., Ex. HCP000190-196; R. Lai Tr. 62:19-24).  Among those is a head shot of the Caliban character on a page citing to the Horizoncomics.com website. (HCP000195).

**Plaintiff's Statement ¶ 64**

Ray Lai's business card included the Horizoncomics.com web address, and the website also contained the *Radix* preview book.  (R. Lai Tr. 62:17-25; (R. Lai Dec. § 9; R. Lai Dec., Ex. 5, HCP00007).  The Caliban image was displayed on the website. (R. Lai Dec. § 13; R. Lai Dec., Ex. 6, HCP00013).  It was one of approximately 11 images of the *Radix* comic characters displayed on the website.  (R. Lai Dec., Ex. 3, HCP00011).

**Plaintiff's Statement ¶ 65**

If one wanted to save the image, one could simply right click the image and choose save from the drop-down menu.  (Ray Lai Dec. § 14).

**Plaintiff's Statement ¶ 66**

The Radix comics sold thousands of copies.  (R. Lai Tr. 91:15-20; R. Lai Dec. § 16).  Some of those sales were surely to comic industry professionals, as many people in the comic

industry made a trip to their local comic shop every Wednesday to view the new releases. (R. Lai Dec. § 17). The first Issue of *Radix*, published in December, 2001, contained a blue-colored Caliban image as a stand-alone page with "Horizoncomics.com" appearing above it. (R. Lai Tr. 30:17-19; 120:2-6; R. Lai Dec. § 4; R. Lai Dec., Ex. 2). The full-colored version of the Caliban appeared on the website. (R. Lai Dec. § 3; R. Lai Dec., Ex. 7, HCP00013).

**Plaintiff's Statement ¶ 67**

Approximately 26,000 copies of Issue 1 of Radix were printed. (R. Lai. Tr. 91:15-20).

**Plaintiff's Statement ¶ 68**

The second and third Issues of *Radix* were published in February and April, 2002, respectively. (R. Lai Tr. 189:20-22). Approximately 16,000 copies of Issue 2 were printed, and approximately 10,000 copies of Issue 3 were printed. (R. Lai Tr. 91:15-20; 71:6-8). Radix Issue 2 was listed at 140 in a leading distributors' Top 300 list of comics for the month in which it was published. (Wiesner Dec., Ex. 4, MENT030252).

**Plaintiff's Statement ¶ 69**

As the *Radix* issues were published, the website was regularly updated to give readers additional previews, plot summaries and sample art. (R. Lai Dec. § 13).

**Plaintiff's Statement ¶ 70**

As a result of the success of *Radix*, the Lais received interest from several producers about making it into a film. (R. Lai Tr. 72:8-15; 73:5-15). For example, on September 20, 2002,

Ray Lai was contacted via email by a representative from Alphaville Productions inquiring as to the availability of film rights in *Radix*. (R. Lai Dec. § 35; R. Lai Dec., Ex. 14).

**Plaintiff's Statement ¶ 71**

In addition to being recruited to work for Marvel, the Lais were also approached by other companies, such as Hasbro and Mattel, who were interested in hiring them. (R. Lai Dec. ; R. Lai Tr. 74:4-9).

**Plaintiff's Statement ¶ 72**

This is not a situation where the Lais submitted sample work to Marvel in the hopes of obtaining work. Quite the contrary, the brothers were recruited by Cebulski., who was familiar with the Lais work and ultimately recruited them to Marvel. (See e.g., R. Lai Tr. 67:5-11; R. Lai Tr. 74:23-25—75:1-12; R. Lai Dec., Ex. 17, HCP000234).

**Plaintiff's Statement ¶ 73**

In March of 2002, Cebulski called Ray Lai and said that he had seen *Radix* and was impressed. (R. Lai Tr. 66:19-22; 65:25-66:1-7; 67:5-11; R. Lai Dec. § 15). Cebulski asked if the Lai brothers would be interested in doing work for Marvel. (R. Lai Tr. 67:5-11; R. Lai Dec. § 15). Ray Lai told Cebulski they were not interested at that time. (R. Lai Tr. 68:15-21).

**Plaintiff's Statement ¶ 74**

In August and September of 2002, the Lai brothers received national and international media attention as a result of an admission by the Massachusetts Institute of Technology

("MIT"), one of the United States' premier scientific research institutions, that it had used a Radix image in its successful $50 million grant proposal to the Pentagon. A public relations firm, Regan Communications, collected news articles concerning that matter as they were published and provided them to the Lais. (R. Lai Dec. § 19; R. Lai Dec. Ex. 8, HCP00073-127).

**Plaintiff's Statement ¶ 75**

MIT had submitted its grant application in March of 2002. (HCP000079). In its application, MIT had submitted an image that was substantially similar to the Lais' character, the heavily armed and armored Valerie Flores, as an example of a "soldier of the future." (R. Lai Dec. Ex. 8 at HCP000073). One of the purposes of the grant was to develop a new generation of body armor for soldiers in what became MIT's Institute for Soldier Nanotechnology when MIT was awarded the grant. ((R. Lai Dec. Ex. 8 at HCP00073-127).

**Plaintiff's Statement ¶ 76**

Ray Lai learned about MIT's use of their character's image when *Radix* fans contacted him and told him they had seen the *Radix* character in a news story about MIT's grant proposal. ((R. Lai Dec. Ex. 8 at HCP00075; R. Lai Dec. § 18).

**Plaintiff's Statement ¶ 77**

After several months, MIT issued a public apology in August, 2002 to the Lai brothers for its unauthorized use of the Radix image. ((R. Lai Dec. Ex. 8 at HCP00086-90).

**Plaintiff's Statement ¶ 78**

As a result of the MIT incident, the Lais stopped working on *Radix*. (B. Lai Tr. 87:8-13; R. Lai Tr. 190:6-9).

**Plaintiff's Statement ¶ 79**

The news story regarding the MIT infringement broke on August 28, 2002 and news stories ran in numerous publications on August 28, 2002, August 29, 2002, August 30, 2002, August 31, 2002 and September 1, 2002. (R. Lai Dec., Ex. 8, HCP00073-127). The Lais and *Radix* were featured in news publications including the Washingtonpost.com on August 29, 2002 (HCP000114-115), ABCNews.com on September 1, 2002 (HCP00086-87), the Associated Press on August 28, 2002 (HCP00073), the Boston Globe on August 28, 2002 and August 31, 2002 (HCP00074-75; HCP00090) and others. On August 29, 2002, an Anderson Cooper interview with Ray Lai was broadcast on CNN. (R. Lai Dec. § 21; R. Lai Dec. Ex. 9; CNN video at 30:59-35:20, HP00091-93).

**Plaintiff's Statement ¶ 80**

A Harvard Law Professor is quoted in a *Boston Globe* article covering the story as saying "if their goal is to get the word out about [the comic] MIT is doing them a great service." (R. Lai Dec. Ex. 8 at HCP00075; Dec. R. Lai).

**Plaintiff's Statement ¶ 81**

As a result of the media blitz, *Radix* received significant attention. The horizoncomics.com website became overloaded with traffic and temporarily inaccessible.

Shortly thereafter it was hacked and had to be rebuilt with the assistance of an IT specialist.

Thereafter it remained fully accessible until at least February of 2003. (R. Lai Dec. § 20).

**Plaintiff's Statement ¶ 82**

Cebulski called Ray Lai again shortly after the news broke about MIT's admission that it had infringed an image from Radix. (R. Lai Tr. 69:16-21; R. Lai Dec. § 22). Cebulski told Ray Lai he had seen the news about MIT and knew that the Lais had stopped working on Radix. (R. Lai Tr. 74:23-25—75:1-12).

**Plaintiff's Statement ¶ 83**

On September 12, 2002, Cebulski sent an email to Ray Lai through the Horizoncomics.com email address, "raylai@horizoncomics.com," asking Lai to email him. (R. Lai Dec. § 23; R. Lai Dec., Ex. 10, HCP000234;). This email address used by Cebulski was embedded in the horizoncomics.com website.

**Plaintiff's Statement ¶ 84**

This was the first time Mr. Cebulski contacted the Lais via email, and neither Lai brother had ever emailed Cebulski. (R. Lai Dec. §§ 25-26).

**Plaintiff's Statement ¶ 85**

The "raylai@horizoncomics.com" email address was different from the email address printed on Ray Lai's business card, "rayradix@horizoncomics.com." (R. Lai Dec. § 31; R. Lai.

Dec., Ex. 6, HCP00007). Cebulski did not use the email address on the Ray Lai's business card.

**Plaintiff's Statement ¶ 86**

The only place the raylai@horizoncomics.com email address was published was on the "Creators" page of the Horizon Comics website located at horizoncomics.com/radix/creators/creators_main.html. (R. Lai Dec. § 27; R. Lai Dec., Ex. 11).

**Plaintiff's Statement ¶ 87**

The email address was embedded within the text of Ray Lai's name using the hyperlink mailto:raylai@horizoncomics.com, such that when one clicked on Ray Lai's name, it would bring up a blank email in the users email program with raylia@horizoncomics.com in the TO: field. (R. Lai Dec. § 28).

**Plaintiff's Statement ¶ 88**

The purpose of the raylai@horizoncomics.com address was to give visitors to that website a way to contact Ray Lai directly. (R. Lai Dec. § 30). Ray Lai maintained these two accounts so he could differentiate emails sent by people to whom he had given his business card, people who were likely to be involved in the comic book industry and, potentially, employers or fans who might visit the website. ((R. Lai Dec. § 32).

**Plaintiff's Statement ¶ 89**

The same day Cebulski emailed Ray Lai through his email address embedded in the website, and after Ray Lai responded, Cebulski told Ray Lai that he was sending him, via fedex, a package containing issues of *Ultimate X Men*, to show him examples of what he and his brother would be working on, in order to secure the Lais as artists for Marvel.  (Dec. R. Lai § 33, Dec. R. Lai Ex., 12, HCP000236).

**Plaintiff's Statement ¶ 90**

Soon thereafter, Ben and Ray Lai executed contracts with Marvel, dated September 16, 2002. (R. Lai Dec. § 34, R. Lai Dec. Ex. 13, HCP000126-135).

**Plaintiff's Statement ¶ 91**

A contemporaneous news story, dated November 13, 2002 explained:  "[t]he move to Marvel, according to [Ray] Lai, began before the Lais' problems with MIT – when editor C.B. Cebulski approached the two in March. It wasn't until September that the two took up Cebulski's offer…."  (R. Lai Dec. . § 49; R. Lai Dec. Ex. 15, HCP000218).

**Plaintiff's Statement ¶ 92**

Between September 12, 2002 and October 28, 2002, Cebulski and the Lais worked together on an issue of *Ultimate X-Men*.  (R. Lai Dec. § 40; R. Lai Dec., Ex. 18, HCP000235-318).

**Plaintiff's Statement ¶ 93**

As the Lais created the pages for the comic, they sent their work to Cebulski, who forwards it to others working on the project. (R. Lai Dec. § 41; R. Lai Dec., Ex. 19, HCP000298).

**Plaintiff's Statement ¶ 94**

In 2002-2003, Ray and Ben Lai also work with Cebulski on a unique project, a custom comic created for the Army National Guard—a comic called *Guard Force*. (R. Lai Dec. § 42; Bogart Tr. 26:15-17; Brevoort Tr. 122:15-18;).

**Plaintiff's Statement ¶ 95**

In addition, Cebulski worked with the Lais on other projects through August of 2003. (R. Lai Dec. § 45; R. Lai Dec., Ex. 22, HCP000573-582; HCP000586).

**Plaintiff's Statement ¶ 96**

In 2002, Tom Brevoort ("Brevoort") was a Senior Editor at Marvel Comics. (Brevoort Tr. 67:8-10).

**Plaintiff's Statement ¶ 97**

Soon after Cebulski's recruitment of the Lai brothers to Marvel, Brevoort offered them a position as lead artists on *Thor*. (Brevoort Tr. 18:16-17; 76:19-25—77:1-11; HCP000319).

**Plaintiff's Statement ¶ 98**

Both Brevoort and Cebulski were involved in coordinating Marvel's press release announcing that the Lais had joined Marvel. This was notable because Marvel did not issue press releases for all artists it hired, and thus issuing a press release announcing the Lai brotehrs work with Marcel suggested they were brought on, at least in part, because they were recognizable names in the industry. (R. Lai Dec. §§ 36, 46).

**Plaintiff's Statement ¶ 99**

In a September 16, 2002 email, Cebulski informs Ray Lai that Marvel will be "making an announcement about you guys coming on soon….we kindly ask you not mention this to anyone until we can get a press release out and then we will get comments from you." (R. Lai. Dec., Ex. 23, HCP000249). On September 27, 2002, Cebulski indicates that he needs to consult Bill Rosemann about a press release announcing that the Lais had been hired (R. Lai Dec. § 47; R. Lai. Dec., Ex. 24, HCP000288). Brevoort provides Bill Rosemann with the information he requested for such a press release on November 13, 2002, including a quote. (R. Lai Dec. § 36; R. Lai. Dec., Ex. 25, HCP000340).

**Plaintiff's Statement ¶ 100**

In a November 13, 2002 email, Brevoort provides a quote for the press release, describing the Lai brothers as follows: "They've got a nice, detail-oriented style, their storytelling is strong and sharp, and their current work on ULTIMATE X-MEN with Colossus showed that they'd excel at depicting massive, powerful characters--which THOR is packed with!" (R. Lai Dec. § 48, R. Lai. Dec., Ex. 25, HCP000340).

**Plaintiff's Statement ¶ 101**

In November 2002, Ray Lai was interviewed for a new story which was published on Newsarama. (R. Lai Dec. § 37). The story was published on November 13, 2002 quotes Ray Lai as explaining "[the Lai brothers'] move to Marvel, according to [Ray] Lai, began before the Lais' problems with MIT – when editor C.B. Cebulski approached the two in March. It wasn't until September that the two took up Cebulski's offer…" (R. Lai Dec., Ex. 15, HCP000218).

**Plaintiff's Statement ¶ 102**

The November 13, 2002 article also stated: "Marvel announced Wednesday that artists Ben and Ray Lai, a one-time discovery of CrossGen and mostly lately creators of their own Image Comics series Radix, will join writer Dan Jurgens on the Thor series as the title's new regular art team with March's issue #61." (R. Lai Dec. § 49; R. Lai Dec., Ex. 15, HCP000217-218).

**Plaintiff's Statement ¶ 103**

In October and November, 2002, Brevoort and Marc Sumerak (Brevoort's Assistant Editor at Marvel Comics) worked directly with Ben and Ray Lai on several issues of *Thor*. (R. Lai Dec. § 50; R. Lai Dec., Ex. 26, HCP00320; HCP000440-445; HCP000486-490; HCP000493; HCP000513-516, HCP000525-526; HCP000529-531; HCP000538-540; HCP000547-563; HCP000567; HCP000572).

**Plaintiff's Statement ¶ 104**

At the Lais request, Reber, the colorist on Radix, is hired by Marvel as colorist, and Brevoort is copied on the emails evidencing Reber's recruitment and work on *Thor*. (R. Lai Dec. § 51; R. Lai Dec., Ex. 27, HCP000319, HCP000344).

**Plaintiff's Statement ¶ 105**

Reber continues to work as a colorist at Marvel Comics. (Bogart Tr. 26:18-25—27:1-8).

**Plaintiff's Statement ¶ 106**

In 2002, William Jemas was President of Consumer Products, Publishing and New Media at Marvel Enterprises Inc. (Dec. of William Jemas). In his Declaration, Jemas claims he was "made aware" of the Lais during this litigation. (Dec. of William Jemas at para. 2). Jemas claims that he has "no recollection of meeting or knowing" the Lais. (Dec. of William Jemas at para. 2).

**Plaintiff's Statement ¶ 107**

Ray Lai spoke with Bill Jemas several times in 2002 and 2003 about doing work for Marvel and they discussed *Radix*, which Jemas was familiar with. (R. Lai Tr. 55:8-25-56:1-9).

**Plaintiff's Statement ¶ 108**

Jemas also worked with the Lais on issues of *Blade* in 2003. (R. Lai Dec. § 56; R. Lai Dec., Ex. 32, HCP000585-590; HCP000622). MacKenzie Cadenhead, Mr. Jemas' assistant,

made it clear to Ray Lai that Jemas was responsible for hiring the brothers to work on the *Blade* series. It was also clear form the numerous emails exchanged that Jemas was responsible for outlining the script for *Blade* (R. Lai Dec., Ex. 32, HCP000582). Emails document that the Lais and Jemas took part in conference calls as they collaborated to create the issues of *Blade*. (R. Lai Dec., Ex. 32, HCP000585-590).

**Plaintiff's Statement ¶ 109**

Brevoort was familiar with the Lais' work in 2002. At that time, Brevoort was a Senior Editor at Marvel Comics. (Brevoort Tr. 67:8-10). Brevoort testified at his deposition that he first heard of the Lai brothers in relation to their work on a comic called Sigil published by Crossgen, where the Lai brothers worked prior to publishing Radix. (Brevoort Tr. 63:11).

**Plaintiff's Statement ¶ 110**

When Crossgen went out of business, Brevoort recalls Joe Quesada alerting Brevoort and others on the editorial staff at Marvel of certain creators who had been at CrossGen that would be available for work, including the Lais. (Brevoort Tr. 75:2-10). He specifically believed that he "would have been made aware of Ben and Ray Lai as a part of that conversation," and would have looked at their work at Crossgen. (Brevoort Tr. 75:10; 77:16-19).

**Plaintiff's Statement ¶ 111**

Brevoort specifically recalled that he had copies of CrossGen comic books on hand because "we were looking at all the various creator [sic] who were involved in the dissolution of CrossGen." (Brevoort Tr. 77:16-25—78:1-3).

**Plaintiff's Statement ¶ 112**

At that time, *Thor* was undergoing a creative shift. (Brevoort Tr. 77:19-20). In relation to that shift, Brevoort recalls either Jose Quesada or Bill Jemas suggesting that the Lai brothers might be a good fit for *Thor*. (Brevoort Tr. 76:27-25).

**Plaintiff's Statement ¶ 113**

Soon thereafter, in November, 2002, Ben and Ray Lai began working with Brevoort and his team on *Thor*. That team included Sumerak, Brevoort's Assistant Editor at Marvel Comics. (R. Lai Dec. Ex. 26, HCP000440-445; HCP000486-490; HCP000493; HCP000513-516, HCP000525-526; HCP000529-531; HCP000538-540; HCP000547-563; HCP000567; HCP000572).

**Plaintiff's Statement ¶ 114**

Michael Pasciullo had worked at Marvel Comics as Manager of Marketing from 1996-1999. (Pasciullo Tr. 15:9-14).

**Plaintiff's Statement ¶ 115**

Pasciullo returned to Marvel Comics in 2006 as Vice President of Marketing for Marvel Comics. (Pasciullo Tr. 15:19-20, 19:11-13).

**Plaintiff's Statement ¶ 116**

At that time, Tim Dillion worked with Pasciullo at Marvel Comics in New York. (Pasciullo Tr. 17:22-24).

**Plaintiff's Statement ¶ 117**

Pasciullo has known Dillion since approximately 2008 and met him at marvel Comics in New York. (Pasciullo Tr. 18:1-6).

**Plaintiff's Statement ¶ 118**

In 2011, Pasciullo moved over to Marvel Studios as Vice President of Marketing for Marvel Studios. (Pasciullo Tr. 20:25—21:1).

**Plaintiff's Statement ¶ 119**

In this role, he worked on the marketing campaign for *Iron Man 3*, along with Tim Dillion. (Pasciullo Tr. 21:7-9; 24:2-10).

**Plaintiff's Statement ¶ 120**

Like Pasciullo, Dillon left Marvel Comics in New York and went to work for Marvel Studios in California. He worked in the same department as Pasciullo on the print campaign for *Iron Man 3*. (Pasciullo Tr. 24:2-6).

**Plaintiff's Statement ¶ 121**

Pasciullo has known Cebulski since approximately 2008.  (Pasciullo Tr. 16:21-22).

**Plaintiff's Statement ¶ 122**

Cebulski and Pasciullo worked together in the same office beginning in approximately 2008, after Pasciullo re-joined Marvel. (Cebulski Tr. 32:7-13). They worked together creating advertisements for Marvel Comics. (Cebulski Tr. 32:23-25).

**Plaintiff's Statement ¶ 123**

At that time, Cebulski and Paciullo also worked with Tim Dillion creating advertisements for Marvel Comics. (Cebulski Tr. 43:12-15).

**Plaintiff's Statement ¶ 124**

Cebulski and Pasciullo are friends.  (Cebulski Tr. 30:17-25).

**Plaintiff's Statement ¶ 125**

Cebulski also considers Dillon a friend.   (Cebulski Tr. 44:4-11).

**Plaintiff's Statement ¶ 126**

 Pasciullo was the "key executive" at Marvel Studios working on the print advertising campaign for *Iron Man 3*. (Crumpacker Tr. 27:18-21).

**Plaintiff's Statement ¶  127**

Numerous individuals at both Disney and Marvel were involved in the creation of the Iron Man 3 poster.  They included Pasciullo, Dillon, Nuchols, and Sabel, and others.  The creators also worked with an outside agency, BLT.  Some of those who worked on the Iron Man 3 campaign had previously been employed at Marvel Comics, such as Pasciullo and Dillon. (Pasciullo Tr. 24:2-6).

**Plaintiff's Statement ¶ 128**

John Sabel and Steve Nuchols, who worked for Disney, collaborated with Pasciullo on the *Iron Man 3* campaign.  (Pasciullo Tr. 23:16-19).

**Plaintiff's Statement ¶ 129**

During the *Iron Man 3* campaign, Pasciullo contributed to the creation of the payoff poster by offering feedback as it was developed and providing artistic materials to Sabel and Nuchols at Disney. (Pasciullo Tr. 26:21-25-27:1-7).

**Plaintiff's Statement ¶ 130**

Pasciullo testified he would provide materials to the team creating the posters to facilitate their creative work. (Pasciullo 27, 15-17).

**Plaintiff's Statement ¶ 131**

Pasciullo testified that it was also in Tim Dillon's purview to provide artistic materials to Disney personnel. (Pasciullo Tr. 31:7-21).

**Plaintiff's Statement ¶ 132**

Sabel testified he had a large "library" of artwork that he would use as "reference material" as inspiration when developing an advertising campaign. (Sabel Tr. 61:11-25—62:1-25). Nung testified to the artwork he had explored with Sabel, including religious materials, but he cut himself off in his deposition claiming not to recall. (Nung Tr. 50-51).

**Plaintiff's Statement ¶ 133**

BLT was a vendor that was contracted to create the *Iron Man 3* print advertising campaign. (Pasciullo 42:10-12).

**Plaintiff's Statement ¶ 134**

Warren Nung ("Nung"), who is the Creative Director of BLT, worked on the Iron Man 3 campaign, including the creation of the payoff poster. (Nung 31:10-12). Nung has held the position of Creative Director since 2001. (Nung Tr. 58:1-5).

**Plaintiff's Statement ¶ 135**

In his deposition, Nung testified that "we get concept art from Disney from John [Sabel] through the process. They have designers and they have concept artists that are visualizing through the process of what the films looks like and designing as the film, and some of that material is shared." (Nung Tr. at 48:9-11).

**Plaintiff's Statement ¶ 136**

Nung testified that concept art came from John Sabel's collection and it included art from Andy Park and Ryan Meindering, among others. (Nung Tr. 52:5-14).

**Plaintiff's Statement ¶ 137**

Pasciullo was involved at all stages of the creation of the Iron Man 3 poster, including providing comments on creative aspects of the work and providing artistic materials to Disney. (Wiesner Dec. Ex. 12, MENT021548; Ex.13, MENT008934-35; Ex.14, MENT008596; Ex.15, MENT0008609-0008610 and 5KND000768-000780; Ex. 16, MENT0009384; Ex. 17, MENT003282).

**Plaintiff's Statement ¶ 138**

Pasciullo was aware of what the payoff poster was going to look like even in October of 2012. (Wiesner Dec. Ex. 18, MENT008578-8579; 5THK000746-762).

**Plaintiff's Statement ¶ 139**

Pasciullo testified he would provide materials to the team working on the Iron Man 3 campaign creating the posters to facilitate their creative work. (Pasciullo Tr. 27:15-17).

**Plaintiff's Statement ¶ 140**

Pasciullo testified that he did not recall if there were materials other than concept art created by Marvel people that was sent to Disney. (Pasciullo, Tr. 30:22-24).

**Plaintiff's Statement ¶ 141**

In addition, Marvel had a "Creative Committee" that "was a group of Marvel employees and creators who consulted with Marvel Studios on the various Marvel film projects…" (Brevoort Tr. 51:3-6). "The purpose of the creative committee was to advise the—interface with the Marvel studios personnel on the conceptualizing on the various Marvel properties for film." (Brevoort, Tr. 53:13-16).

**Plaintiff's Statement ¶ 142**

Joe Quesada, the Chief Creative Officer at Marvel Comics in New York was on the Creative Committee (Brevoort Tr. 25:13-16; 52:21-23).

**Plaintiff's Statement ¶ 143**

Brevoort also testified that he believed Alan Fine was also on the Creative Committee. (Brevoort Tr. 52:21-23).

**Plaintiff's Statement ¶ 144**

In the course of the development of the *Iron Man 3* payoff poster, there was a "filmmaker's meeting" attended by Megan Crumpacker and John Sabel, among others. (Wiesner Dec. Ex. 19, WDS005013).

**Plaintiff's Statement ¶ 145**

An email sent by Crumpacker on November 30, 2012 records that Sabel brought a "massive stack" of work to the meeting with the filmmakers. (Wiesner Dec. Ex. 19, WDS005013; Sabel Tr. 114:6-19).

**Plaintiff's Statement ¶ 146**

The analysis undertaken in his expert report show almost exact proportions in the bodies of the Radix and Iron Man 3 images. (Wiesner Dec. Ex. 20).

**Plaintiff's Statement ¶ 147**

Based on his analysis—supported with step-by-step illustrations—he concludes that "it would be highly unlikely in my opinion—approaching impossible—for all the aforementioned similarities between these two images to align so closely in the absence of copying." (Wiesner Dec. Ex. 19 at para. 55).

**Plaintiff's Statement ¶ 148**

Mr. Westwood's analysis utilized the software Adobe Photoshop, which enabled him to create equally sized images for the purpose of side-by-side comparisons of various points of the two images and their relative proportions. His knowledge of anatomy permitted his to locate points such as the shoulder joint to enable further comparisons. (Wiesner Dec. Ex. 20).

**Plaintiff's Statement ¶ 149**

C.B. Cebulski testified at a deposition on June 5, 2018. (Cebulski Tr. 1).

**Plaintiff's Statement ¶ 150**

During his deposition testimony, Cebulski denied he even knew the Lai brothers. When asked: "Do you know Ben and Ray Lai?" Cebulski responded that he only knows the names. (Cebulski Tr. 45:3, 8).

**Plaintiff's Statement ¶ 151**

Cebuski claimed that his only interaction with either of the Lai brothers was when he met one of them (he claimed he could not recall which one) at a comic convention sometime after 2007, years after he worked with Ben and Ray Lai in 2002-2003. (Cebulski Tr. 46:5; 49:18).

**Plaintiff's Statement ¶ 152**

While Cebulski admitted he knew the Lais from their work at CrossGen and Marvel, he claims to have only met them in 2007. (Cebulski Tr. 48:2-11; 49:14-20).

**Plaintiff's Statement ¶ 153**

Cebulski testified he had "never" met either Lai before 2007. (Cebulski Tr. 49:25—50:1-2).

**Plaintiff's Statement ¶ 154**

Cebulski claimed in his testimony that the "only interaction" he ever had with the Lais occurred when one of the Lai brothers approached him in "artist alley" at the 2007 ComicCon

convention and "introduced themselves" and "reminded me who they were. That they had worked for Marvel." (Cebulski Tr. 46:9-11).  He testified that he had never met them before. (Cebulski Tr. 46:20; 51:23-24).


**Plaintiff's Statement ¶ 155**

Cebulski testified that he "never made Ben and Ray Lai any kind of offer" to work at Marvel.  (Cebulski Tr. 59:18-21).


**Plaintiff's Statement ¶ 156**

Cebulski claimed in his testimony that he had "no idea" about Radix or that the Lais had created Radix.  (Cebulski Tr. 52:20-25—53:1-2).  Cebulski testified that his only knowledge of Radix was in the context of this litigation, and that he had never seen it before.  (Cebulski Tr. 52:11-19; 52:22).


**Plaintiff's Statement ¶ 157**

Cebulski claimed he "did not work on" with the Ultimate X-Men comic book.  (Cebulski Tr. 53:8-23; 54:12-13).


**Plaintiff's Statement ¶ 158**

Even when presented with a copy of the February 2003 Ultimate X-Men comic book crediting Cebulski as Associate Editor and Ben and Ray Lai as the artists, Cebulski did not recant, and instead testified that "every office is credited for working on a book, whether their hands touched it or they dealt with the creators or they had anything to do with it or not."

(Cebulski Tr. 54:6-9). He claimed he "did not work on Ultimate X-Men." (Cebulski Tr. 54:13).

**Plaintiff's Statement ¶ 159**

Cebulski also testified at his deposition that Ben and Ray Lai worked for Ralph Macchio at Marvel Comics, but he did not know what work they did. (Cebulski Tr. 52:4-10).

**Plaintiff's Statement ¶ 160**

There are numerous emails showing that Cebulski was heavily involved with the creation of *Ultimate X-Men* with the Lai brothers. (R. Lai Dec. Ex, 20, HCP000374-387; HCP000389-420; HCP000424-432; HCP000435-439; HCP000446-451; HCP000453-467; HCP000 475-477; 482-482; 494-512; 517-523; 526-528; 532-536; 541-546; 564-566; HCP000573-582; HCP000586).

**Plaintiff's Statement ¶ 161**

At his deposition, Cebulski was presented with a contemporaneous news report (Exhibit 4) which includes the following text: "The move to Marvel, according to Lai, began before the Lais' problems with MIT—when editor C.B. Cebulski approached the two in March. It wasn't until September that the two took up Cebulski's offer." (*Ex. 4,* Cebulski Deposition*;* Cebulski Tr. 60:16-20). When asked about the article, Cebulski testified as follows:

Q: So is your role, as described in this paragraph false?
Mr. Litvack: I'm going to object to that. Can you ask a more precise question?
Q: Well, did you approach Ben and Ray Lai in March?
Mr. Litvack: of 2002? 2001? What year is that?

Q: Well, did you ever approach Ben and Ray Lai?
A: I don't know.
Q: You don't know?
A: I don't know.
Q: Well, you testified that you interacted with either Ben or Ray Lai at the Chicago Comic-Con sometime after 2007?
A: Yes.
Q: You had recalled at the time of that interaction that Ben or Ray Lai had worked on something at Marvel?
A: Yes.
Q: I believe you testified—but tell me if I'm wrong—that you had never interacted with Ben or Ray Lai before that time in 2007 at the Chicago Comic-Con?
A: Yes, I've never had.
Q: Never had?
A: No.
Q: So did you ever approach Ben and Ray Lai?
A: No. I never met them before. I don't even know what this article is. I'm sorry.
Q: So you never me them—so that's what I'm saying. You never met them before?
A: I never met them before.
Q: So it couldn't be true that you approached the two in March?
A: Exactly.
Q: So that's false?
A: That is false.
Q: "It wasn't until September that the two took up Cebulski's offer." Did you ever make Ben or Ray Lai an offer?
A: I do not—I never made Ben or Ray Lai any kind of offer.
Q: Okay. So as far as your role as depicted in this final paragraph in Exhibit 4, those statements are false?
A: According to this—according to what I'm reading, yes, those statements are false.

(Cebulski Tr. 57:11—60:1-2).

A: What is written in this paragraph [referring to *Ex. 4*] is not true.
Q: Okay. And it's not true because you've never interacted with Ben or Ray Lai other than the one time that you've testified to at the Chicago Comic-Con sometime after 2007?
A: Yes.

(Cebulski Tr. 62: 22-25—63:1-4).

**Plaintiff's Statement ¶ 162**

At his deposition, Cebulski was asked about his role on a comic book that Marvel Comics had created for the Army National Guard. (Brevoort Tr. 122:15-18). The comic book, called *Guard Force*, was a custom, single edition comic book. (Brevoort Tr. 122:15-18).

**Plaintiff's Statement ¶ 163**

It was unusual for Marvel Comics to create such a book for a third party. (Bogart Tr. 26:15-17; Brevoort Tr. 122:15-18). David Bogart, now the Senior Vice President of Operations of Publishings and Promotions, and at the time a Managing Editor at Marvel Comics, testified that he remembered *Guard Force* because it was a unique book. (Bogart Tr. 8:20-24; 26:15-17).

**Plaintiff's Statement ¶ 164**

Cebulski is credited as the Assistant Editor on *Guard Force*, with the Lai brothers as artists. (R. Lai Dec. § 44; R. Lai Dec., Ex. 21).

**Plaintiff's Statement ¶ 165**

Cebulski testified that he "was made aware of the existence of this comic book yesterday." (Cebulski Tr. 66:2).

**Plaintiff's Statement ¶ 166**

He testified that his explanation for why his name appears as an assistant editor on the book is "the same as [his] explanation for the X-Men edition." (Cebulski Tr. 66:9). Namely, that

all editors are given credit regardless of whether they had a role in the comic book's creation. Cebulski claimed that he had no role in Guard Force, "[n]one whatsoever." (Cebulski Tr. 66:13).

**Plaintiff's Statement ¶ 167**

Ray Lai's uncovered email correspondence shows that Cebulski was deeply involved with *Guard Force*. (R. Lai Dec. § 42; R. Lai Dec., Ex. 20, HCP000374-387, HCP389-420, HCP000424-432, HCP000435-439, HCP000446-451, HCP000453-467, HCO000475-477, HCP000482, HCP000494-512, HCP000517-523, HCP000526-528, HCP000532-536, HCP000541-546, HCP000564-566).

**Plaintiff's Statement ¶ 168**

The project lasted for a period of almost four months. (R. Lai Tr. 88:20-25; R. Lai Dec., Ex. 20, HCP000374-387; HCP000389-420; HCP000424-432; HCP000435-439; HCP000446-451; HCP000453-467; HCP000475-477; HCP000482-482; HCP000494-512; HCP000517-523; HCP000526-528; HCP000532-536; HCP000541-546; HCP000564-566).

**Plaintiff's Statement ¶ 169**

There are numerous emails concerning difficulties in getting the details in the comic book right. (R. Lai Dec. § 43; R. Lai Dec., Ex. 20, HCP000374-387; HCP000389-420; HCP000424-432; HCP000435-439; HCP000446-451; HCP000453-467; HCP000475-477; HCP000482-482; HCP000494-512; HCP000517-523; HCP000526-528; HCP000532-536; HCP000541-546; HCP000564-566).

**Plaintiff's Statement ¶ 170**

In emails, Cebulski references meeting with representatives from the Army as they created Guard Force. (R. Lai Dec., Ex. 20, HCP000446; HCP000518).

**Plaintiff's Statement ¶ 171**

In 2017, Cebulski was outed in media reports as having disguised himself as a Japanese comic book artist Akira Yoshida (Cebulski Tr. 69:16-20; 72:15-16).

**Plaintiff's Statement ¶ 172**

On August 15, 2018, Cebulski executed an errata sheet for his deposition. (Wiesner Dec. Ex. 6).

**Plaintiff's Statement ¶ 173**

Brevoort was deposed on May 22, 2018. (Brevoort Tr. 1).

**Plaintiff's Statement ¶ 174**

During his deposition, Brevoort denied ever seeing Radix prior to this litigation, and stressed it was not that he just couldn't recall, but rather that he was sure he "did not see [the Radix comics]." (Brevoort Tr. 62:9-25—63:1-6).

**Plaintiff's Statement ¶ 175**

Despite Brevoort's testimony at his deposition, it is clear that he was familiar with the Lais' work on Radix in 2002. It is also clear that he was well aware of the Lais work at Marvel

with Cebulski. In an effort to recruit the Lais to work on *Thor*, Brevoort's Assistant Editor, Marc Sumerak, authored an email on October 20, 2002 to the Lai brothers, which copied Brevoort. In that email, Sumerak states "<u>After seeing the work you have been doing both in RADIX and with C.B.</u>, **we'd** love for [the new *Thor*] art team to be you guys!" (R. Lai Dec. Ex. 27, HCP000319) (emphasis added).

**Plaintiff's Statement ¶ 176**

Brevoort described the Lais' work in a November 13, 2002 email as "nice, detail-oriented style, their storytelling is strong and sharp, and their current work on ULTIMATE X-MEN with Colossus showed that they'd excel at depicting massive, powerful characters--which THOR is packed with!" (R. Lai Dec. Ex. 26, HCP000340).

**Plaintiff's Statement ¶ 177**

From November 2002 through April, 2003, Brevoort is included in or authors numerous emails between Sumerak and Ray Lai as they discuss the Lai brothers' work on numerous issues of *Thor*. (R. Lai Dec. Ex. 26, HCP000440-445; HCP000486-490; HCP000493; HCP000513-516, HCP000525-526; HCP000529-531; HCP000538-540; HCP000547-563; HCP000567; HCP000572).

**Plaintiff's Statement ¶ 178**

At his deposition, Brevoort disavowed any specific memory or familiarity with the Lais work in Radix (Brevoort Tr. 80:8-10; 82:16-19).

**Plaintiff's Statement ¶ 179**

Even when confronted with the contemporaneous press concerning the Lai brothers working on *Thor*, Brevoort insists that he had "never seen or heard of Radix prior to this lawsuit." (Brevoort Tr. 108:21-15—109:1-3).

**Plaintiff's Statement ¶ 180**

After Cebulski's deposition testimony, Ray Lai searched for old computers in order to attempt to recover his correspondence with Cebulski. He was at first unable to find it. (R. Lai Dec. § 38).

**Plaintiff's Statement ¶ 181**

In August 2018, the Lai brothers' father passed away. While attending to his father's possessions, Ray Lai found a computer that he had given to his parents years ago. The computer was not operational. However, Lai was able to remove the two hard drives that it contained. The hard drives were old models that were not capable of being read by a modern computer without additional equipment. As a result, Ray Lai ordered equipment to try to allow him to read the hard drives on a modern computer, but it did not work. Ray Lai then sent the drives to a forensic expert in November of 2018. That expert was able to recover the photographs of the San Diego Comicon and the emails. (R. Lai Dec. § 39; R. Lai. Dec., Ex. 16, HCP000199-213; R. Lai. Dec., Ex. 17**;** HCP000234-HCP000630. (R. Lai Dec. § 39).

Respectfully submitted,
HORIZON COMICS PRODUCTIONS, INC.

By: /s/ Jeffrey P. Wiesner

*Admitted Pro Hac Vice*                              *Admitted Pro Hac Vice*
Jeffrey P. Wiesner, BBO# 655814              Paul S. Sennott, BBO# 670571
Jennifer McKinnon, BBO# 657758             Sennott, Williams & Rogers, LLP
Wiesner McKinnon LLP                            90 Canal Street
90 Canal Street                               Boston, MA 02114
Boston, MA 02114                              Telephone: (617) 303-1656
Telephone: (617) 303-3940                     psennott@sennottwilliams.com
Facsimile: (617) 507-7976
jwiesner@jwjmlaw.com
jmckinnon@jwjmlaw.com


Dated: April 24, 2019


**CERTIFICATE OF SERVICE**

I certify that on this day I caused a true copy of
the above document to be served upon the
attorney of record for all parties via CM/ECF.


Date:4/24/19          */s/Jeffrey Wiesner*
                      Jeffrey Wiesner