UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| HORIZON COMICS PRODUCTIONS, INC., | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| -against- | ) | 16-cv-2499-(JPO) |
| | ) | |
| MARVEL ENTERTAINMENT, LLC, ET AL., | ) | |
| | ) | |
| Defendant(s). | ) | |

_____

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR LOCAL RULE 56.1
STATEMENT OF MATERIAL UNDISPUTED FACTS AND RESPONSE TO
<u>PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS</u>**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the

Southern District of New York, Defendants[1] submit this reply in further support of their initial

Rule 56.1 statement, and their responses to Plaintiff's purported statement of additional material

facts, as follows:

**REPLY TO PLAINTIFF'S RESPONSES TO DEFENDANTS'
STATEMENT OF MATERIAL UNDISPUTED FACTS**

Plaintiff's responses to Defendants' statement of 46 material undisputed facts can be

sorted into three groups:

1.      Plaintiff has explicitly admitted 22 of the 46 facts.

2.      For 20 of the remaining facts, Plaintiff has purported to dispute Defendants'

stated fact, but has either not "supported the assertion by . . . citing to particular parts of materials

---

[1] Marvel Entertainment, LLC, MVL Film Finance, LLC, Marvel Worldwide, Inc., DMG Entertainment, LLC,
Marvel Studios, LLC, and Walt Disney Studios Motion Pictures.  Capitalized terms have the same meanings as in
Defendants' Memorandum of Law in support of their motion for summary judgment (Dkt. 98).

in the record," Fed. R. Civ. P. 56(c)(1)(A), or has responded with a *non sequitur* or other non-responsive contention.

      3.      For four facts (Nos. 5, 9, 10, and 14), Plaintiff attempts to cite some record evidence in support of its dispute. However, the evidence cited fails to create a material dispute of fact for the reasons explained below.

### A.    The Admitted Facts.

      Plaintiff has explicitly "not disputed," and thus admitted, the following statements of material undisputed facts: 1-3, 11, 20, 24, 26-28,[2] 29-32,[3] 36-43, 46. *See, e.g.*, *Buckman v. Calyon Sec. (USA) Inc.*, 817 F. Supp. 2d 322, 328 n.42 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted.").

### B.    The Improperly or Insufficiently Disputed Facts.

      Plaintiff purports to dispute 20 of Defendants' remaining facts[4] in whole or in part, but each of these supposed "disputes" is facially inadequate for one or more reasons. For some, Plaintiff fails to offer any factual or other cited evidence, rendering the dispute nugatory. *See* n.3. For others, Plaintiff has not specifically controverted the stated facts, but has rather offered non-responsive arguments on immaterial and tangential issues. These, too, are ineffective. *See, e.g.*, *Risco v. McHugh*, 868 F. Supp. 2d 75, 88 n.2 (S.D.N.Y. 2012) ("[Plaintiff's] Statement

---

[2] In its response to paragraph 27, Plaintiff expressly admits the stated fact, but then contends that, in BLT's "inspiration boards" and "sketches," there is "not a single" crouching figure depicted "with right arm and right knee up," as in the *Iron Man 3* Poster. This contention is factually inaccurate—in one of BLT's black-and-white sketches, prepared as a guide for the Special Shoot, Iron Man is shown with his right knee raised and his right arm cocked. *See* Nung Decl. ¶ 7; Litvack Decl., Ex. G at WDS000134; Mem. at 6; 56.1 ¶ 29 (undisputed). Plaintiff repeats the same inaccurate contention in its responses to paragraphs 30 and 33.

[3] In its response to paragraph 29, Plaintiff expressly admits the stated point, but then states—with no citation—that "[t]he 'pencil sketches' are photoshop layered files." The relevance of Plaintiff's point is entirely unclear, and in any event it is wholly unsupported. *See* Fed. R. Civ. P. 56(c)(1)(A); *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n. 5 (S.D.N.Y. 2011) (disregarding plaintiff's responses to defendant's Rule 56.1 statement where plaintiff failed to refer to evidence in the record).

[4] Nos. 4, 6-8, 12-13, 15-19, 21-23, 25, 34-35, and 44-45.

improperly interjects arguments and/or immaterial facts in response to facts asserted by

Defendant, without specifically controverting those facts").

The four facts for which Plaintiff attempts to cite some record evidence in support of its

dispute are:  Nos. 5, 9, 10, and 14.  These purported disputes fail to create a material dispute of

fact for the reasons explained below.

*        *        *

**Defendants' Statement ¶ 4**
In its initial disclosures, Plaintiff identified six individuals who allegedly had "access" to the
Caliban Drawing: (1) Bill Jemas; (2) C.B. Cebulski; (3) Tom Brevoort; (4) Jeph Loeb; (5) Andy
Park; and (6) Joe Quesada (the "Access Individuals"). (Litvack Decl., Ex. A at 2.) Plaintiff did
not specify how or when these individuals allegedly had such access. (*Id*.)

**Plaintiff's Response to ¶ 4**
Disputed in part.  It is not disputed that the Plaintiff identified six potential "Access"
individuals in its initial disclosures. However, despite the Defendants' attempt to present the
Radix comic and materials as obscure, Plaintiff's work in Radix and the Lai brothers were
widely known among comic book artists at the time.  (See Plaintiff's Additional Statement of
Facts, below).

**Defendants' Reply to ¶ 4**

Plaintiff concedes the facts actually stated in paragraph 4.  It is immaterial to Defendants'

motion whether "the Radix comic and materials" and/or the Lai brothers were or were not

obscure.

**Defendants' Statement ¶ 5**
The only Access Individuals who were deposed (Brevoort, Cebulski) testified that they had no
role in the creation of the *Iron Man 3* Poster. (Litvack Decl., Ex. K (transcript of the deposition
of Tom Brevoort, or the "Brevoort Tr.") at 137:17 – 138:6, 140:7 – 12; Litvack Decl., Ex. L
(transcript of the deposition of C.B. Cebulski, or the "Cebulski Tr.") at 77:22 – 78:5.) There is no
evidence that any of the other Access Individuals had any responsibility for, or input into, the
creation of the *Iron Man 3* Poster. (*See, e.g.*, Declaration of William Jemas, Jr., dated October
25, 2018 (the "Jemas Decl.") ¶ 1.)

**Plaintiff's Response to ¶ 5**
Disputed.  Cebulski and Brevoort's testimony is demonstrably false.  Cebulski's
testimony in particular has no credibility.  (See Plaintiff's Additional Statement of Facts at §§
149-172).

While the Defendants attempt to invent an iron curtain between Marvel Comics and Marvel Studios and Disney, there is evidence of overlap between the entities—and central to that overlap is Michael Pasciullo ("Pasciullo") and Joe Quesada ("Quesada"). Pasciullo was Senior Vice President of Marketing for Marvel Studios at the time that the *Iron Man 3* movie, and poster, were being developed. (Wiesner Dec. Ex. 8 (hereinafter "Pasciullo Tr.") at 10:25-11:1-12). Quesada was the Chief Creative Officer at Marvel Comics in New York and was on the Creative Committee. (Wiesner Dec. Ex. 5 (hereinafter "Brevoort Tr.") at 25:13-16). Pasciullo was the "key executive" at Marvel Studios working on the print advertising campaign for *Iron Man 3*. (Wiesner Dec. Ex. 9 (hereinafter "Crumpacker Tr.") at 27:18-21). (See Plaintiff's Additional Statement of Facts at § 14).

**Defendants' Reply to ¶ 5**

Plaintiff has not validly disputed the material facts stated in paragraph 5.

a.      Plaintiff does not dispute the fact that each Access Individual who testified stated that they had no role in the creation of the *Iron Man 3* Poster, and that there is no evidence that that the other three Access Individuals (Messrs. Quesada, Loeb, and Park) had anything to do with the poster either. (As to Mr. Quesada, his purported membership in some so-called "creative committee" is not evidence that he worked on or had anything to do with the *Iron Man 3* Poster—and Plaintiff cites none. *See* ¶ 14, *infra*.) Hence, those facts are admitted.

b.      As to Plaintiff's purported challenge to the credibility of Cebulski and Brevoort: *see* ¶¶ 8, 15, *infra*.

c.      The reference to Mr. Pasciullo is misplaced; he was not an Access Individual.

d.      It is undisputed that the Lais do not claim to have given either Mr. Pasciullo or Mr. Quesada—or indeed, anyone—a copy of the Radix Drawing, at any time. *See* ¶ 6.

**Defendants' Statement ¶ 6**
Neither of the Lai brothers claims to have ever given, sent, or otherwise provided the Caliban Drawing (or any copy thereof) to any of the six Access Individuals or to any other person associated with any Defendant. (R. Lai Tr. at 55:8 – 57:22, 59:8 – 60:21, 62:12 – 64:6, 89:2 – 20, 104:25 – 106:4, 116:18 – 117:2; Litvack Decl., Ex. J (transcript of the deposition of Ben Lai, or the "B. Lai Tr.") at 54:19 – 55:21, 101:8 – 11, 104:4 – 17.)

**Plaintiff's Response to ¶ 6**
Disputed it [sic] part. Ray Lai did not recall what he did with the printed Caliban images.

(R. Lai Tr. 115:20-25—116:1-14).  At the 2001 summer ComicCon, Ray Lai gave Cebulski his business card.  (R. Lai Tr. 92:21-25-93:1-1; R. Lai. Dec., Ex. 6, HCP0007).  Ray Lai's business card included the Horizoncomics.com web address.  (R. Lai Tr. 62:17-25; R. Lai Dec., Ex. 6, HCP00007).  The Caliban image was displayed on the website. (R. Lai Dec., Ex. 7, HCP00013). It was one of approximately 11 images of the *Radix* comic characters displayed on the website. (R. Lai Dec., Ex. 6, HCP00011).

In addition, Ray Lai also gave Cebulski promotional materials for their work, including a *Radix* preview book.  (R. Lai Tr. 42:3-16; 62:12-25—63:1-6; R. Lai Dec., Ex. 5, HCP000190-196).  The *Radix* preview book contains a synopsis of the story line of *Radix* and a character page showing the various characters, among which is a head shot of the Caliban character on a page citing to the Horizoncomics.com website. (R. Lai Dec., Ex. 5, HCP000195).  Cebulski also visited the Lais' booth at the ComicCon convention in 2001 where the Caliban was displayed. (R. Lai Dec., Ex. 4, HCP000211-213).

Issue 1 of *Radix* contained a blue-colored Caliban image as a stand-alone page with "Horizoncomics.com" appearing above it.  (R. Lai Tr. 30:17-19; 120:2-6; R. Lai Dec., Ex. 3). The full-colored version of the Caliban appeared on the website. (R. Lai Dec., Ex. 3, HCP00013).  In addition, Radix and the Lai brothers gained significant attention as the result of an admission by the Massachusetts Institute of Technology ("MIT"), one of the United States' premier scientific research institutions, that it had used a Radix image in its successful $50 million grant proposal to the Pentagon. (R. Lai Dec., Ex. 8, HCP00073-127).

Thomas Brevoort, despite his testimony to the contrary, had also seen the Lais' work in Radix.  In 2002, Brevoort was a Senior Editor at Marvel Comics.  (Brevoort Tr. 67:8-10).  Soon after Cebulski's recruitment of the Lai brothers to Marvel, Brevoort offered them a position as lead artists on *Thor*.  (Brevoort Tr. 18:16-17; 76:19-25—77:1-11; R. Lai. Dec., Ex. 17 at HCP000319).  In an October 20, 2002 email to the Lais, Brevoort's Assistant Editor, Marc Sumerak, copying Brevoort, wrote "After seeing the work you have been doing both in RADIX and with C.B., **we'd** love for [the new *Thor*] art team to be you guys!"  (Lai. Dec., Ex. 17 at HCP000319) (emphasis added).

The additional witnesses mentioned, Jeph Loeb, Andy Park, and Joe Quesada also had knowledge of Radix. Quesada was also a comic book artist who worked with people the Lai brothers worked with at Crossgen comics. The Lai brothers were part of a small community of comic book artists and were generally aware of each other's work. (See e.g., R. Lai Dec. §§ 9, 11, 12, 16, 17, 20).  Brevoort testified that Joe Quesada alerted Brevoort and others on the editorial staff at Marvel of certain creators who had been at CrossGen that would be available for work, including the Lais.  (Brevoort Tr. 75:2-10; 77:16-19). In relation to that shift, Brevoort recalls either Jose Quesada or Bill Jemas suggesting that the Lai brothers might be a good fit for *Thor*. (Brevoort Tr. 76:27-25). Andy Park was also aware of the Lai brothers.  (R. Lai Dec. § 9). Jeph Loeb was also aware of early Radix materials and the Lai brothers. (R. Lai Tr. 38:7-12).  In 1998, Loeb saw the Lai brothers early Radix materials at a comic convention in Montreal.  Loeb asked the Lai brothers to create some sample work for the Deadpool book Loeb was working on at Marvel.  (R. Lai. Tr. 61:15-25—62:1-8).

The Defendants attempt to paint the Plaintiff's failure to depose several witnesses as suggesting that their original claims that these individuals were aware of their work were either unfounded or withdrawn. But Plaintiff decided not to pursue deposing these individuals after Cebulski perjured himself at his deposition. Brevoort also testified falsely by denying knowledge of Radix and was otherwise less than forthcoming in his testimony. The Lai brothers' work in Radix was widely known by the small community of budding artists and future movie makers in their small group in the early 1990s. The publicity engendered by the MIT infringement and the news coverage it received made their work even more well-known than it otherwise would be in the small comic book community.

**Defendants' Reply to ¶ 6**

Plaintiff has not validly disputed the facts in paragraph 6. To the contrary, the basic stated fact remains uncontroverted: the Lai brothers admit that they did not ever give the Caliban Drawing to anyone. The various explanations and assertions in Plaintiff's response are irrelevant *non sequiturs*:

a.    Ray Lai's testimony that he "did not recall" what he did with a handful of printed copies of the Caliban Drawing is not evidence that he gave them to anyone, much less anyone associated with Defendants—and certainly does not contradict Ray Lai's detailed, specific testimony that, *inter alia*, he "didn't give the [Caliban Drawing] to people at Marvel," and that he "never gave [the Caliban Drawing] to anyone at Marvel or anyone anywhere." R. Lai Tr. at 115:20-117:2.

b.    Evidence that the Lais distributed materials *other* than the Caliban Drawing, or materials that did not contain the Caliban Drawing (*i.e.*, the *Radix* preview book, *Radix* #1), is irrelevant.[5]

c.    The assertion that *Radix* or the Lai Brothers were generally known is irrelevant. The issue is the Caliban Drawing, and there is no evidence that it was known to anyone but the Lai brothers.

---

[5] As to the "blue-colored Caliban image" specifically, *see* Defendants' Reply Memorandum at 2 n.3. Ray Lai testified that the "blue-colored Caliban image" in *Radix* #1 is "different" than the Caliban Drawing. *See* R. Lai Tr. 116:18 – 118:3; 119:21 – 120:9.

d.      As explained in Defendants' Reply Memorandum, Plaintiff's claim that Mr. Cebulski "perjured" himself is utterly baseless.  Plaintiff's claim that Mr. Brevoort "testified falsely" is likewise unsupported, and the claims are a totally unwarranted effort to deflect attention from Plaintiff's failure to carry its burden.  At their depositions, Plaintiff's counsel asked Mr. Cebulski and Mr. Brevoort about decade-old interactions with two long-gone freelance artists without providing those witnesses with documents within Plaintiff's control (*see* Reply Memorandum at 4 n.5) that could have refreshed their recollections and provided context for Plaintiff's questions.  Failing to remember some freelance artists who left the business more than a decade ago, after hundreds of different freelancers have since come and gone, is hardly surprising.  It is certainly not evidence of perjury.

In short: the facts set forth in paragraph 6 have not been rebutted.

**Defendants' Statement ¶ 7**
The Caliban Drawing was not included in any of the three published Radix comic books. (Litvack Decl., Ex. B; R. Lai Tr. at 117:4 – 18, 119:21 – 120:9, 195:21 – 196:6.)

**Plaintiff's Response to ¶ 7**
Disputed in part.  While the Caliban drawing was not included in any of the three published Radix comic books, a full-page, blue colored version of it appeared in Issue 1.  (R. Lai Tr. 120:2-6; R. Lai Dec., Ex. 2). In that Issue, the horizoncomics.com website appears above the Caliban. (*Id.*).  The full color version of the Caliban image was also displayed on the website. (R. Lai Dec., Ex. 3 at HCP000197).  In addition, the Caliban was displayed at the Lais' booth at the 2001 ComicCon, where Cebulski first approached them.  (R. Lai Tr. 38:16-25—39:1-23; R. Lai Dec., Ex. 4, HCP000211-213).

**Defendants' Reply to ¶ 7**
Plaintiff concedes that "the Caliban drawing was not included in any of the three published Radix comic books."  The "blue colored version" is irrelevant and immaterial for the reasons stated in Defendants' Reply Memorandum and in paragraph 6 *supra*.  The other averments are non-responsive.

**Defendants' Statement ¶ 8**

Other than the Lai brothers, no witness in this case, including the Access Individuals, has testified to ever having seen the Caliban Drawing or any of the three Radix comic books, prior to this lawsuit. To the contrary, every witness has disavowed ever seeing the Caliban Drawing or even being aware of Radix. (Jemas Decl. ¶¶ 3 – 4; T. Brevoort Tr. at 62:9 – 63:6, 138:20 – 139:10; C.B. Cebulski Tr. at 52:11 – 52:22, 77:12 – 77:16; Litvack Decl., Ex. M (transcript of the deposition of Megan Crumpacker, or the "Crumpacker Tr.") at 195:14 – 195:22; Litvack Decl., Ex. N (transcript of the deposition of Steve Nuchols, or the "Nuchols Tr.") at 145:14 – 19; Litvack Decl., Ex. O (transcript of the deposition of Warren Nung, or the "Nung Tr.") at 119:11 – 120:1, 120:25 – 121:5; Litvack Decl., Ex. P (transcript of the deposition of Michael Pasciullo, or the "Pasciullo Tr.") at 20:6 – 18; Litvack Decl., Ex. Q (transcript of the deposition of John Sabel, or the "Sabel Tr.") at 191:16 – 193:4; Litvack Decl., Ex. Y (transcript of the deposition of Dave Bogart, or the "Bogart Tr.") at 68:4 – 17.)

**Plaintiff's Response to ¶ 8**

Disputed in part. It is not disputed that the witnesses denied seeing the Caliban drawing or any of the three Radix comic books prior to this lawsuit. It is disputed that this testimony is credible. Cebulski and Brevoort's deposition testimony has been proven to be false. Cebulski's testimony was almost certainly intentionally false. The Lai brothers were recruited to work at Marvel because of their work in Radix. (See Plaintiff's Additional Statement of Facts at §§ 55, 73, 82).

**Defendants' Reply to ¶ 8**

Plaintiff has not validly disputed the facts in paragraph 8. Plaintiff admits that all witnesses have denied seeing the Caliban Drawing and does not challenge the testimony of any witness other than Messrs. Cebulski and Brevoort. In particular, the pivotal testimony of the people who created the *Iron Man 3* Poster (Messrs. Sabel, Nuchols, and Nung) is not challenged, and there is no basis to do so.[6]

**Defendants' Statement ¶ 9**

While Horizon claims the Caliban Drawing was available to view on its website, and that in or about 2001 Ray Lai gave his business card (with a reference to Horizon's website on it) to people who were employed at one time or another at Marvel Comics, there is no evidence that any of those individuals, or anyone associated with Defendants, ever visited the website. (R. Lai Tr. at 59:22 – 60:9.)

---

[6] The evidence with which Plaintiff purports to dispute the credibility of Messrs. Cebulski and Brevoort – why "[t]he Lai brothers were recruited to work at Marvel" between 2002 and 2004 (citing Plaintiff's Statement ¶¶ 55, 73, 82) – has nothing whatsoever to do with witnesses who are not claimed to have had any role in the Lais' hiring (Messrs. Pasciullo and Bogart), or who indeed did not and have never worked for Marvel Comics, like the film studio executives (Mr. Sabel, Mr. Nuchols, Ms. Crumpacker) or Mr. Nung, the film poster creative vendor. *See* Defendants' Statement ¶¶ 14, 17.

**Plaintiff's Response to ¶ 9**

      Disputed. The citation relied upon by the defendants for this statement does not support their statement.  Further, there is evidence that Cebulski visited the website.  On September 12, 2002, Cebulski sent an email to Ray Lai through the email address embedded in the Horizoncomics.com website, "raylai@horizoncomics.com," asking Lai to email him.  (R. Lai Dec. Ex. 10, HCP000234).  Cebulski did not use the email address on the Ray Lai's business card, "rayradix@horizoncomics.com." (R. Lai Dec. Ex. 6, HCP00007).  Ray Lai embedded a different email address in the website so he could later tell if he was being contacted through the website.  (R. Lai Dec. Ex.11).

**Defendants' Reply to ¶ 9**

      Plaintiff has not validly disputed the facts in paragraph 9.

      a.    The cited admissible evidence cited *does* support the proposition – Ray Lai testified that he did not know whether Mr. Cebulski did or did not "go online and check" the Horizon website.

      b.    As to the assertion that there is evidence that Mr. Cebulski visited Horizon's website, the only cited evidence is Mr. Cebulski's September 12, 2002 use of an email address for Ray Lai that supposedly appeared on the website's "creators" page.  *See* Dkt. 112, Ex. 11. While Plaintiff would have the Court draw the inference that Mr. Cebulski necessarily visited the website's "creators" page to see that email address, that inference would only be reasonable if the Horizon website were the sole way for him to have learned of the address.  It was not; according to Plaintiff's own contention, Mr. Cebulski had at least two phone calls with Ray Lai prior to September 12, 2002, during which Ray Lai could easily have provided him the email address.  *See* Plaintiff's Statement ¶¶ 73, 82.

      c.    Moreover, there is still no evidence that Mr. Cebulski or *anyone* saw the Caliban Drawing, which was *not* displayed on the "creators" page, *see* Dkt. 112, Ex. 11, but was— undisputedly, *see* ¶ 10—buried on the interior of the website, such that it would take multiple clicks to access.

**Defendants' Statement ¶ 10**

Horizon's website was operational from approximately Spring of 2001, through 2003 at the latest. (R. Lai Tr. at 145:17 – 21, 147:11 – 25.) During that time a visitor to the Horizon website would have had to click through a number of pages to arrive at the Caliban Drawing. (R. Lai Tr. at 177:3 – 17, 179:4 – 25, 181:10 – 182:17, 182:23 – 183:8.) There is no evidence that anyone associated with any Defendant did so, at any time. (*E.g.* Jemas Decl. ¶¶ 3 – 4; T. Brevoort Tr. at 139:11 – 139:16; R. Lai Tr. at 59:22 – 60:9.)

**Plaintiff's Response to ¶ 10**

Disputed in part. It is not disputed that Horizon's website was operational from approximately Spring of 2001, through 2003 at the latest.  It is disputed that there is no evidence that anyone associated with any Defendant accessed it at any time.  There is evidence that C.B. Cebulski accessed the website.  See Plaintiff's Response to ¶ 9, above**.**

Moreover, there is a fundamental difference in point of view between the parties in this case. Defendants actively recruited Ray and Ben Lai to work as artists at Marvel Comics because of the Defendants' interest in the Lai brothers' work in *Radix*. That interest is evidence that individuals associated with Defendants accessed the website to view the Lai brother's work.

**Defendants' Reply to ¶ 10**

Plaintiff has not validly disputed the facts in paragraph 10.

a.    Plaintiff concedes the dates during which the website was operational –

including that it was *not* operational after February 2003 (*i.e.*, roughly a decade before the

alleged infringement).

b.    Plaintiff does *not* dispute, and therefore admits, that "a visitor to the Horizon

website would have had to click through a number of pages to arrive at the Caliban Drawing."

c.    The bare contention that "Defendants' interest in the Lai brothers' work in *Radix*

. . . *is evidence* that individuals associated with Defendants accessed the website" is illogical

and is not supported by any citation to record evidence; it is speculation and conjecture.  It is

thus not a proper basis for disputing the fact.

**Defendants' Statement ¶ 12**

Work on the *Iron Man 3* Poster began in 2012 and concluded in March 2013. (Nung Tr. at 19:16 – 19:20.)

**Plaintiff's Response to ¶12**

Disputed. The Photoshop files produced in this case contain creation dates of 2011.

**Defendants' Reply to ¶ 12**

Plaintiff has not disputed the cited testimony of Nung, or cited to "particular parts of

materials in the record," *see* Fed. R. Civ. P. 56(c), and thus concedes the point.  Moreover, the

bare assertion offered, even if supported, would not rebut the fact in paragraph 12.  The fact

that particular computer files – which are constantly reused and revamped – contain unspecified

"creation dates" in 2011 says nothing at all about when work on the theatrical poster for a 2013

film was conducted.  In any event, whether the date was 2011 or 2012 is immaterial.

**Defendants' Statement ¶ 13**
The personnel at Defendants responsible for creating and producing the *Iron Man 3* Poster,
Steve Nuchols and John Sabel, worked in the Creative Print Services department at Walt
Disney Studios in 2012 and 2013. Sabel was Executive Vice President, Creative Print Services;
Nuchols was Vice President, Creative Print Services. (Nuchols Tr. at 13:19 – 14:2; Pasciullo
Tr. at 54:19 – 25; Sabel Tr. at 10:17 – 11:4, 149:4 – 8.) Both Sabel and Nuchols worked in
California. (Litvack Decl., Exs. S at WDS005729, U at BLT_000980.)

**Plaintiff's Response to ¶13**

Disputed.  It is disputed that only Nuchols and Sabel were responsible for creating and
producing the *Iron Man 3* poster. Pasciullo and Dillon were recent transplants to Marvel Studios
from Marvel Comics in New York and both were friends with Cebulski.  (See Plaintiff's
Additional Statement of Facts at § 14). At Marvel Studios, Pasciullo and Dillon were also
involved in the print advertising campaign. Pasciullo was the "key executive" at Marvel Studios
overseeing the creation of the *Iron Man 3* poster. (Crumpacker Tr. 27:18-21). Pasciullo
contributed to the creation of the Poster by offering feedback on it and providing artistic
materials to Sabel and Nuchols at Disney. (Pasciullo Tr. 26:21-25-27:1-7).  Pasciullo testified
that it was in Tim Dillon's purview as well to provide artistic materials to Disney personnel.
(Pasciullo Tr. 31:7-21). Pasciullo was involved at all stages of the creation of the *Iron Man 3*
poster, including providing comments on creative aspects of the work and providing artistic
materials to Disney. (See Plaintiff's Additional Statement of Facts at § 14).

**Defendants' Reply to ¶ 13**

Plaintiff has not validly disputed the facts in paragraph 13.  Mr. Pasciullo testified

that Messrs. Sabel and Nuchols' teams created the *Iron Man 3* Poster, and that the role of

Messrs. Pasciullo and Dillon was limited to review and providing feedback.  *See* ¶ 14.  The fact

that those gentlemen and others at Marvel Studios offered feedback on the *Iron Man 3* Poster

and provided background materials is consistent with Messrs. Nuchols, Sabel, and Nung being

responsible for creating the *Iron Man 3* Poster.

**Defendants' Statement ¶ 14**
There is no evidence that Mr. Sabel or Mr. Nuchols (or anyone else on the Creative Print
Services team) had any connection to or interaction with employees at Marvel who worked in
New York at Marvel Comics. (Sabel Tr. at 188:24 – 189:14.) The only witness asked that
question, Mr. Sabel, testified he had no connection to or knowledge regarding Tom Brevoort or
C.B. Cebulski. (*Id.*)

**Plaintiff's Response to ¶14**
        Disputed. The citation the Defendants rely upon for this fact does not support their
statement. Sabel testified that he was not sure if he knew anyone at Marvel Comics, and that he
was not sure if some of the people that he attended meetings with were from Marvel Comics.
(Sabel Tr. 189:7-13).

        More significantly, Sabel, Nuchols and others involved in the creation of the Iron Man 3
poster had a connection to and/or interaction with Pasciullo and Dillon, employees at Marvel
Studios who formerly worked in New York at Marvel Comics. (See Plaintiff's Response to § 3,
above).  Before joining Marvel Studios in 2011, Pasciullo worked for many years at Marvel
Comics in New York. (Pasciullo Tr. 15:19-20, 19:11-13) (Sabel Tr. 162:16-25—163:1-23;
179:12-20). Tim Dillon, who worked in Pasciullo's department at Marvel Studios and on the
*Iron Man 3* poster, was also a former employee of Marvel Comics in New York. (Pasciullo Tr.
24, L. 2-6); Cebulski Tr. 43:12-15). Pasciullo has known C.B. Cebulski since approximately
2008.  (Pasciullo Tr. 16:21-22).  Cebulski and Pasciullo are friends.  (Cebulski Tr. 30:17-25).
Cebulski and Pasciullo worked together in the same office beginning in approximately 2008,
after Pasciullo re-joined Marvel. (Cebulski Tr. 32:7-13). They worked together creating
advertisements for Marvel Comics. (Cebulski Tr. 32:23-25). At that time, Cebulski and Pasciullo
also worked with Tim Dillion creating advertisements for Marvel Comics. (Cebulski Tr. 43:12-
15). Cebulski also considers Dillon a friend. (Cebulski Tr. 44:4-11).

        In addition, there was the "Creative Committee," a [sic] "a group of Marvel employees
and creators who consulted with Marvel Studios on the various Marvel film projects…"
(Brevoort Tr. 51:3-6). "The purpose of the creative committee was to advise the—interface with
the Marvel studios personnel on the conceptualizing on the various Marvel properties for film."
(Brevoort, Tr. 53:13-16). Joe Quesada, the Chief Creative Officer at Marvel Comics in New
York (Brevoort p. 25, L. 13-16) was a member of the "Creative Committee," which was a group
of Marvel [Comics] employees and creators who consulted with Marvel Studios on the various
Marvel film projects. (Brevoort p. 51, L. 3-6). "The purpose of the creative committee was to
advise the—interface with the Marvel studios personnel on the conceptualizing on the various
Marvel properties for film." (Brevoort, p. 53, L. 13-16). Joe Quesada was on the Creative
Committee. (Brevoort Tr. 25:13-16; 52:21-23).  Brevoort recalls either Jose Quesada or Bill
Jemas suggesting that the Lai brothers might be a good fit as artists for *Thor*. (Brevoort Tr.

76:27-25). Alan Fine was also on the Creative Committee and there is evidence that he had involvement with the print advertising campaign. (Wiesner Dec., Ex. 17, MENTO03282). The "Creative Committee" evidences cross-over between Marvel Comics and Marvel Studios.

**Defendants' Reply to ¶ 14**

Plaintiff has failed to validly disputed the facts in paragraph 14.

a.    The testimony to which Plaintiff cites – Mr. Sabel's statement that he was "not sure" if he knew "anybody at Marvel Comics" – immediately followed his testimony that he did *not* know Mr. Cebulski or Mr. Brevoort. In any event, Mr. Sabel's statement *supports* Defendants' point – there is no evidence that he worked with anyone at Marvel Comics.

b.    Plaintiff fails to offer any dispute with respect to Mr. Nuchols and the other members of Disney Studios' Creative Print services team, and thus admits the point as to them.

c.    Plaintiff's contentions about Messrs. Pasciullo and Dillon are not responsive to the facts in paragraph 14, as those individuals – Marvel Studios employees – were not members of the Creative Print Services team at Disney Studios. To the extent that Plaintiff is seeking to imply that Messrs. Pasciullo and Dillon were "creators" of the *Iron Man 3* Poster, there is no record support for that. In fact, and to the contrary, Mr. Pasciullo expressly testified that Messrs. Sabel and Nuchols were responsible for creating the Campaign's creative images, and the larger Disney marketing team developed the *Iron Man 3* marketing strategy. The role of Messrs. Pasciullo and Dillon was, as Mr. Pasciullo testified, limited to providing feedback on the Creative Print Services team's work product and facilitating delivery of Marvel Studios' *Iron Man 3* film-based art assets for the team's reference. Pasciullo Tr. 21:10 – 23:19, 24:2 – 6. Mr. Pasciullo testified that he could not recall a single instance in which his department "created" materials for Disney in connection with the Campaign. Pasciullo Tr. 26:21 – 27:1, 27:5 – 13.

d.     Evidence that Mr. Pasciullo and Mr. Dillon *formerly* worked at Marvel Comics, and that they were friendly with Mr. Cebulski, does not refute the facts in paragraph 14, and is not material.  *See, e.g.*, Defendants' Reply Memorandum at 6 n.9.

e.     The argument regarding a so-called creative committee is a complete red herring: (i) no evidence exists that it "created," had decision-making authority, or had anything to do with the *Iron Man 3* Poster design; (ii) there is no evidence that anyone on the creative committee had access to the Caliban Drawing, and Plaintiff never claims as much (*see* ¶ 6); and (iii) Plaintiff cites no evidence that Alan Fine was even a member of any so-called creative committee.[7]

**Defendants' Statement ¶ 15**
Neither Mr. Sabel, Mr. Nuchols, nor anyone else who was involved in the creation, development or production of the *Iron Man 3* Poster ever (a) met either of the Lais (b) saw or received the Caliban Drawing (c) saw a Radix comic or (d) ever heard of Horizon or its three Radix comics prior to the lawsuit. (Declaration of Warren Nung, dated March 19, 2019 (the Nung Decl.") ¶ 17; R. Lai Tr. at 104:25 – 105:25; B. Lai Tr. at 54:19 – 55:21 Nuchols Tr. at 145:8 – 19; Nung Tr. at 119:11 – 120:1, 120:25 – 121:3; Sabel Tr. at 191:16 – 193:4.)

**Plaintiff's Response to ¶15**
        Disputed. The denials of Defendants' employees in light of Cebulski and Brevoort's deposition testimony is not credible.  Although not referred to by the Defendants, Michael Pasciullo and Tim Dillon were involved in the creation and development of the *Iron Man 3* poster. (See Plaintiff's Response to §§ 13, 14, above).  Creative Committee member Joe Quesada was aware of *Radix* and the Lai brothers, and there is evidence the Creative Committee was involved in the print advertising campaign. (Brevoort, Tr. 53:13-16; 25:13-16; Wiesner Dec., Ex. 17, MENTO03282) [sic].

**Defendants' Reply to ¶ 15**

        Plaintiff has failed to validly dispute the facts in paragraph 15.

a.     Plaintiff has offered no valid basis to question the credibility of the witnesses cited in paragraph 15, and thus has utterly failed to refute that testimony.

b.     The same is true with respect to Mr. Pasciullo's unrebutted denial of access to

---

[7] As to the cited email between Pasciullo and Fine: the email says nothing at all about any creative committee, and certainly indicates no involvement whatsoever by any supposed member of this committee (*e.g.*, Quesada).

the Caliban Drawing.

**Defendants' Statement ¶ 16**
At the outset of their work on the *Iron Man 3* Poster, in 2012, Sabel retained BLT Communications, LLC ("BLT"), an outside creative vendor that he had used on many other motion pictures, to help develop and create ideas for possible posters for *Iron Man 3*. (Nung Decl. ¶ 3; Sabel Tr. at 25:15 – 26:4, 29:18 – 23.) A different team at BLT had worked on print campaigns for *Iron Man* and *Iron Man 2* (films that were distributed by Paramount Pictures Corporation, not by Walt Disney Studios. (Nung Tr. at 121:15 – 122:18; Nuchols Tr. at 31:1 – 31:10, 32:1 – 8.)

**Plaintiff's Response to ¶16**
        Disputed in part. The photoshop files produced of the *Iron Man 3* poster comps show creation dates of 2011.

**Defendants' Reply to ¶ 16**

        Plaintiff has failed to validly dispute the facts in paragraph 16, for the reasons stated in

paragraph 12.

**Defendants' Statement ¶ 17**
            Warren Nung headed the BLT team that worked on creating the *Iron Man 3* Poster. Mr. Nung and his staff, along with Messrs. Nuchols and Sabel, are responsible for the creation of the *Iron Man 3* Poster. (Nung Decl. ¶¶ 3, 5 – 12; Nuchols Tr. at 61:9 – 62:5; Sabel Tr. at 149:4 – 150:11.) Mr. Nung has never met either of the Lai brothers and had never seen the Caliban Drawing or heard of Radix prior to this lawsuit. (Nung Decl. ¶ 17.) Nor did Nung know Cebulski, Brevoort, or anyone at Marvel Comics. (Nung Tr. at 179:25 – 180:11.)

**Plaintiff's Response to ¶17**
            Disputed. Mr. Nung and his staff, along with Nuchols and Sabel, are not the only individuals responsible for the creation of the *Iron Man 3* Poster. Pasciullo and Dillon, as well as several others at Marvel Studios as well as the filmmakers, commented on the poster, influenced its creation, and ultimately signed off on its final version.  (Wiesner Dec. Ex. 12, MENT021548; Ex.13, MENT008934-35; Ex.14, MENT008596; Ex.15, MENT0008609-0008610 and 5KND000768-000780; Ex. 16, MENT0009384; Ex. 17, MENT003282). There is also evidence the Creative Committee was involved in the print advertising campaign. (Wiesner Dec. Ex. 17, MENTO03282-3283).  See also Defendants' Statement § 44, "the Marvel Studios visual effects team (VFX) sent Sabel and others a number of emails and renderings suggesting changes to the proposed Iron Man 3 Poster,  and § 46, "The Iron Man 3 Poster was approved by the film's lead producers, Kevin Feige and Stephen Broussard, on February 2, 2013."

**Defendants' Reply to ¶ 17**

        Plaintiff has failed to validly dispute the facts in paragraph 17.

      a.    Plaintiff does not dispute any of the facts relating to Nung.

      b.    The feedback provided by Messrs. Pasciullo and Dillon is addressed in

paragraph 14.  The same applies *a foriori* to the other Marvel Studios executives, none of

whom is alleged to have done anything other than – at most – provide feedback and comments

on the *Iron Man 3* Poster.  And there is no evidence that anyone on any so-called creative

committee even did that.  *See* ¶ 14 *supra*.

      c.    Further, and it bears repeating – there is no evidence that *anyone* described in

paragraph 17 (either in Defendants' initial statement or Plaintiff's response) had access to the

Caliban Drawing, and the Lais have disavowed *ever sending the drawing to anyone*.  *See* ¶ 6;

R. Lai Tr. 116:18 – 117:2, B. Lai Tr. 54:19 – 55:21.

**Defendants' Statement ¶ 18**
There is no evidence that: (a) the Lai brothers ever sent the Caliban Drawing to anyone
associated with BLT or (b) anyone at BLT has ever seen the Caliban Drawing. (R. Lai Tr. at
116:18 – 22; B. Lai Tr. at 54:19 – 55:21.)

**Plaintiff's Response to ¶18**
      Disputed in part.  Lai brothers did not send their artwork to anyone.  They were
recruited by Marvel because of their work in Radix.  Artistic materials were exchanged between
Pasciullo, Sabel and Nung.  Sabel testified he had a large "library" of artwork that he would use
as "reference material" as inspiration when developing an advertising campaign. (Sabel Tr.
61:11-25—62:1-25). Nung regularly met with Sabel and viewed art work with Sabel, and
testified to the artwork he had explored with Sabel, including religious materials, but he cut
himself off in his deposition claiming not to recall. (Nung Tr. 49:2-25—50:1-24). Pasciullo
testified he would provide materials to the team creating the posters to facilitate their creative
work. (Pasciullo 27, 15-17).  It was within Tim Dillon's purview to provide artwork to Sabel at
Disney. (Pasciullo Tr. 31:7-21).

**Defendants' Reply to ¶ 18**

  Plaintiff has failed to validly dispute the facts in paragraph 18.

      a.    Plaintiff admits that the Lais "did not send their artwork to anyone."

      b.    The remaining assertions are immaterial and certainly not evidence that "anyone

at BLT has ever seen the Caliban Drawing."

**Defendants' Statement ¶ 19**

Key elements of the *Iron Man 3* suit and poses similar to the one that appears in the *Iron Man 3* Poster had existed in the Iron Man and *Avengers* films prior to *Iron Man 3* and the creation of the *Iron Man 3* Poster. (Litvack Decl., Ex. C (*Iron Man*) at 1:17:06 – 1:17:24; Ex. D (*Iron Man 2*) at 0:05:11 – 0:06:00, 1:35:55 – 1:36:12; Ex. E (*The Avengers*) at 0:42:23 – 0:42:36, 1:52:27 – 1:52:39; Ex. F (*Iron Man 3*) at 0:05:35 – 0:07:38, 0:19:09 – 0:20:12, 1:30:52 – 1:31:02, 1:43:00 – 1:44:28).

**Plaintiff's Response to ¶19**

Disputed.  There is no prior art that matches the pose of the Iron Man 3 Image with right arm up and right knee up.

**Defendants' Reply to ¶ 19**

Plaintiff has failed to validly dispute the facts in paragraph 19.

a.    There is, indeed, "prior art" that shows Iron Man "with right arm up and right knee up."  *See* Defendants' Reply Memorandum at 10; *supra* at 2 n.2.

b.    In any event, Plaintiff's contention is non-responsive.  Defendants stated that "poses similar to the one that appears in the *Iron Man 3* Poster" were visible throughout a range of prior art – which Plaintiff has not disputed.

**Defendants' Statement ¶ 21**

In *Iron Man*, Iron Man's armor has a red and gold color scheme, and has glowing blue lights on the chest plate of his armor, as in *Iron Man 3* and the *Iron Man 3* Poster. (*Id.* at 0:25:15 – 0:26:00, 0:50:30 – 0:52:30, 1:05:58 – 1:07:28, 1:15:58.)

**Plaintiff's Response to ¶ 21**

Disputed in part, as the *Radix* materials pre-date the *Iron Man* movies.

**Defendants' Reply to ¶ 21**

Plaintiff's contention is not responsive; Plaintiff thus admits the point.

**Defendants' Statement ¶ 22**

*Iron Man 2*, also starring Robert Downey Jr., was released on May 7, 2010. In that film Iron Man's armor has a red and gold color scheme, and glowing blue lights on the chest plate as in *Iron Man 3* and the *Iron Man 3* Poster. (Litvack Decl., Ex. D, at 0:19:24 – 0:19:51, 1:02:56 – 1:05:29, 1:26:34 – 1:28:07, 1:46:18 – 1:47:20.)

**Plaintiff's Response to ¶ 22**

Disputed in part, as the *Radix* materials pre-date the *Iron Man* movies.

**Defendants' Reply to ¶ 22**

Plaintiff's contention is not responsive; Plaintiff thus admits the point.

**Defendants' Statement ¶ 23**

*The Avengers*, also starting Robert Downey Jr., was released on May 4, 2012. In that film Iron Man's armor has a red and gold color scheme, and glowing blue lights on the chest plate as in *Iron Man 3* and the *Iron Man 3* Poster. (Litvack Decl., Ex. E, at 0:44:00 – 0:44:20, 1:13:53 – 1:13:59, 1:20:48 – 1:20:57, 1:50:06 – 1:50:21, 2:05:37 – 2:05:57.)

**Plaintiff's Response to ¶ 23**

Disputed in part, as the *Radix* materials pre-date the *Avenger* movie.

**Defendants' Reply to ¶ 23**

Plaintiff's contention is not responsive; Plaintiff thus admits the point.

**Defendants' Statement ¶ 25**

After BLT and Warren Nung were retained in early 2012, Nung reviewed the Iron Man 3 film script; as a result of that review and discussions with Sabel and his team (who had also reviewed the script and brainstormed with producers), BLT's artists developed "inspiration boards" and black and white pencil sketches. (Nung Decl. ¶¶ 5 – 7; Nung Tr. at 39:5 – 19, 45:11 – 15, 46:21 – 47:2, 54:13 – 15; Nuchols Tr. at 33:4 – 34:7, 40:4 – 23; Sabel Tr. at 30:8 – 11, 30:20 – 31:5.)

**Plaintiff's Response to ¶ 25**

In his deposition, Nung testified that "we get concept art from Disney from John [Sabel] through the process. They have designers and they have concept artists that are visualizing through the process of what the films looks like and designing as the film, and some of that material is shared." (Nung Tr. at 48:9-11). Nung testified that some concept art that came from John Sabel included work from Andy Park, Ryan Meindering, and other artists. (Nung Tr. 52:5-14). Andy Park and Ray Lai had met in the past and Park was familiar with Radix. R. Lai Dec. § 9). . . . The "pencil sketches" are photoshop layered files.

**Defendants' Reply to ¶ 25**

a.   Plaintiff does not dispute the facts in paragraph 25. The additional contentions made in response are irrelevant, but, at any rate, not inconsistent with the facts stated there, and Plaintiff thus admits the point.

b.   As to Andy Park: his alleged familiarity with "Radix" is immaterial.

c.   As to Plaintiff's contention that the "'pencil sketches' are photoshop layered

files": (i) Plaintiff does not "cit[e] to particular parts of materials in the record" to support the

contention, Fed. R. Civ. P. 56(c)(1)(A); and (ii) it is immaterial.

**Defendants' Statement ¶ 34**
Photos taken during the Special Shoot show Robert Downey Jr. looking down at BLT's concept sketches while engaging in kneeling and crouching poses – including the photos of Downey Jr. that BLT ultimately used to create the *Iron Man 3* Poster. (Litvack Decl., Ex. G; Nung Decl. ¶ 14 & Ex. D; Nuchols Tr. at 58:2 – 59:8.)

**Plaintiff's Response to ¶ 34**
Disputed in part. The photos used to create the Iron Man 3 Poster are cutouts from the photos. For example Robert Downey Junior's left arm was used in the poster as his right arm.

**Defendants' Reply to ¶ 34**

Plaintiff has failed to validly dispute the facts in paragraph 34.  To the contrary,

Plaintiff concedes that photos taken at the Special Shoot were used to create the *Iron Man 3*

Poster.  Plaintiff disputes none of the other facts in paragraph 34, and thus admits them.

**Defendants' Statement ¶ 35**
Robert Downey Jr., through a personal hairstylist present at the Special Shoot, styled his own hair for the shoot. (Nuchols Tr. at 57:4 – 57:10; Nung Decl. ¶ 9; Litvack Decl., Ex. R at BLT_000713.)

**Plaintiff's Response to ¶ 35**
Disputed in part, the hairstyle appears to be modeled up on the BLT sketches.

**Defendants' Reply to ¶ 35**

Plaintiff has failed to validly dispute the fact in paragraph 35.  Plaintiff's unsupported

speculation about how the "hairstyle appears to be modeled" is not admissible evidence, and

certainly does not rebut the sworn testimony and other evidence.  *See* Fed. R. Civ. P. 56(c)(1).

**Defendants' Statement ¶ 44**
During January 2013 the Marvel Studios visual effects team (VFX) sent Sabel and others a number of emails and renderings suggesting changes to the proposed Iron Man 3 Poster to have it conform with the depiction of the suit and the hero in Iron Man 3. Some of the VFX team's proposed changes were adopted and some were not, because while conformance to the film was important, the creative image for the poster was for the creative print and production teams to decide. (Litvack Decl., Ex. U; Nuchols Tr. at 102:1 – 109:10; 113:10 – 115:21, 122:11 – 123:2, 123:20 – 124:8, 125:15 – 127:24.)

**Plaintiff's Response to ¶ 44**

Disputed. Defendants facts contradict their earlier statements (para. 13, 14) that it was only the Creative Print Team at Disney, Sabel and Nuchols, that was responsible for the Iron Man 3 poster. The filmmakers at Marvel Studios had the final sign off for the poster, including Pasciullo. (Wiesner Dec. Ex. 12, MENT021548; Ex.13, MENT008934-35; Ex.14, MENT008596; Ex.15, MENT0008609-0008610 and 5KND000768-000780; Ex. 16, MENT0009384; Ex. 17, MENT003282).

**Defendants' Reply to ¶ 44**

Plaintiff has failed to validly dispute the facts in paragraph 44. Once again, there is no contradiction—people who "sign off" on the poster are plainly not the "creative team" that created the poster. *See* ¶¶ 13–14. Moreover, there is no evidence that "the filmmakers at Marvel Studios," any more than anyone else, had access to the Caliban Drawing, not least because the Lais never sent it to anyone. *See* ¶ 6; R. Lai Tr. 116:18 – 117:2, B. Lai Tr. 54:19 – 55:21.

**Defendants' Statement ¶ 45**

On January 23, 2013 a member of Sabel's team, Michelle Testa, emailed Inyoue requesting sourcing information for the visual assets in the draft *Iron Man 3* Poster to provide Marvel Legal to clear all licensing, including for stock photography. Inouye then uploaded BLT "call outs" for the *Iron Man 3* Poster to Disney's secure server. (Litvack Decl., Ex. V; Nuchols Tr. at 76:10 – 17; Sabel Tr. at 24:11 – 15.) BLT's call outs are visual reference sheets sourcing the images and files used in a draft comp. (Nung Decl. ¶ 13.) BLT's call outs identified the exact Special Shoot photos, as well as the other sources, used in the *Iron Man 3* Poster, and show that the photos used for Iron Man's head, shoulders, arms, and fist (among other elements) were all taken at the Special Shoot. (Nung Decl. ¶ 13 – 15 & Exs. C, D, and E.)

**Plaintiff's Response to ¶ 45**

Disputed. The elements from the Special Shoot used in the final image are two pieces of RDJ's body: the head and the left arm. The left arm had to be mirrored, presumably in photoshop, to make it a right arm. The torso and other portions of RDJ body were taken from a body stunt double. The body was pieced back together and greatly revised in the final image.

**Defendants' Reply to ¶ 45**

Plaintiff has failed to validly dispute the facts in paragraph 45; none of the assertions in Plaintiff's response contradict anything in paragraph 45. Plaintiff has thus admitted the facts.

## RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Plaintiff has not cross-moved for summary judgment; hence, any "Additional Material Facts" it puts forth are required to be pertinent to Defendants' motion for summary judgment. But they are not. In fact, as explained below and in Defendants' Reply Memorandum, Plaintiff's more than 130 new purported "facts" are tangential to the motion at bar, and are simply a transparent attempt to divert attention from the pertinent material facts.

Specifically, Plaintiff's "Additional Material Facts" are drafted as though this motion were about how well-known the Lai brothers were, and why they worked as freelancers at Marvel Comics. It is not, and no amount of deflection can make it so. Defendants' motion is about access to the Caliban Drawing, the lack of striking similarity between that drawing and the *Iron Man 3* Poster, and the independent creation of that poster, pure and simple—and that is where Plaintiff fails.

Defendants address Plaintiff's submission, in categorical fashion, below.

### A.    The Not Disputed Facts.

Defendant does not dispute the facts in the following paragraphs: 47, 48, 52, 106, 119, 120, 133, 134.

### B.    Not Disputed But Immaterial.

The vast majority of Plaintiff's additional facts, while undisputed, are not "material" to the pending motion for summary judgment. These are: Nos. 50, 51, 53, 54, 57–59, 63, 65–73, 74–77, 79–90, 93–97, 99, 100, 103–105, 107–118, 121–125, 128, 130, 131, 135, 136, 139–145, 148–159, 160, 162, 164–166, 168, 170–174, 176–178, 180, 181.

The facts put forth in these paragraphs are immaterial on their face for numerous reasons, including that: (1) they relate, at most, to other people's knowledge of the Lai brothers or *Radix*

21

generally, as opposed to the Caliban Drawing at issue on this motion (*e.g.* ¶ 50); (2) they are otherwise not material to Plaintiff's required proof of access to the Caliban Drawing under the governing legal standards (*e.g.* ¶ 65); and (3) they are not material to a "striking similarity" analysis under the governing legal standards.

### C.  Disputed But Immaterial.

While they are immaterial to Defendants' pending motion, nonetheless Defendants dispute the veracity of many of Plaintiff's additional facts, as follows:

| Plaintiff's Additional Material Fact | Dispute |
|---|---|
| 49 | Defendants dispute the purported fact that many people stopped by "the Lais' booth." Ray Lai's Declaration clearly suggests that "the booth" at the San Diego Comic Con in 1999 was CrossGen's, not "the Lais.'" (*See* R. Lai Dec. ¶ 11.) |
| 55 | Plaintiff's cited evidence does not establish that the Lais were recruited to Marvel "[b]ased on their work in *Radix*," but, accepting their version of the facts, at most it shows that Mr. Cebulski offered the Lais work in 2002. In any event, the Lais never provided Mr. Cebulski—or anyone—with the Caliban Drawing, at any time. (*See* ¶ 6; R. Lai Tr. 116:18 – 117:2, B. Lai Tr. 54:19 – 55:21.) |
| 56, 60-62 | Mr. Cebulski and Ray Lai could not have exchanged the business cards referenced in paragraph 60 at a comic book convention in 2001 because Mr. Cebulski was not employed by Marvel Comics until 2002, and did not receive business cards for several months thereafter. (*See* Litvack Reply Decl., Ex. A [Cebulski Tr.] at 81:9 – 82:16.) |
| 64 | The exhibit cited in paragraph 64 establishes that the website "contains 22 images," not "11 images." |
| 78 | The cited evidence does not support the proposition that the Lais stopped working on *Radix* "[a]s a result of the MIT incident.' |
| 91, 101-02 | None of the cited evidence is to a "news story." |
| 98 | None of the evidence in the record (other than the cited passages in Ray Lai's instant declaration) support the assertion that any press releases concerning the Lai brothers' hiring were "notable" in any way. |
| 126 | Mr. Pasciullo's responsibilities on the *Iron Man 3* campaign as Vice President of Marketing involved merely "reviewing and giving comments on the marketing plans and creative for Marvel Studios." (Pasciullo Tr. 20:22 – 21:9.) In any event, the Lais never provided Mr. Pasciullo—or anyone— with the Caliban Drawing, at any time. (*See* ¶ 6; R. Lai Tr. 116:18 – 117:2, B. Lai Tr. 54:19 – 55:21.) |

| Plaintiff's Additional Material Fact | Dispute |
|---|---|
| 129, 137 | *See* ¶ 127, *infra* |
| 132 | Plaintiff's characterization of Mr. Nung's deposition testimony is not a "fact," and is not supported by the cited evidence. |
| 138 | The cited evidence relates to a January 25, 2013 exchange, and thus does not support the stated proposition.   To be sure, the record establishes the design of the *Iron Man 3* Poster was a months-long, iterative process and that the overall theme and design of the poster drew from typical comic book scenes-a-faire, Iron Man's own decades-long publication history, the previous *Iron Man* films, and key sequences from *Iron Man 3* specifically. (*See* ¶¶ 12, 19, 21 – 23, 40 – 43, 46; Janson Report ¶¶ 56, 58 – 59, 64.)  But there is no evidence to support the stated contention in paragraph 138. |
| 146 | The cited report does not show "almost exact proportions in the bodies" of the two figures, whatever that means.  The analysis is also immaterial, as it is utterly insufficient to show "striking similarity" as a matter of law. (*See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Dkt. 98) at 19 – 21; Defendants' Reply Memorandum at 7 – 9.) |
| 147 | Disputed because Westwood's report is, on its face, meaningless.  Not only does Westwood have no experience in the comic, film, or marketing industries, his cursory "analysis" not peer-reviewed, does not account for any control variables, and ultimately does not support his proffered conclusion.  Indeed, Westwood's "analysis" consisted of manipulating the two images at issue in Photoshop, including by overlaying one over the other and making "modest adjustment" to "anatomical similarities" where those similarities were "not perfect." (Dkt. 113, Ex. 20 ¶¶ 50 – 51; *see also* Reply Memorandum at 8 – 9.)  The proposition is immaterial because, even if Westwood had a valid basis to offer the opinion set forth in paragraph 147, it would be irrelevant to the striking similarity analysis. (*See* Reply Memorandum at 9.) |
| 161 | Paragraph 161 is not a "fact" – it is a lengthy excerpt of a deposition transcript relating to the hiring of the Lais and is immaterial to Plaintiff's access case, because the Lais never provided Mr. Cebulski—or anyone— with the Caliban Drawing, at any time. (*See* Defendants' Statement ¶ 6; R. Lai Tr. 116:18 – 117:2, B. Lai Tr. 54:19 – 55:21.) |
| 163 | Plaintiff's cited evidence does not establish that it was "unusual" for Marvel Comics to create comics for third parties.  Mr. Brevoort testified only that *Guard Force* was a "custom comic for the Army National Guard," but that he otherwise did not remember it.  Mr. Bogart testified that Guard Force was a "unique book" and that he recalled the Lais worked on it, but that's "all [he] know[s]" on the subject. (Bogart Tr. 26:11 – 17.) |
| 167 | Disputed in part – nothing in the cited documents demonstrates that Mr. Cebulski was "deeply" involved with *Guard Force*, whatever that means – but immaterial. |

| Plaintiff's Additional Material Fact | Dispute |
|---|---|
| 169 | Disputed in part due to the inherent vagueness of the formulations "numerous emails" and "getting the details in the comic book right," but immaterial. |
| 175 | Nothing in the cited email contradicts Brevoort's deposition testimony or establishes his specific familiarity with *Radix*.  It is also immaterial to Plaintiff's access case because the Lais never provided Mr. Brevoort—or anyone—with the Caliban Drawing, at any time.  (*See* Defendants' Statement ¶ 6; R. Lai Tr. 116:18 – 117:2, B. Lai Tr. 54:19 – 55:21.) |
| 179 | There is nothing contradictory, either logically or in the record, between the Lais working on *Thor* and Mr. Brevoort being unaware of their work in *Radix* (*see* paragraph 175).  It is immaterial because whether Mr. Brevoort had "seen or heard of Radix" (as opposed to the Caliban Drawing) is irrelevant, and because there is no suggestion – even in Plaintiff's "additional material facts" – of any connection between Brevoort and any of the creators of the *Iron Man 3* Poster.  (*See* ¶¶ 4-6.) |

  **D.**  **Disputed.**

**Plaintiff's Statement ¶ 127**

Numerous individuals at both Disney and Marvel were involved in the creation of the Iron Man 3 poster.  They included Pasciullo, Dillon, Nuchols, and Sabel, and others.  The creators also worked with an outside agency, BLT.  Some of those who worked on the Iron Man 3 campaign had previously been employed at Marvel Comics, such as Pasciullo and Dillon. (Pasciullo Tr. 24:2-6).

**Defendants' Response to ¶ 127**

   Disputed in part, to the extent Plaintiff seeks to cast Messrs. Pasciullo and Dillon as "the creators" of the *Iron Man 3* Poster, for the reasons stated in ¶ 14(c) *supra*.  Furthermore, the fact is immaterial since there is no evidence that either of them ever saw the Caliban Drawing.  And Mr. Pasciullo, the only one of the two to be deposed, denied ever seeing it.  *See* ¶ 6; R. Lai Tr. 116:18 – 117:2, B. Lai Tr. 54:19 – 55:21.  The fact that Messrs. Pasciullo and Dillon "had previously been employed at Marvel Comics" is also immaterial.  *See, e.g.*, Reply Memorandum at 6 n.9.

Dated:  May 8, 2019
        New York, New York

/s/ Sanford M. Litvack

Sanford M. Litvack
CHAFFETZ LINDSEY LLP
1700 Broadway, 33rd Floor
New York, New York 10019
Telephone: (212) 257-6960
Fax: (212) 257-6950
sandy.litvack@chaffetzlindsey.com

Benjamin A. Fleming
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100
benjamin.fleming@hoganlovells.com

*Attorneys for Defendants*