UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

HORIZON COMICS PRODUCTIONS INC.,

                            Plaintiff,

            -v-

MARVEL ENTERTAINMENT, LLC, et al.,

                            Defendants.

16-CV-2499 (JPO)

OPINION AND ORDER

---------------------------------------------------------------

J. PAUL OETKEN, District Judge:

       Plaintiff Horizon Comics Productions, Inc. ("Horizon") initiated this action against Defendants Marvel Entertainment, LLC; MVL Film Finance, LLC; Marvel Worldwide, Inc.; Marvel Studios, LLC; DMG Entertainment, LLC; and Walt Disney Studios Motion Pictures, Inc. (collectively, "Marvel"), alleging copyright infringement under the Copyright Act, 17 U.S.C. § 101 et seq.  (Dkt. No. 2 ("Compl.").)  Marvel has moved for summary judgment pursuant to Federal Rule of Civil Procedure Rule 56, on the grounds that Marvel did not have access to Horizon's work at issue and that Marvel's *Iron Man 3* poster was independently created.  (Dkt. No. 96.)  For the reasons that follow, the motion is granted.

**I.    Background**

      **A.    Factual Background**

       The following facts are drawn primarily from the parties' Rule 56.1 statements, and are not subject to genuine dispute unless otherwise noted.

          **1.    The Posters at Issue**

       Marvel is the copyright holder, creator, and distributor of the *Iron Man* and *Avenger* movie franchises.  (Compl. ¶ 1.)  After releasing the first two *Iron Man* movies, Marvel dropped another blockbuster, *Iron Man 3*, on May 3, 2013.  (Dkt. Nos. 111, 115 (collectively, "SUF")

¶ 24.) Around the time of the movie's debut, Marvel released an *Iron Man 3* poster (the "*Iron Man 3* Poster") on Yahoo! and displayed it throughout U.S. and Canadian theaters. (SUF ¶ 46.) The *Iron Man 3* Poster features Iron Man—a fictional superhero played by the actor Robert Downey Jr. ("RDJ")—kneeling and crouching in his red and gold armor. (*See* Compl. at 14.)

Around twelve years prior to the release of *Iron Man 3*, in 2001, comic book artists Ben and Ray Lai, the brothers who own Horizon, created a character named Caliban for their comic book series called *Radix*. (SUF ¶¶ 1–3.) In connection with their comic book series, the Lai brothers also designed a drawing depicting Caliban with his mechanized suit of armor in a kneeling pose (the "Caliban Drawing"). (SUF ¶ 3; *see* Compl. at 14.) Three editions of *Radix* were ultimately published between 2001 and 2002, but none of them contained the Caliban Drawing. (SUF ¶ 2, 7.)

Horizon alleges that Marvel infringed its copyright in the Caliban Drawing by copying it in designing the *Iron Man 3* Poster. (Compl. ¶ 31.) A side-by-side comparison of the two images is reproduced below.



### 2. The Lai Brothers' Interactions with Marvel

After *Radix* came out, it gathered substantial interest in the comic industry. (SUF ¶¶ 66–68.) According to Horizon, at least six current Marvel employees were aware of *Radix*, including William Jema, Chester Bror Cebulski, Thomas Brevoort, Jeph Loeb, Andy Park, and Joe Quesada. (SUF ¶¶ 4, 6.) Among them, Cebulski and Brevoort have had working relationship with the Lai brothers.

Cebulski first met Ray Lai in 1999 at the San Diego Comicon. (SUF ¶ 55.) While attending another comic book convention in 2001, Cebulski spoke to the Lai brothers again at their *Radix* booth, where a copy of the Caliban Drawing was displayed. (SUF ¶¶ 56, 59.) Later, in March 2002, Cebulski called the Lai brothers and tried to hire them to work for Marvel. (SUF

3

¶ 73.)  The Lai brothers declined Cebulski's offer at that time.  (*Id.*)  Then, in September 2002, Cebulski again emailed the Lai brothers through an address embedded in Horizon's website horizoncomics.com, on which webpage a copy of the Caliban Drawing was hosted.  (SUF ¶¶ 64, 83–88.)  Soon after, the Lai brothers went to work for Marvel.  (SUF ¶ 90.)

In addition, Tom Brevoort, then a Senior Editor at Marvel Comics, offered the Lai brothers a position as lead artists on the *Thor* comic books in 2002.[1]  (SUF ¶ 97.)  After accepting the offer from Brevoort, the Lai brothers did some work on *Thor*.  (SUF ¶ 103.)  At the Lai brothers' request, Marvel also hired the colorist for *Radix*—Brian Reber—to work on *Thor*.  (SUF ¶¶ 54, 104.)  Reber continues to work at Marvel Comics.  (SUF ¶ 105.)

### 3. The Creation of the *Iron Man 3* Poster

About a decade after these events, around 2012, Marvel started to work on the *Iron Man 3* Poster, with Steve Nuchols and John Sabel leading the efforts and BLT Communications ("BLT") serving as the outside vendor.  (SUF ¶¶ 12–13, 16.)  To begin their work on the *Iron Man 3* Poster, BLT's artists developed inspiration boards and black and white pencil sketches.  (SUF ¶ 25.)  These inspiration boards featured many figures in crouching or kneeling postures, as well as characters wearing mechanized suits of armor.  (SUF ¶ 27.)  Based on the inspiration boards, the BLT artists created black and white pencil sketches of Iron Man and other characters in various poses.  (SUF ¶ 29.)

Then, on August 5, 2012, Marvel hosted a photoshoot featuring RDJ to produce pictures for the poster design.  (SUF ¶¶ 31, 33.)  BLT eventually used several of the pictures that feature RDJ in kneeling and crouching poses to create the *Iron Man 3* Poster.  (SUF ¶ 34.)

---

[1] Horizon also avers that it was either Joe Quesada or William Jemas who suggested that Brevoort hire the Lai brothers.  (SUF ¶ 112.)

4

Based on the *Iron Man 3* trailers and relevant market research, Sabel and Nung decided on the concept for the *Iron Man 3* Poster. (SUF ¶¶ 39–40.) Thereafter, BLT created various drafts of the poster, and the Marvel executives met on November 30, 2012, to review BLT's proposed designs. (SUF ¶¶ 41–42.) Finally, the *Iron Man 3* Poster was approved by the film's lead producers on February 2, 2013, and was released on February 27, 2013. (SUF ¶ 46.)

Two of Cebulski's friends, Michael Pasciullo and Tim Dillon, also worked on the marketing campaign for *Iron Man 3*. (SUF ¶¶ 118–20, 124–25.) Together, Pasciullo and Dillon were responsible for providing artistic materials and feedback on designs of the *Iron Man* 3 poster. (SUF ¶ 129–31.)

### B. Procedural History

Horizon commenced this action on April 4, 2016, asserting claims of copyright infringement based on Marvel's *Iron Man 3* Poster and the depictions of Iron Man's armor. (Dkt. No. 1.) Marvel moved to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim. (Dkt. No. 35.) The Court dismissed Horizon's infringement claim based on the depictions of Iron Man's armor, but allowed the claim premised on the *Iron Man 3* Poster's similarity to the Caliban Drawing to proceed. (Dkt. No. 47 at 11, 14.) After extensive discovery, Marvel now moves for summary judgment on the remaining claim. (Dkt. No. 96.) The briefing on this motion is complete, and the motion is ripe for resolution. (Dkt. Nos. 96, 105, 110, 114.) The Court heard oral argument on May 29, 2019. (*See* Dkt. No. 119.)

## II. Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as

a whole, a rational jury could find in favor of the non-moving party. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014). The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (second quoting *Lunds, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

**III.   Discussion**

To establish a claim of copyright infringement, a plaintiff must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Because the parties do not contest Horizon's copyright in the Caliban Drawing for purposes of this motion (Dkt. No. 105 at 11 n.6), the sole remaining question is whether Horizon can satisfy the second element.

The second element requires a plaintiff to demonstrate "that his work was actually copied." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (internal quotation marks and citation omitted). "Because direct evidence of copying is seldom available," a plaintiff may establish actual copying by introducing circumstantial evidence that shows (1) the

6

creator of the infringing work has access to the copyrighted material, and (2) the two works share similarities that are probative of copying. *Id.*

In addition, "[i]f the copyright owner fails to produce evidence of both access and probative similarity," *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 439 (S.D.N.Y. 2011), the owner may still prove actual copying by showing that the works in question "are so strikingly similar as to preclude the possibility of independent creation," *Repp & K & R Music, Inc. v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997).

Finally, after a plaintiff has established a prima facie case of infringement, the defendant may introduce evidence of independent creation as an affirmative defense. *Id.* But the burden of proof for this affirmative defense is a stringent one, requiring "strong, convincing, and persuasive evidence." *Webb v. Stallone*, 910 F. Supp. 2d 681, 685 (S.D.N.Y. 2012) (internal quotation marks and citation omitted).

Here, in light of the fact that Horizon does not introduce any direct evidence of copying, Marvel argues that Horizon's copyright infringement claim should be dismissed because (1) Marvel did not have any access to the Caliban Drawing, (2) the two posters are not "strikingly similar," and (3) Marvel independently created the *Iron Man 3* Poster. The Court addresses each argument in turn.

### A.     Access

It is well established that "[a]ccess means that an alleged infringer had a 'reasonable possibility'—not simply a 'bare possibility'—of [seeing] the prior work." *Jorgensen*, 351 F.3d at 51 (quoting *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988)). A plaintiff must present "significant, affirmative and probative evidence" to support the claim of access. *Id.* (quoting *Scott v. Paramount Pictures Corp.*, 449 F. Supp. 518, 520 (D.D.C. 1978)). To demonstrate access, a "plaintiff must show either (1) 'a particular chain of events' or a 'link'

from his work to the creators of the allegedly infringing work, or (2) that plaintiff's work was 'widely disseminated.'" *Webb*, 910 F. Supp. 2d at 686 (quoting *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 538 (S.D.N.Y. 2007)).

Here, Horizon's principal argument is that because Marvel employees William Jema, Chester Bror Cebulski, Tom Brevoort, Jeph Loeb, Andy Park, and Joe Quesada (the "Access Individuals") were aware of *Radix* (Dkt. No. 110 at 9–15), these individuals could be the links between the creators of the *Iron Man 3* Poster and the Caliban Drawing (Dkt. No. 110 at 15–16). The evidence of these links, Horizon argues, supports a reasonable possibility that the creators of the *Iron Man 3* Poster had access to the Caliban Drawing.

Marvel contends that there is no evidence that any of the Access Individuals have ever seen the Caliban Drawing (Dkt. No. 105 at 13–16), nor is there evidence that they in fact shared the Caliban Drawing with the creators of the *Iron Man 3* Poster (Dkt. No. 105 at 16–17). Because the parties' dispute boils down to whether any of the Access Individuals could have served as a nexus between the Caliban Drawing and the creators of the *Iron Man 3* Poster, the Court examines the evidence with respect to each of the Access Individuals in turn.

First, Horizon argues that Cebulski—now editor-in-chief of Marvel Comics—provides a link between the Caliban Drawing and the creators of the *Iron Man 3* Poster. Specifically, Horizon claims that Cebulski has seen the Caliban Drawing on at least two occasions. (Dkt. No. 110 at 9–11.) First, Horizon asserts that Cebulski saw the drawing in 2001 when he met the Lai brothers at a comic convention at which the Caliban Drawing was displayed at the *Radix* booth. (Dkt. No. 110 at 9–10; SUF ¶¶ 56, 59.) In addition, Horizon also claims that Cebulski would have seen the Caliban Drawing when Cebulski accessed Horizon's official website (horizoncomics.com). (Dkt. No. 110 at 10–11; SUF ¶¶ 64, 83–88.) According to Horizon,

Cebulski necessarily accessed Horizon's website and saw the Caliban Drawing, because he contacted the Lai brothers using an email address embedded in the website which also hosted the Caliban Drawing.  (*Id.*)  Horizon then goes on to argue that because Cebulski is also friends with two other Marvel employees, Pasciullo and Dillon, who were allegedly involved in the development of the *Iron Man 3* Poster, there is a direct link between his access to the Caliban Drawing and the developers of the *Iron Man 3* Poster.  (Dkt. No. 110 at 14–15.)

Regardless of whether Cebulski has actually seen or saved a copy of the Caliban Drawing, the Court concludes that Cebulski could not be a nexus, because no evidence in the record could support the finding of a reasonable possibility that Cebulski shared a copy of the Caliban Drawing with Pasciullo or Dillon.  As a matter of fact, each of the witnesses who were involved in creating the *Iron Man 3* Poster denied ever seeing the Caliban Drawing.[2]  (SUF ¶ 8.)  And Horizon fails to present any evidence supporting a contrary conclusion.  To support its assertion that Cebulski did share the image with the actual creators of the *Iron Man 3* Poster, Horizon relies only on Cebulski's alleged "friendship" with Pasciullo and Dillon.  It is true that a court may infer that a reasonable possibility of access exists if "the author sent the copyrighted work to a third party intermediary who has a *close relationship* with the infringer."  *Jorgensen*, 351 F.3d at 53 (quoting *Towler v. Sayles*, 76 F.3d 579, 583 (4th Cir. 1996)).  But such "close relationship" often exists if the intermediary supervises or otherwise contributes creative ideas to the infringer.  *See, e.g.*, *Gaste v. Kaiserman*, 863 F.2d 1061, 1067 (2d Cir. 1988) (inferring a singer's access to the copyrighted work through his publisher who has received a copy of the work); *Towler*, 76 F.3d at 583 (refusing to infer access where the intermediary used to worked

---

[2] Horizon challenges the credibility of Cebulski and Brevoort (SUF ¶ 8), but neither of them was involved in the development of the *Iron Man 3* Poster.

9

with the defendant's predecessor on unrelated projects); *Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 944 (8th Cir. 1992) (inferring access where the intermediary was "in a position to provide suggestions" to the defendants); *Mowry v. Viacom Int'l, Inc.*, No. 03 Civ. 3090, 2005 WL 1793773, at *5 n.8 (S.D.N.Y. July 29, 2019) (refusing to infer access where the intermediary was "acquainted with" the defendant); *but see Price v. Fox Entm't Grp., Inc.*, No. 05 Civ. 5259, 2007 WL 241389, at *8 (S.D.N.Y. Jan. 27, 2007) (inferring a reasonable possibility of access when the intermediary and the defendant are "business friends").  Here, Horizon fails to introduce any evidence to show that Cebulski was in any position to provide creative suggestions to either Pasciullo or Dillon, or otherwise had any close relationship with them.  In light of the dearth of evidence of Cebulski's "close relationship" with Pasciullo and Dillon, and Pasciullo's unequivocal denial of access to the Caliban Drawing (SUF ¶ 8),[3] the Court rejects Horizon's theory of access predicated on Cebulski, 3 *Patry on Copyright*, § 9:29 ("[A]cquaintance or friendship is not 'access' to a work in the copyright sense.").

Second, Horizon contends that Pasciullo and Dillon might be the links between the Caliban Drawing and the creators of the *Iron Man 3* Poster, because they "were recent transplants from Marvel Comics in New York and friends with C.B. Cebulski." (Dkt. No. 110 at 14.)  Horizon does point to evidence sufficient to show that Pasciullo and Dillon played significant roles in creating the *Iron Man 3* Poster. (*See* Dkt. No. 110 at 14–15.)  But as discussed earlier, Horizon cannot rely on the fact of their friendship with Cebulski alone to establish Pasciullo and Dillon's access to the Caliban Drawing.  And the fact that Pasciullo and Dillon used to work for Marvel Comics has no bearing on the question of their access to the Caliban Drawing.

---

[3] Horizon never deposed Dillon. (Dkt. No. 114 at 6.)

Third, Horizon argues that Quesada could be a link because Quesada was not only aware of *Radix*, but also sits on a Creative Committee which was allegedly involved with the *Iron Man 3* Poster design. (Dkt. No. 110 at 12–13.) According to Horizon, Quesada met the Lai brothers in 2000 and suggested that Marvel hire them to work on the comic *Thor*. (*Id.*) But Horizon does not introduce any evidence to show that Quesada ever actually saw the Caliban Drawing. Quesada's awareness of *Radix* does not automatically translate into knowledge of one discrete piece of promotional art that was not never published as part of the *Radix* series. In the absence of any evidence suggesting a reasonable possibility that Quesada has seen the Caliban Drawing, Horizon has failed to show access through Quesada.

Finally, Horizon also points to several individuals who had differing degrees of working relationships with the Lai brothers and who were each allegedly aware of *Radix*, such as Brevoort, Loeb, Jemas, Reber, and Park. (Dkt. No. 110 at 13–14.) However, there is virtually no evidence in the record that shows any one of these individuals either would have seen the Caliban Drawing or would have been involved in the *Iron Man 3* Poster design, let alone both. Horizon's arguments that these individuals could provide an access nexus is founded on nothing more than speculation.

To sum up, Horizon's attempt to show a genuine dispute of fact as to access fails because Horizon does not introduce any "significant, affirmative and probative evidence," *Jorgensen*, 351 F.3d at 51, of a "a particular chain of events," *Webb*, 910 F. Supp. 2d at 686, sufficient to permit a reasonable jury to infer that the creators of the *Iron Man 3* Poster had reasonable possibility of seeing the Caliban Drawing.[4]

---

[4] Horizon challenges the credibility of Cebulski and Brevoort on the basis of certain discrepancies in their deposition testimonies. (Dkt. No. 110 at 2–3, 21–22.) But even discounting the challenged portions of these depositions, Horizon still fails to introduce any

Undaunted, Horizon argues in the alternative that the Caliban Drawing was "widely disseminated" in a "specialized market" consisting of "comic industry professionals," providing a basis from which access can be inferred. (Dkt. No. 110 at 18–19.) Horizon's argument, which focuses on the dissemination of the *Radix* series generally rather than the Caliban Drawing in particular, misconstrues the works at issue. In order to satisfy the "widely disseminated" standard, Horizon needs to show the Caliban Drawing, rather than *Radix*, was widely disseminated. The alleged popularity of *Radix* does not mean that the Caliban Drawing was also widely disseminated, particularly in light of the undisputed fact that the *Radix* comic series itself did not even contain the Caliban Drawing. Accordingly, Horizon has failed to produce facts sufficient to establish the wide dissemination of the Caliban Drawing.

### B.     Striking Similarity

Horizon seeks to overcome its failure of proving access by arguing that the two works are "strikingly similar." (Dkt. No. 110 at 22–23.) "If the two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access." *Repp*, 132 F.3d at 889 (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995)) (internal quotation marks omitted).

Under the stringent standard of "strikingly similar," Horizon is required to show that the two works at issue are "so identical as to preclude any reasonable possibility of independent creation." *Dimmie v. Carey*, 88 F. Supp. 2d 142, 150 (S.D.N.Y. 2000). In other words, it is insufficient for Horizon to show "[t]he mere existence of multiple similarities"[;] instead, the

---

"significant, affirmative and probative evidence" that shows either Cebulski or Brevoort passed a copy of the Caliban Drawing to the creators of the *Iron Man 3* Poster. *Jorgensen*, 351 F.3d 51. And absent any evidence calling into question the credibility of those creators, who unequivocally denied having seen the Caliban Drawing, Horizon's claim of access must fail.

similarities must be so striking as to compel the conclusion that "copying is the only realistic basis for them." *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 543 (S.D.N.Y. 2007).

Here, Horizon relies exclusively on its expert report, which describes several alleged similarities between the two works with respect to the figures' anatomical structures, faces and heads, and camera views. (Dkt. No. 113-22 ("Westwood Report") ¶¶ 49–64.) But Horizon's argument suffers from two fatal defects.

First, the Westwood Report fails to offer an "unequivocal opinion" about the striking similarity of the two works. *Cf. Bunick v. UPN*, No. 06 Civ. 2833, 2008 WL 1968305, at *6 (S.D.N.Y. Apr. 30, 2008) (noting that the Second Circuit has "require[ed] 'unequivocal opinions' about the 'striking similarity' of the compared works" to survive summary judgment). Indeed, nowhere does the Westwood Report state that the "two works are so strikingly similar as to preclude the possibility of independent creation." *Repp*, 132 F.3d at 889 (citation omitted). At most, the report states that the similarities in the anatomical structures of the two figures render it "highly unlikely . . . approaching impossible" for the *Iron Man 3* Poster to be independently created. (Westwood Report ¶ 55.) But when examining the specifics of the drawings, the Westwood report is more equivocating. For example, in describing the faces and heads of the two figures, the Westwood Report points out their "noteworthy similarities," but does not identity any "striking similarities" between the two works. (Westwood Report ¶ 56.) In addition, the Westwood Report admits that the similarities with respect to the images' camera views are not readily apparent at first sight, but would require "careful viewing of the two images" to discern. (Westwood Report ¶ 63.) In sum, because the Westwood Report—on which Horizon relies exclusively—never concludes that the similarities between the two works would

preclude any reasonable possibility of independent creation, Horizon fails to meet the stringent standard of "strikingly similar."

Second, even crediting Horizon's reliance on the Westwood Report's characterizations, there remain enough differences between the two works to "foreclose a finding of striking similarity." *Price v. Fox Entm't Grp., Inc.*, 499 F. Supp. 2d 382, 388 (S.D.N.Y. 2007). For example, as Marvel correctly points out, there are apparent "differences in pose, differing placement of blue lights, and significantly different overall coloring" between the two works. (Dkt. No. 105 at 20.) Additionally, the *Iron Man 3* Poster depicts a battle scene with Iron Man crouching "on a piece of debris floating in the ocean," whereas the Caliban Drawing shows an armored figure appearing "in a void, with no background or context whatsoever." (*Id.*) In light of these differences between the two works, the Court concludes "that no reasonable juror could find the two works so strikingly similar as to justify an inference of copying and preclude the possibility of independent creation." *Price*, 499 F. Supp. 2d at 387–88.

### C. Independent Creation

Finally, even if the Court assumes that Horizon could have established a prima facie case of infringement, Marvel would be entitled to summary judgment on the basis of its evidence of independent creation of the *Iron Man 3* Poster. In contrast to Horizon's virtually non-existent evidence of copying, Marvel has introduced unrebutted evidence showing its independent creation of the *Iron Man 3* Poster.

As established by Marvel, the work on the *Iron Man 3* Poster began in 2012 when Sabel and Nuchols at the Walt Disney Studios Motion Pictures ("Walt Disney") retained Warren Nung of BLT Communications to create posters for *Iron Man 3*. (Dkt. No. 105 at 5; SUF ¶¶ 12–13, 16.) The creative team for the *Iron Man 3* Poster then developed inspiration boards and sketches with images sourced from prior *Iron Man* movies and comics. (Dkt. No. 105 at 5–6; SUF ¶ 25.)

More importantly, Marvel arranged a photo shoot featuring RDJ to produce photographs for poster design.  (Dkt. No. 105 at 7–8; SUF ¶¶ 31, 33.)  And it was photos from this shoot featuring RDJ kneeling and crouching that were ultimately used to create the *Iron Man 3* Poster.  (Dkt. No. 105 at 7; SUF ¶ 34.)  The creative teams also utilized battle scenes from *Iron Man 3* trailers to create the background in the *Iron Man 3* Poster.  (Dkt. No. 105 at 8; SUF ¶¶ 39–40.)

       Horizon does not offer any evidence to rebut this evidence submitted by Marvel showing that the *Iron Man 3* Poster was independently designed.  It instead argues that because the record lacks an image showing RDJ in the exact same pose as the *Iron Man 3* Poster, the final poster was not independently created.  (Dkt. No. 110 at 23–24.)  The Court is not persuaded.  Creative processes invariably involve minor tweaks here and there, and the fact that the pose reflected in the final version of the poster is slightly different from the RDJ pictures does not create a genuine dispute of fact with respect to whether the *Iron Man 3* Poster was independently designed based on those pictures.  Indeed, the record contains many independently designed sketches and photos at least as similar to the final poster as is the Caliban Drawing.  (*See* Dkt. No. 105 at 6.)  In conclusion, because the "strong, convincing, and persuasive evidence" of independent creation in the record is not subject to genuine dispute, Marvel is entitled to summary judgment in its favor.  *Webb*, 910 F. Supp. 2d at 685.

### IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motion at Docket Number 96 and to close this case.

SO ORDERED.

Dated: July 15, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge